WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-01695-004-TUC-JAS (EJM) |
|---|---|
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Samuel Lee Berrelle Rakestraw, III, | |
| Defendant. | |

Pending before the Court is a Motion to Suppress Statements filed by defendant Samuel Rakestraw, III ("Rakestraw").   (Doc. 1135.)  For the reasons discussed below, it is recommended that the District Court grant the motion and suppress the statements.

## FACTUAL BACKGROUND

The defendant is charged with eighteen other individuals in a Second Superseding Indictment dated October 20, 2021, with offenses stemming from his alleged involvement in a street gang known as the Western Hills Bloods.  (Doc. 811.)[1]  The defendant is charged in a RICO conspiracy, the objects of which are murder, other violent acts, drug trafficking, and obstruction of justice (Count One).   He is also charged with the following offenses related to the RICO conspiracy: Violent Crime in Aid of Racketeering – Conspiracy to Commit Murder (Count Two); Violent Crime in Aid of Racketeering – Murder (Count Three); and Use of a Firearm During and in Relation to a Crime of Violence Resulting in

---

[1] A Third Superseding Indictment was returned on April 6, 2022. Because no defendants or charges were added, the Court refers to the Second Superseding Indictment which was pending when the instant motion was filed.

Death (Count Four).

On February 21, 2022, the defendant filed a Motion to Suppress his statements made during a custodial interview on September 14, 2015.   (Doc. 1135.)  The defendant argues that his statements were obtained involuntarily and in violation of *Miranda*.  The defendant argues that he was not properly advised of his *Miranda* rights, and therefore, could not have knowingly, intelligently, and voluntarily waived those rights.  Specifically, he was never told that he had the right to stop answering questions or request an attorney at any time during the interview.  The defendant also argues that he did not validly waive his *Miranda* rights because the officer who read him his rights never asked him if he was willing to waive his right to remain silent and right to counsel and speak with law enforcement.  The defendant also argues that his statements were involuntary for these same reasons, as well as because the interrogating officer made a disparaging racial remark that implied that he "was 'good for nothing.'"

The government argues that the interrogating officer properly advised the defendant of his *Miranda* rights, and that *Miranda* does not require the officer to also inform the defendant that he has the right to stop questioning or request counsel at any time. (Doc. 1200.)  The government argues that the defendant impliedly waived his *Miranda* rights by never invoking his rights and voluntarily answering the officer's questions throughout the interview.   Additionally, the government claims that the "defendant's prior contact with law enforcement suggests that he had previously been informed of his *Miranda* rights in other instances, further supporting his knowing and intelligent *Miranda* waiver in this instance."  Finally, the government argues that the defendant's statements were voluntary because there is no evidence of coercive police activity.

The Court held a hearing on the motion to suppress on March 30, 2022.  The government called Tucson Police Department ("TPD") Detective Alexandra Frieberg as a witness.  She did not administer the *Miranda* warnings to the defendant, but she took part in the custodial interview on September 14, 2015.  The detective who administered the *Miranda* warnings passed away unexpectedly in 2019.  The Court will first set forth the

1    pertinent portions of the interview before turning to Detective Frieberg's testimony.

2         **September 14, 2015 Interview.**

3         On September 14, 2015, a custodial interview was conducted of the defendant.   The

4    law enforcement officers present for the interview were TPD Detectives Barber and

5    Frieberg, and ATF Special Agent Berlin.   In response to Detective Barber's question of

6    whether Rakestraw knew why he was in custody, Rakestraw stated: "No, sir."   (9/14/15

7    Interview Transcript at 2.)   Detective Barber tells Rakestraw that he wants to talk to him

8    "about that," but explains that because Rakestraw is in handcuffs, he has to read him his

9    rights. *Id.* at 2-3.   The rights provided are as follows:

10
11        DETECTIVE BARBER:  You have the right to remain silent.  Anything you
          say can and will be used against you in a court of law.  You have the right to
12        the presence of an attorney to assist you during questioning and to be with
          you during questioning if you so desire.   If you cannot afford an attorney,
13        you have the right to have an attorney appointed to you prior to questioning.
          Do you understand your rights?

14        SAMUEL RAKESTRAW: Yes, sir.

15   *Id.* at 3.

16        Detective Barber does not ask Rakestraw if he is willing to waive his rights and

17   speak with him.  Rather, he begins asking background questions.  Rakestraw states that he

18   is twenty-one-years-old, obtained his GED when he was 18, and finished a semester at

19   Pima Community College last year. *Id.* at 3-4.   However, he has been working at Tucson

20   Windows and Doors because he is on Intensive Probation as the result of a state case, and

21   has to pay fines every month. *Id.* at 4.   In response to Detective Barber's question of why

22   he is on Intensive Probation, Rakestraw explains that it is the result of a prohibited

23   possessor conviction. *Id.* at 5.   Rakestraw adds that he did not know that his conviction as

24   a juvenile made him a prohibited possessor. *Id.*   Rakestraw explains that if he successfully

25   completes probation, the conviction will become a misdemeanor. *Id.*

26        Detective Barber asks Rakestraw if he has been "doing any gang banging lately."

27   *Id.* at 6. Rakestraw states that he has just been working and doing community service

28   mandated by probation and as a result of a domestic violence charge. *Id.*   He explained

that he recently "dropped dirty" and, as a result, he had "to go serve a couple days in the Mission" (which is apparently a jail) and just got out last night. *Id.* Detective Barber made some inquiries about when Rakestraw checked into the Mission, apparently because Detective Barber had information that the check-in time was two hours later than Rakestraw claimed. *Id.* at 6-8.

Detective Barber asks Rakestraw to tell him how his day went before he checked into the Mission. *Id.* at 9. Rakestraw explained that he went to community service from 9:00 a.m. to 12:00 p.m., and then went to get something to eat. *Id.* The following conversation occurred about where the defendant had lunch:

DETECTIVE BARBER: Where'd you eat?

SAMUEL RAKESTRAW: At Wings and Rice it's called, across the street.

DETECTIVE BARBER: God damn, chicken wings, man.

SAMUEL RAKESTRAW: It's pretty bomb. But I went there and then --

*Id.* at 9-10.

Rakestraw goes on to say that he went home after eating and called his Probation Officer around 2:00 p.m. to let him know that he was not going into work because he had to turn himself into the jail by 8:00 p.m. *Id.* at 10.

In response to Detective Barber's request for the code for his phone, Rakestraw responds: "I don't really want to give the code. I have stuff that's personal to me." *Id.* at 12. In response to Detective Barber's question of whether there are "nasty pictures on there," Rakestraw says "[s]omething like that, yeah." *Id.*

Detective Barber asks Rakestraw if he hooked up with Little Mike prior to going to the Mission for the weekend. *Id.* Rakestraw says that he did not see him, and asks "[w]hat is this about?" *Id.* at 12-13. Detective Barber says that "Mike's got some trouble going on and people said that you were with him." *Id.* at 13. Rakestraw says that he was not with Mike, and asks "[w]hat happened?" *Id.* Detective Barber tells Rakestraw that there was a drive-by shooting, which causes Rakestraw to say: "[a]nd they're saying I was with him?" *Id.* Detective Barber explains that is why he is "trying to go through all the times you gave

me"; people are saying your name, a witness puts you in a car with Mike on the day of the drive-by, and the jail records say you checked in at 8:00 p.m. *Id.* at 13-14, 20. Detective Barber follows up by saying: "I'm not lying to you. I told you. I went to the jail and pulled your shit. I'm trying to give you every opportunity here." *Id.* at 15. Rakestraw says that he checked into the jail at 6:00 p.m. *Id.* at 19. He insists that he has not seen Mike in a long time and was not involved in a drive-by shooting. *Id.* Rakestraw says that he lives with his grandmother and was at her house until he left at around 5:00 p.m. to report to the prison. *Id.* at 21. He says his grandmother can confirm that he was there. *Id.* at 21-22. Rakestraw only has one phone and always has it with him because of work and does not let anyone else use his phone; he will use his grandmother's cell phone if his is "dead." *Id.* at 22-23.

Detective Barber asks if Rakestraw is "associated to someone" who lives at 550 North Pantano. *Id.* at 24. Rakestraw says he has probably been in the area, but doesn't believe that he is "associated' with anyone who lives there. *Id.* In response to Detective Barbers's question of whether his "baby's momma" lives there, Rakestraw says she lives in California. *Id.* at 25. The following exchange then occurs:

> DETECTIVE BARBER: You only have one baby's momma?
>
> SAMUEL RAKESTRAW: Yeah.
>
> DETECTIVE BARBER: So far?
>
> SAMUEL RAKESTRAW: So far.

*Id.*

Rakestraw explains that he has a girlfriend, but she does not live in that area of town. *Id.* at 26-27. Rakestraw provides what he believes is her phone number. *Id.* at 27. In response to Detective Barber's question if he wants to check, Rakestraw responds: "Well, I don't really want nobody going through my phone, I'll go through it, but." *Id.*

Rakestraw explains that because he is on intensive probation, he is not allowed to go anywhere; he just works and goes home. *Id.* at 29. He hasn't seen Mike for months. *Id.* at 30-31. He denies Detective Frieberg's assertion that she "know[s] for a fact that you've

hung out with him way sooner than that." *Id.* at 33. He agrees that he "banged" with Western Hills before but he doesn't "do that shit no more." *Id.* at 31.   Detective Barber says he knows that he is still "gang banging with Western Hills." *Id.* at 35.   Rakestraw again denies that is the case. *Id.* Detective Barber also says that "[w]e know for a fact that you've been hanging out with Little Mike." *Id.* Detective Barber goes on to say that "it's Little Mike, it's not Mike, it's not Michael, . . . [i]t's not Mikey"; "[h]e wasn't on a fucking cereal box.  His name is Little Mike." *Id.* at 35-36.

Detective Barber tells Rakestraw that he is "sitting right here and nobody gives a shit about you but you." *Id.* at 36.  He also tells Rakestraw that he will listen "if you want to tell us what happened." *Id.* at 36.  Rakestraw says that he already explained what he did that day which can be verified. *Id.* at 37.  Detective Barber tells Rakestraw that they are going to follow up with his grandma and she's going to say, "oh yeah, he was laying right here, you know, I was making apple pies and folding pamphlets for the church and he was laying right here, we got the wrong guy." *Id.* at 39.  He also tells Rakestraw that they are going to get a search warrant for his phone records to see where he was at the day of the drive-by. *Id.* at 37-38.  He further tells Rakestraw: "So if you want to unlock your phone, we can do that.  It will help us and it will speed things up." *Id.* at 38.  Rakestraw again says that he does not "feel comfortable with my phone but like my grandmother -- I know I was there, sir." *Id.* at 39.

Detective Barber turned back to Rakestraw's "story" of what he did the day of the drive-by. *Id.* at 40.  Rakestraw says that he woke up around 7:00 a.m., left around 8:00 a.m. to go to community service which started at 9:00 a.m., left there at 12:00 p.m. to get something to eat. *Id.* at 41.   The following (bizarre) exchange occurred about what he ate:

> DETECTIVE BARBER:  And what'd you eat, wings and rice, or some shit like that?
>
> SAMUEL RAKESTRAW: (indiscernible) yeah.
>
> DETECTIVE BARBER:  I hate wings.
>
> SAMUEL RAKESTRAW:  It's pretty good.

DETECTIVE BARBER:  It's terrible.

DETECTIVE FRIEBERG:   You do hate wings.

DETECTIVE BARBER:  Everybody makes me eat them god damn chicken wings. Nobody likes wings, Ethiopian ass chickens, they're no good for nothing.

*Id.* at 42.

Rakestraw goes on to explain that after eating he went home and his grandmother "opened the door for me as always." *Id.* at 43.  He ate a little more and used his grandma's phone to call his probation officer around 2:00 p.m. *Id.* at 43-44.  Rakestraw provided his grandma's phone number and told Detective Barber that she will let him see her phone.  *Id.* at 44.  Rakestraw took a nap and got a ride with his mom to the jail at around 4:45 p.m. *Id.* at 47.

Detective Barber then says "[t]hat's your story," you weren't involved in the drive-by.  *Id.* at 51.  Rakestraw again denied that he was involved, or was even close to where it occurred. *Id.* at 51.  He also was not hanging out with Mike the night of the drive-by, and has not hung out with him for a while.  *Id.*

Detective Frieberg asks Rakestraw who is or were involved in the "young wrecking crew."  *Id.* at 52.  Rakestraw responds: "I mean I don't really want to go into it 'cause I don't want to involve myself like I'm some type of bad person, you know what I mean. Like I don't want to put myself in that kind of category."  *Id.* at 52.  Detective Frieberg explains that she is not saying that he is a bad person; she just would like some names.  *Id.* at 53.  Rakestraw responds: "I'd rather not just because I don't want to affiliate nobody else and get them in trouble."  *Id.*

Detective Frieberg asks if Rakestraw has any questions.  *Id.* at 54. Rakestraw asks if he is being charged for the drive-by.  *Id.*  Detective Barber says he doesn't know; he has to verify some stuff.  *Id.*

The interview then turns to the Floyd Davis homicide.  *Id.*  Rakestraw says that he does not believe he knows who that is, but he knows what Detective Frieberg is "talking about."  *Id.*  Rakestraw knows someone was killed a few months ago and asks if Davis

was that person.  *Id.*  He does not know anything about that killing.  *Id.* at 55.   Detective Barber tells Rakestraw that "word on the street is your name's being brought up as being involved in that," and asks why people would say that. *Id.*   Rakestraw responds that his "name gets brought up in a bunch of shit" and "[a] lot of people don't like me" and "want to put my name with this." *Id.*  He adds that people know that he was "chilling with Mike" and "that I'm from there, or I bang there," but he hasn't "been doing shit these past couple of months." *Id.* at 56-57.

Rakestraw does not remember when he heard that Davis was killed, but he thinks it "was way after" when he heard. *Id.* at 58.  He does not recall where he was during the early morning of May 16, 2015, when Davis was killed. *Id.* at 59.  He has never been to the La Quinta hotel near the Tucson Airport where Davis was killed, but he has been in that area; he was caught at the Burger King near the airport with a gun last September. *Id.* at 59-61.  He has not been in that area the past couple of months, including on May 16, 2015. *Id.* at 60.  In response to Detective Barber's question, he stated that if the detective looks in his phone it will not show him in that area. *Id.* at 61.  He does not give his phone to anyone, he always keeps it with him, and he does not have another phone. *Id.* at 61-62. In response to Detective Frieberg's question of if he is "still on good terms with the Hills," Rakestraw says that he would not be scared to go into the neighborhood, but he is "not doing none of that." *Id.* at 62.

Detective Frieberg then inquires as to whether Rakestraw is familiar with Anna Rodriguez. *Id.*  Rakestraw says "I don't think so, no." *Id.*   The detectives point out that they have pictures of him and Rodriguez "in the same place." *Id.* at 63.  Rakestraw says that he does not know her by name but has probably seen her. *Id.*  Detective Frieberg says that she "hangs out with you guys" and is "the one that was with Floyd when he was killed." *Id.*  Rakestraw says that he does not "know who you're talking about just off the bat like that."   *Id.* at 63.  After being shown a photo of Rodriguez, Rakestraw says he does not think he knows her but probably has seen her. *Id.* at 65.

Rakestraw is shown a picture that includes him and Megan Borges and is asked if

- 8 -

he knows her.  *Id.* at 66.   Rakestraw says that he is not going to say he has never seen her, but he does not know who she is.  *Id.*  Detective Barber says "[t]hat's with your traditional throw down beads and stuff."  *Id.*    Rakestraw points out that his hair is a lot longer now. *Id.*  The following exchange then occurs:

> DETECTIVE BARBER:   It takes a lot of time to do that.
>
> SAMUEL RAKESTRAW:  Little bit.
>
> DETECTIVE BARBER:  It's crazy.

*Id.* at 67.

Rakestraw says that he has seen this girl before "but I don't know her like that."  *Id.* Detective Barber tells Rakestraw that Rodriguez is friends with Megan; Rakestraw does not remember seeing them together.  *Id.*  Detective Barber tells Rakestraw that he "was hoping you could tell me what type of girl that girl is," specifically, whether she is trustworthy.  *Id.* at 68.  Rakestraw says he doesn't know.  *Id.*  The detectives then show Rakestraw a picture and ask him if that is Mike. *Id.*  Rakestraw states: "I mean, like I said I don't want to be the one to be pointing out pictures and shit like that . . . ."  *Id.*

In response to Detective Barber's question of whether there is anything Rakestraw wants to tell them, Rakestraw states: "That man, I did not do this shit and I should not [be] here."  *Id.* at 70.  Detective Barber tells Rakestraw that he is "in a lot of trouble" and that people identified him by name and described what he was wearing.  *Id.* at 70-71. Rakestraw says "[i]t's ridiculous" and doesn't "even make no sense at all."  *Id.*  Detective Frieberg tells Rakestraw that what makes no sense is that he had his phone for over a year and he's the only one who carries it, and that he was "at the hotel the night Floyd was killed."  *Id.*  The following exchange occurs:

> SAMUEL RAKESTRAW:  No.
>
> DETECTIVE FRIEBERG:  You were, Sammy.
>
> SAMUEL RAKESTRAW: No, I was not.
>
> DETECTIVE FRIEBERG: You were.
>
> SAMUEL RAKESTRAW:  No.

DETECTIVE BARBER:  There comes a point in time when you have to make a decision.

SAMUEL RAKESTRAW: No.

DETECTIVE BARBER: Listen to me, okay.  You have to take care of you.

SAMUEL RAKESTRAW:  Right.  And I am, sir.

DETECTIVE BARBER:  Nobody else cares about you but you.

SAMUEL RAKESTRAW:  Right.

DETECTIVE BARBER:  You understand that, right?

SAMUEL RAKESTRAW:  Yes, sir.

DETECTIVE BARBER:  So when it comes time to point blame at people, nobody's going to help you.

SAMUEL RAKESTRAW:  Right.  Yes, sir.

DETECTIVE BARBER:  So when this detective starts confronting you with stuff, it's not stuff that she would pull out of her ass.

SAMUEL RAKESTRAW: Right.

DETECTIVE BARBER:  This is provable stuff in court.

*Id.* at 72-73.

Detective Barber proceeds to tell Rakestraw that his phone was at the murder scene. *Id.* at 73.  Rakestraw maintains he was not there.  *Id.*  He tells the detectives: "I don't even know what you're talking about trying to put me at the scene.  I was nowhere near that." *Id.* at 74.   In response to Detective Barber's insistence that his phone was at the murder scene, Rakestraw states: "How can my phone be there if I have it?" *Id.* at 75.  ATF Special Agent Berlin explains to Rakestraw that cell towers can pick up the location of his phone at any given time.  *Id.* at 75-76.  Rakestraw responds: "Like I do follow what you're saying but that's not true because no, I was not there.  I was not nowhere.  I don't even know the involvement of that shit." *Id.* at 76.

The detectives and Agent Berlin repeatedly tell Rakestraw they know he was present when the murder was committed; Rakestraw denies he was there. *Id.* at 76-79.  Detective Barber tells Rakestraw that "[y]ou can say it 100 times but doesn't make it true." *Id.* at 79. Rakestraw responds:  "This is crazy, dude.  This is fucking crazy." *Id.*  Detective Barber

then says: "I'm afraid for you that you don't want to tell us the truth." *Id.*  Again, Rakestraw

says "[t]his is crazy." *Id.*   Rakestraw denies Detective Barber's assertion that he is afraid

of Little Mike or "this code of honor that you have." *Id.*  In response to a rapid-fire series

of the same questions, Rakestraw denied that he did anything, denied driving the car,

denied pulling the trigger, and denied killing anyone. *Id.* at 80.

In response to Detective Barber's question of whether Rakestraw knows how many

kids Davis has, Rakestraw states that: "Sir, I didn't do anything.  I have a kid myself.  I

didn't do anything." *Id.*  Detective Barber responds: "If you die, who's going to raise your

child?" *Id.* at 80-81.  Rakestraw continues to deny Detective Barber's assertions that he

killed Davis. *Id.* at 81.  Detective Barber tells Rakestraw: "You're done.  Your Western

Hills shit is going to come back and it's going to haunt you." *Id.*  Rakestraw continues to

deny on many more occasions that he killed anyone. *Id.* at 82.

Agent Berlin and the detectives tell Rakestraw that "everyone's talking about it.

You got all these people that are at one scene at one time.  I mean everybody's got a baby

momma and a side chick, and . . .  [y]ou need to get ahead of it right now." *Id.* at 84.

Detective Barber then tells Rakestraw that he doesn't want him "to be the only guy.  Don't

let these people put this on you." *Id.*  Detective Barber again tells Rakestraw:  Sammy,

it's not if you were there.  We know you were there." *Id.* at 85.  Detective Barber asks

Rakestraw to tell him what happened and then rattles off the following series of questions:

(1) did you drive there?; (2) did you drive back?; (3) how many times did you shoot?; and

(4) what's your gun of choice? *Id.* at 85-86.  In response to each question, Rakestraw

denies that he was at the scene of the Davis homicide or involved in any way. *Id.*  Detective

Barber twice tells Rakestraw that he is lying and then adds: "You can only lie so long." *Id.*

at 86-87.  Rakestraw denies that he is afraid of Little Mike or anyone else and would tell

detectives if he knew something. *Id.* at 87.

Detective Frieberg interjects and says: "You know what, Sammy, there needs to be

a point that you need to worry about your daughter. . . and her mom and your life." *Id.*

She goes on to say that "right now your daughter and your baby's momma are the one

that's going to be affected by this." *Id.* at 88.  Rakestraw says that this is "ridiculous" and "stupid." *Id.*   Detective Frieberg follows up by saying: "You want your daughter to lose her dad for life?" *Id.*   In response to repeated accusations that he was there, Rakestraw maintains that he was not and is not lying. *Id.* at 88-89.

Detective Barber then advises Rakestraw that "[t]wo of your homies got arrested this weekend," and suggests that someone is going to cut a deal. *Id.* at 90.  Agent Berlin tells Rakestraw that he doesn't "realize how serious this is maybe right away." *Id.* at 91. Rakestraw responds that he knows how serious it is because "you're talking about a murder, you're talking about something that where I could spend the rest of my fucking life behind bars, man, that shit is more than serious." *Id.*   Agent Berlin tells Rakestraw that if he realizes the seriousness of the situation, then he also knows that he "could go to prison for the rest of your life." *Id.* at 91-92.   As a result, Agent Berlin asks Rakestraw to tell him his "involvement" or "excuse" for his phone being at the murder scene. *Id.* at 92. Rakestraw responds that he has "no involvement" and does not believe it's true that his phone was at the murder scene because he was not there. *Id.*   Agent Berlin and the detectives tell Rakestraw that they can show him "the paperwork," but they never do. *Id.* at 92-93.

Agent Berlin asks Rakestraw if he wants to defend himself.   Detective Barber then states: "So proof doesn't mean nothing to you?" *Id.* at 93.   Rakestraw continues to deny that he or his phone were at the murder scene. *Id.* at 93.   Detective Barber tells Rakestraw that "[w]e're coming for you guys." *Id.* at 94.  Rakestraw again denies he was there or involved. *Id.* at 94-95.  Detective Barber tells Rakestraw that people are saying he was there and asks "[a]re you betting your life in prison that nobody else talked?" *Id.* at 95.

Once again, Rakestraw denies that he was at the murder scene and that the people who are saying he was there are making false statements. *Id.* Detective Barber tells Rakestraw that he has a baby, a family, a grandmother, so "[y]ou need to step the fuck up and tell us what happened." *Id.* at 96.  Rakestraw again says he does not know what happened. *Id.*

Detective Barber then states three times "You were there," and then says "[w]e can prove you were there." *Id.* at 96-97. In response to each accusation, Rakestraw denies that he was there. *Id.* Detective Barber tells Rakestraw that Western Hills "pushed you into it." *Id.* at 97. He tells Rakestraw (multiple times) that he made a rap about it, which Rakestraw denies. *Id.* at 98. Detective Barber tells Rakestraw that this is his chance to tell "us what happened." *Id.* Rakestraw states that he already said that he did not do anything. *Id.* at 99. Specifically, he says: "And I for a fact was not there. I did not do no fucking drive by shooting for a fact I did not do that. And everything that I said is going to verify[.]" *Id.* Detective Barber again tells Rakestraw that "[y]ou did it. You did the murder." *Id.* For the umpteenth time, Rakestraw denies committing a murder or being present. *Id.* After another series of accusations and denials, Rakestraw states:

> I was not there. I was not there. I was not there. And like I want like a lawyer like because this shit is crazy. I don't understand it. I don't understand it and you're right, I am like fucking nervous and shit but like 'cause someone's coming at me with something that I more than truthful about, more than telling the truth about, and.

*Id.* at 100-101.

Detective Barber notes for purposes of the recording that the interview is terminated. *Id.* at 101. Agent Berlin asks Detective Barber: "Is he going to be in the jail for a little bit 'cause he's got a prior, right[?]" *Id.* Detective Barber responds: "Oh, yeah. He's on IPS… [s]o he's not getting out." *Id.* The interview is terminated. *Id.* Rakestraw asks if he's getting out. *Id.* Detective Barber tells him that he's being charged with drive-by shooting, aggravated assault, and being a prohibited possessor. *Id.* Rakestraw says that he did not have a gun. *Id.* Detective Barber states: "Well, you didn't do a drive by without a gun. You can't throw rocks." *Id.* Rakestraw states that he did not do a drive-by. *Id.* Detective Barber tells Rakestraw that he's being honest with him and that he's under arrest and going to jail for a drive-by shooting. *Id.* at 101-102. Rakestraw asks: "Well, when my stuff checks out, am I going to be still locked up for this?" *Id.* at 102. Agent Berlin tells Rakestraw that "we have evidence . . . you can convince yourself all day long that you

- 13 -

weren't involved in any of this stuff but we can prove otherwise.  This is your chance (indiscernible)."  *Id.* at 102.  Detective Frieberg adds: "Whether your stuff checks out or not, yes, you are still going to be charged with it because someone puts you there on scene." *Id.* at 103.  The recording ends.

Detective Barber notes that "[w]e're going back on tape" because Rakestraw is kicking the door so "[we]'re going to go back and make contact with him."  9/14/15 Supp. Interview Tr. at 2.   In response to Rakestraw's question of whether he can call his girlfriend, Detective Barber tells him he can call her from jail. *Id.* at 2.  Detective Barber asks if Rakestraw wants to unlock his phone so he can call her. *Id.*   Detective Frieberg asks for the password. *Id.* at 3.  Rakestraw states that he does not want to give that. *Id.* When Detective Frieberg asks "why," he states that because "there's private shit in there[.]" *Id.* Detective Barber tells Rakestraw "that's the trade off" if you want to call your girl with that phone. *Id.*   Detective Frieberg tells Rakestraw that if "[y]ou want to unlock it, I'll let you call her." *Id.*  Rakestraw responds: "I'll unlock it but I can't give -- I don't want to give it to you guys, man." *Id.*  Agent Berlin again says "it's a trade" and "it could help your alibi theoretically if your story is what it is and you're being truthful out about it." *Id.* at 4.  Detective Frieberg says "[g]ive me your code and I'll let you call it." *Id.*  Rakestraw says: "That's messed up, man." *Id.* Detective Frieberg again says that she will let him call if he provides the passcode for the phone. *Id.*  Rakestraw responds as follows: "I don't want nobody in my phone, that's it, there's not nothing personal, there's not nothing (indiscernible) I'm trying to hide anything, or anything like that." *Id.* at 4-5.

**Detective Frieberg's Testimony.**

**1.    Direct Examination**

Detective Frieberg joined the TPD in 2008.  (Tr. 3/30/22 at 66.)  She was promoted to the rank of Detective in 2013 and joined the gang unit.  In 2020, she was assigned to the gun crime reduction unit, and then assigned to the homicide unit in May 2021. *Id.* at 66-67.

Detective Frieberg, Detective Barber, and ATF Special Agent Berlin interviewed

1    Rakestraw on September 14, 2015. *Id.* at 68.   Detective Frieberg started working with

2    Detective Barber when she joined the gang unit in 2013. *Id.* at 69.  She worked with him

3    frequently and they became friends. *Id.* Detective Barber passed away unexpectedly last

4    year. *Id.*

5         Detective Frieberg's testimony turned to the transcript of the September 14, 2015

6    interview.   She testified that the *Miranda* warnings provided to Rakestraw by Detective

7    Barber were consistent with her training on what *Miranda* rights need to be provided before

8    a custodial interview. *Id.* at 70.  Rakestraw told Detective Barber that he understood the

9    rights explained to him and proceeded to answer questions "for some time." *Id.*  The main

10   topics of the interview were a drive-by shooting on September 11, 2015, and the Floyd

11   Davis homicide case. *Id.* at 71.  The first half of the interview pertained to the drive-by

12   shooting and the second half pertained to the Davis homicide. *Id.*

13        At the time of the interview, detectives suspected that Rakestraw was involved in

14   the drive-by shooting. *Id.*  However, information later came to light that casted doubt on

15   that suspicion. *Id.* at 71-72.  Rakestraw consistently denied his involvement in the drive-

16   by throughout the interview. *Id.* at 72.   Detective Frieberg testified that Rakestraw never

17   stopped the questioning at any point or asked further information about his *Miranda* rights.

18   *Id.* He also never invoked his *Miranda* rights or asked for a lawyer. *Id.* at 73.

19        At some point during a discussion about Rakestraw's whereabouts on the day of the

20   drive-by, there was a conversation about where Rakestraw had lunch that day. *Id.* at 74.

21   Detective Frieberg was shown a transcript of the interview and testified that Rakestraw

22   said he had lunch at "Wings and Rice," and Detective Barber responded, "Goddamn

23   chicken wings, man." *Id.* at 75.  Rakestraw stated that "[i]t's pretty bomb." *Id.* at 75.

24   Detective Frieberg testified that she interpreted Detective Barber's comment about chicken

25   wings to mean that "he's not a fan of chicken wings." *Id.* at 76.  Later on in the interview,

26   the subject of chicken wings is discussed again.   The transcript reflects that Detective

27   Barber says: "I hate wings." *Id.*  He goes on to say: "Everybody makes me eat them

28   goddamn chicken wings" . . .  and "they're no good for nothing." *Id.* at 77.  Detective

Frieberg again testified that she interpreted the comments to mean that Detective Barber does not like chicken wings. *Id.* Counsel pointed out that Detective Barber also referred to "Ethiopian ass chickens," and asked how Detective Frieberg took that comment. *Id.* She testified that Detective Barber liked a "big chunk of meat and not just a little bit of meat." *Id.* at 78. Detective Barber was on the "heavier side" and "liked to eat a large meal." *Id.* In Detective Frieberg's opinion, Detective Barber's comments related only to chicken wings. *Id.* She testified that Rakestraw did not react to the comments except to say that he liked wings. *Id.* At the conclusion of the interview, Rakestraw was arrested for the drive-by shooting. *Id.* at 80. He was later released from custody on that charge. *Id.*

Detective Frieberg testified that Rakestraw was not physically threatened or intimidated into making a statement. *Id.* No one caused him any injuries, coerced him into making any statements, or did anything to make him fearful for his physical safety. *Id.* at 82. Detective Frieberg testified that Rakestraw would not provide the code for his phone or let agents look in his phone. *Id.* He also would not provide the names of other people involved. *Id.* Detective Frieberg testified that if Rakestraw had asked for a lawyer before questioning, he would not have been asked any questions. *Id.* at 83. Finally, Detective Frieberg testified that "it was the work of Detective Barber that ultimately led to Mr. Rakestraw being released from custody for the September 11th shooting." *Id.* at 84.

### 2. Cross-Examination

Detective Frieberg agreed with defense counsel that she was incorrect when she testified that Rakestraw did invoke his right to counsel. *Id.* at 84-85. She testified that he asked for a lawyer at the end of the interview, but not initially. *Id.* at 84. She agreed with defense counsel that it was ultimately determined that Rakestraw was not the shooter in the drive-by; he was not the driver; he wasn't there; and he had nothing to do with it. *Id.* at 85.

Detective Frieberg testified that the interview was conducted before Agent Berlin was removed from the case. *Id.* at 91. She does not know exactly why he was removed

from the case other than "internal conflicts." *Id.*   When pressed by defense counsel about how she could not know why Agent Berlin was removed from the case, Detective Frieberg testified that she was "not privy to the internal conflicts of the case." *Id.* at 92.

She agreed with counsel that the objective of the interrogation was to talk to Rakestraw about two different crimes. *Id.* at 93.  It's possible that law enforcement made the decision not to tell Rakestraw "about what those crimes were[.]" *Id.*  She agreed that the transcript of the interview reflects that Rakestraw did not know why he was being questioned. *Id.* at 94.

Counsel then inquired about different ways to provide *Miranda* warnings and the substance of those warnings.  Detective Frieberg agreed that an officer can read the warnings from a card, provide the warnings from memory, get a written wavier, or "do it without a written waiver." *Id.*  TPD does not have a specific protocol, but her practice is to read the warnings off a card that TPD provides to officers. *Id.*   Because Detective Frieberg had that card with her, counsel asked Detective Frieberg to read the warnings from the card.   The card reads as follows:

> You have the right to remain silent.  Anything you say can and will be used against you in a court of law.
>
> You have the right to the presence of an attorney to assist you prior to questioning and to be with you during questioning if you so desire.  If you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning.
>
> Do you understand your rights?
>
> Now having been advised of these rights and understanding these rights, will you answer my questions?

*Id.* at 95.

Detective Frieberg does not recall if Detective Barber read the rights off that card. *Id.*  She agreed that Detective Barber did not read the last admonition – *i.e.*, whether Rakestraw was willing to answer questions.   *Id.* at 96.  She agreed that a signed waiver was not obtained, but she added that TPD does not "do signed waivers." *Id.*  She testified that TPD does not have a policy regarding whether the rights must be read off the card, but

doing so ensures that "you don't mess anything up[.]" *Id.* at 107.   She always reads the rights off the card.  *Id.*

Detective Frieberg agreed with counsel that when she spoke to Rakestraw in 2018 with ATF Special Agent Parkinson, Rakestraw was presented with a waiver form which he declined to sign. *Id.* at 97-98.   She explained that prior to that attempted interview, she was required to read the rights off an ATF form.  *Id.* at 97.   She agreed with counsel that the ATF form included more information than "just the four basic *Miranda* rights" on the TPD card.  *Id.*   Counsel asked whether the ATF form "includes the admonition that Detective Barber skipped," specifically: "If you decide to answer my questions without a lawyer present, you have the right to stop answering my questions at any time." *Id.* Detective Frieberg said she does not know because she does not have the form in front of her.  *Id.*   After reviewing the ATF form, she testified that she "went through the full, expanded recitation of rights from the ATF rights waiver[.]" *Id.* at 105.  Detective Frieberg testified that ATF was involved in the case in 2015 "[t]o a certain extent." *Id.* at 105.  But she disagreed with counsel that she should have used the ATF form to advise Rakestraw of his rights in 2015.  *Id.* at 105.  She also did not agree with counsel that it is better to have a written waiver form.  *Id.* at 98.  But she did agree that if there is "a signed waiver, then there's no question about whether the person waived or not[.]" *Id.*   She also agreed that Rakestraw did not sign the waiver of rights form in 2018.   *Id.* at 105-106.

Detective Frieberg attended the "Reid interviewing and interrogation course" in July 2014, about a year before the interview with Rakestraw.  *Id.* at 99.  The course addressed interviewing and interrogation techniques.  *Id.* at 107.  There are three components: factual analysis; behavioral analysis; and interrogation.  *Id.* at 107-108.  In June 2015, a couple months before the interview, she attended a Gang Investigative Association conference. *Id.* at 100.   In response to counsel's question about the instruction she received on black gangs, Detective Frieberg testified that it was not only black gangs; there was a specific class for each heritage.  *Id.* at 102.  She learned about clothing colors, gang names, their monikers, and tattoos you will see on gang members.  *Id.*

Detective Frieberg agreed that Detective Barber told Rakestraw that they have a witness that puts him at the drive-by. *Id.* at 109. He also suggested to Rakestraw that maybe he was just the driver and that Western Hills pushed him into it. *Id.* at 111. Detective Frieberg agreed that Rakestraw was told that he was in a lot of trouble, specifically, that if he died who's going to raise his kid, and his daughter is going to lose her dad for life. *Id.* at 113-114. Detective Frieberg denied these statements were threats to get the defendant to cooperate. *Id.* at 115.

Counsel asked how Detective Frieberg felt when Detective Barber made the comment: "Ethiopian ass chickens, they're no good for nothing." *Id.* at 119. She testified that "it sounds like Detective Barber" because he would make "off-the-wall" comments. *Id.* at 119-120. She disagreed that the comment was racist. *Id.* at 120. She believes "Ethiopian" was referring to the chicken not having much meat on it. *Id.* at 120-121. She disagreed with counsel's assertion that the comment means Detective Barber does not like Africans. *Id.* at 122. The comment did not trouble her enough to ask Detective Barber what he meant by it. *Id.* She does not recall if he made other comments like that during the investigation, but he may have. *Id.*

### 3. Redirect Examination

Detective Frieberg testified that when Rakestraw asked for a lawyer at the end of the interview, the interview was terminated, and he was not asked any more questions. *Id.* at 123. She agreed with government counsel that Rakestraw never incriminated himself during the interview. *Id.* at 124. Rakestraw refused to let officers search his phone. *Id.* at 125. Rakestraw never did or said anything that led her to believe that he was offended by the chicken wing comments. *Id.* at 126. Detective Frieberg and Detective Barber are both half Hispanic. *Id.* Detective Frieberg never heard Detective Barber say anything racist during the years they worked together and socialized. *Id.*

## DISCUSSION

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), formulated a warning that must be given before a custodial interrogation by law enforcement can occur.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A suspect in custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.  "*Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning[.]" *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).

For statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be knowing, intelligent, and voluntary.  *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998).  "A valid waiver of *Miranda* rights depends upon the 'totality of the circumstances including the background, experience, and conduct of the defendant.'"  *Garibay*, 143 F.3d at 536.  The government bears the burden of proving by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  "There is a presumption against waiver." *Garibay*, 143 F.3d at 536.  As such, the government's burden to make the required "showing 'is great,' and the court will 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'"  *Id.* at 537 (quoting *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1994)).

A waiver is voluntary if, under the totality of circumstances, the statement is "'the product of a free and deliberate choice rather than coercion or improper inducement.'" *United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008) (quoting *United States v. Doe*, 155 F.3d 1070 (9th Cir. 1998).  A waiver is made knowingly and intelligently if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Berghuis*, 560 U.S. at 382-383; *see also Cook v. Keenan,* 948 F.3d 952, 967 (9th Cir. 2020).  A determination of whether a waiver was voluntary "turns upon external factors," whereas the determination of whether a waiver was knowing

1    and intelligent "depends upon mental capacity."  *Cox v. Del Papa*, 542 F.3d 669, 675 (9th

2    Cir. 2008).

3        **1.    The Defendant's Statements Were Not Voluntary.**

4        The defendant argues that his statements were not voluntarily made for two reasons.

5    The first is that the *Miranda* warnings provided failed to advise him that he could invoke

6    his right to remain silent or his right to counsel at any point during the interview.  The

7    second is that the interview was coercive because interrogating officers made racially

8    disparaging remarks and threatened him with severe penalties – the death penalty or life in

9    prison – if he was convicted of the crimes that were the subjects of the interview.

10        The government argues that the Ninth Circuit's decision in *United States v. Lares-*

11    *Valdez*, 939 F.2d 688 (9th Cir. 1991) forecloses the argument a defendant must be advised

12    of his right to terminate the interview at any time for *Miranda* warnings to be valid.  The

13    government disputes that the remarks the defense points to had anything to do with race.

14    And the government argues that the defendant's willingness to engage in a long "free-

15    wheeling conversation," and his refusal to consent to unlock his cell phone and answer

16    certain questions demonstrates voluntariness.

17        In *Lares-Valdez*, the Ninth Circuit held that the Supreme Court in *Miranda*

18    "contemplated the right to cease questioning and declined to include it among the warnings

19    it deemed necessary to effect an accused's fifth and sixth amendment rights."  939 F.2d at

20    690.  As such, *Miranda* only requires that the defendant understands his "right to remain

21    silent; when and how he then chose to exercise that right is up to him."  *Id.*  However, the

22    court pointed out that the Tenth Circuit has held that the failure to advise a suspect of the

23    right to terminate questioning at any time is an important factor in determining

24    voluntariness of any statements made.  *Id.* at n. 1 (quoting *United States v. DiGiacomo*,

25    579 F.2d 1211, 1214 (10th Cir. 1978)).  But the Ninth Circuit did not have to address that

26    issue because the defendant only challenged the adequacy of the warnings, and not the

27    voluntariness of his statements.  *Id.*[2]

28    _____
     [2]  The government's reliance on the Sixth Circuit's decision in *United States v. Davis*, 459
     F.2d 167 (6th Cir. 1972), is baffling.  In that case, the defendant's statement began with a

1    In *DiGiacomo*, the defendant, who was arrested and charged with possession of

2    counterfeit currency, argued that his *Miranda* warnings were deficient because he was not

3    advised that he could terminate questioning or that he had the right to appointed counsel.

4    579 F.2d at 1212.   The defendant also alleged that the agents threatened him with jail time.

5    *Id.* at 1213.   Specifically, the agents emphasized the "seriousness of the matter" and that

6    he "could make it easier on himself and avoid jail by cooperating" rather than be taken to

7    jail that night.   *Id.*   Agents also told him that "he could probably be charged with six

8    felonies," each of which carried a possible 15-year prison sentence.   *Id.*   The district court

9    suppressed the defendant's statements and the government appealed.   *Id.* at 1214.

10    The Tenth Circuit held that "[a]lthough there may be no express requirement to warn

11    suspects of the right to terminate questioning, the government's failure to so warn is

12    certainly an important factor to be considered in determining the voluntariness of any

13    statements made." *Id.* at 1214.   The court also held that the right to appointed counsel is a

14    significant right that must be included in a *Miranda* warning.   *Id.*   The Court concluded

15    that "[t]he faulty advisement, coupled with the jail threats and order to surrender all

16    counterfeit money, [was] more than sufficient to sustain the trial court's determination that

17    the inculpatory statements were not rendered voluntarily."   *Id.* at 1215.

18    It is undisputed that Rakestraw was never advised by Detective Barber that he could

19    terminate the interview or invoke his right to remain silent or his right to counsel at any

20    point during the interview.   As in *DiGiacomo*, this factor weighs against the defendant's

21    statement being voluntary.   And, as discussed below, the evidence of coercion in the case

22    at hand tips the scale in favor of a finding of involuntariness.

23    First, the threats about the penalties that the defendant in *DiGiacomo* faced pale in

24    comparison to those made to Rakestraw.   Here, the defendant was threatened with both the

25    "recitation of rights" which clearly showed that he was told that he could invoke his right
to remain silent or his right to counsel "at any time." *Davis*, 459 F.2d at 169.   And while
26    the court found that this statement was an adequate apprisal of rights, the court also noted
that it could devise a more explicit statement to advise the defendant of his rights, including
27    his right to end questioning or request counsel at any time.   *Id.*   Thus, *Davis* does not
support the government's argument that Rakestraw did not need to be advised of his right
28    to end questioning.

death penalty and life in prison.   Specifically, Detective Barber says: "If you die, who's going to raise your child?" (9/14/15 Interview Tr. at 80-81.)   Detective Frieberg tells Rakestraw that "there needs to be a point that you need to worry about your daughter . . . and her mom and your life." *Id.* at 87.   She follows up by telling Rakestraw: "You want your daughter to lose her dad for life?" *Id.* at 88.   Agent Berlin tells Rakestraw "you could go to prison for the rest of your life." *Id.* at 91-92.   Detective Barber follows up by asking Rakestraw if he is "betting [his] life in prison that nobody else talked[.]" *Id.* at 95.

Second, even though Rakestraw told officers early in the interview that he was not comfortable with them searching his phone, the officers repeatedly asked and tried to convince Rakestraw to unlock his phone.   After many attempts, they told Rakestraw that the phone could potentially "help" him confirm his alibi.   When that didn't work, officers told him that the "trade off" for allowing him to call his girlfriend to let her know that he had been arrested was that he unlock his phone so it could be searched.   And the "trade-off" proposition occurred after Rakestraw had asked for a lawyer.

Third, the two detectives and the federal agent who conducted the interview spent the bulk of the interview badgering the defendant by telling him countless times that he was guilty of both crimes and was lying.   When initially accused of being involved in both crimes, Rakestraw maintained that he was not involved.   He also denied that he was lying. Nevertheless, officers continued to tell him ad nauseam "that you did it," "we know you did it," "we can prove you did it," "you were there," "your phone was there," and you're lying.   Apparently, the "strategy" of the interview was that Rakestraw would eventually confess if accused enough times of committing the crimes, especially if he was accused of lying when he did not confess.   That strategy didn't work.   But the interview did not have to achieve its desired result to be coercive.   Rakestraw's statements, even if not facially inculpatory, clearly have evidentiary value because the government wants to introduce them at trial.   The government will most likely admit the statements to prove that other evidence shows that Rakestraw lied during the interview.   And the government will certainly admit the statements to prove his association with the Western Hills Bloods and

- 23 -

their members, which are lynchpins to the conspiracy charges.  As a result, even absent a confession, the coercive tactics enabled the government to obtain statements that will benefit the government and prejudice the defendant.

Finally, there were several racial or at least offensive remarks that were interspersed within the officers' insistence that the defendant was guilty of both crimes, facing the death penalty or life in prison, and was lying.  At first blush, the Ethiopian chicken wing comment does not seem overtly racial or even particularly offensive.  However, there are other more subtle comments that cast doubt on that conclusion.

The first are the references to Rakestraw's baby's momma; specifically, Detective Barber's comment that Rakestraw only has one baby's momma "so far," and Agent Berlin's comment that everybody's got a baby momma and a side chick.  *Id.* at 25, 84.   It is worth noting that Detective Frieberg, and not Rakestraw, is the first to refer to the mother of Rakestraw's child as his "baby's momma."   The phrase "baby's momma" or "baby momma" is defined as the biological mother of a man's child, usually not married to the child's father or not in a relationship with him.   While this phrase has crossed racial lines, it originated in African American culture.   And this slang term is often viewed as disparaging and offensive for several reasons, one of which is because it suggests that the father has no involvement with the mother or child.   In this Court's view, there is little doubt that both Detective Barber and Agent Berlin are using that phrase disparagingly, even if not racially.

However, the following comments undoubtedly have racial connotations.  Detective Barber states that the Mike they are talking about "wasn't on a fucking cereal box."  *Id.* at 35-36.  This appears to be a reference to a picture or pictures of NBA Superstar Michael Jordan (who everyone knows is a Black man) on a box of Wheaties cereal.  Detective Barber's comments about Rakestraw's "throw down beads" in his hair, it taking "a lot of time to do that," and it being "crazy," relate to hairstyles of African Americans.  *Id.* at 66-67.  The use of the term "homies" also has a racial component, especially since Rakestraw never used the word "homies" when describing friends and/or Western Hills gang

members.

It is a fair inference that the Detectives and Special Agent (who are not Black) would not have used these terms or phrases if they were not interviewing a young Black man. These comments made during an interview that had severe ramifications for Rakestraw served no purpose other than to offend, demean, and ridicule him to help obtain a confession or slip-up about his involvement in serious crimes.

For the reasons discussed above, the failure to advise the defendant that he could invoke his right to remain silent or right to counsel at any time during the interview, coupled with the threats of the death penalty or life in prison and the coercive nature of the interview (including the racially charged and/or offensive remarks), are more than sufficient to conclude that the defendant's statements were not rendered voluntarily.

### 2. The Government Has Not Proven That the Defendant Validly Waived His *Miranda* Rights.

The defendant argues that he did not validly waive his rights because he was never asked if he was willing to do so. The government argues that the defendant impliedly waived his *Miranda* rights because he stated that he understood his rights and then voluntarily answered questions.

It is undisputed that the defendant was never asked if he was willing to waive his rights and speak with law enforcement. The failure to do so is baffling especially because the TPD card that Detective Frieberg always uses to administer *Miranda* rights contains that question. Maybe Detective Barber forgot to ask that question. Or perhaps Detective Barber did not want to hear the answer to that question, but instead, wanted to get Rakestraw talking by asking background questions that anyone would feel that they must answer. Once he got Rakestraw talking, Detective Barber was able to pin down what Rakestraw did the day of the drive-by shooting and the day of the Floyd Davis homicide. Because Detective Barber has passed away, we will never know why he did not simply ask Rakestraw the next logical question of whether he was willing to waive his rights and speak to law enforcement. Nevertheless, as discussed below, the implied waiver doctrine can cure

that failure under certain circumstances.

In *Berghuis*, the Supreme Court held that if the government can show that a defendant was properly advised of his *Miranda* rights, it "does not need to show that a waiver of *Miranda* rights was express.  An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence."  560 U.S. at 384 (2010).  "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'"  *Id.* at 384 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  The Court reached that conclusion because "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."  *Id.*

However, importantly for the case at hand, the Court's conclusion that the defendant in that case understood his *Miranda* rights was based on the fact that the defendant "read aloud the fifth warning, which stated that 'you have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned.'"  *Id.* at 386.   The Court reasoned that this warning made the defendant:

> [A]ware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation.  Those rights, the warning made clear, could be asserted at any time.  [The defendant], moreover, read the warnings aloud.

*Id.*

The Court went on to discuss why a suspect's knowledge that his *Miranda* rights can be invoked at any time becomes important during an interrogation.  The Court reasoned that:

> Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective.  As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate.  When the suspect knows that *Miranda* rights can be invoked at any time, he or she has the opportunity to

1    reassess his or her immediate and long-term interests.

2    *Id.* at 388.

3         Again, it is undisputed that Rakestraw was never told that he could end the interview
4    at any time or invoke his right to remain silent or request counsel at any time.   In this
5    Court's view, *Berghuis* makes clear, at least with respect to the factual situation at hand,
6    that the failure to advise Rakestraw that he could invoke his right to remain silent or his
7    right to counsel at any time, forecloses the government's argument that the defendant
8    impliedly waived his *Miranda* rights.   That failure is important because, as highlighted in
9    *Berghuis*, the interrogation provided Rakestraw with additional information that could
10   have put his decision to waive or invoke his rights at any time into perspective.

11        As discussed earlier, at the time the defendant was read his *Miranda* rights and then
12   started answering the officers' background questions, he had no idea why he was in custody
13   or was being questioned.   After questioning the defendant about his background and why
14   he was on probation, the officers inquired about the defendant's whereabouts on the day of
15   the drive-by shooting and if he was with Mike.   After the defendant answered these
16   questions and asked officers what this was "all about," the officers accused the defendant
17   of being involved in a drive-by shooting with Mike.   The defendant repeatedly denied that
18   he was involved in that crime, which was true, and provided officers with an alibi.   The
19   officers then moved on to the Floyd Davis homicide, a crime alleged against the defendant
20   in the instant indictment, and repeatedly accused the defendant of being involved in the
21   murder.   At this point, the failure to advise Rakestraw that he could invoke his *Miranda*
22   rights at any time became even more significant.   If he had been so advised, he would have
23   had both: (1) the opportunity to consider and make a more informed decision as to whether
24   to continue to answer questions or insist on silence; and (2) the opportunity to reassess his
25   immediate and long-term interests in continuing with the interview.

26        Deprived of those opportunities, Rakestraw made many statements related to the
27   Floyd Davis homicide which the government wants to use against him at trial.   The
28   government claims that Rakestraw never admitted to being involved in the murder of Floyd

Davis.  While technically true, Rakestraw's statement clearly has significant evidentiary value for the government.  As discussed earlier, the government will likely attempt to prove through other evidence that Rakestraw lied to the police during his interview and that he is a member of the Western Hills Bloods.  At a minimum, the jury will get to hear that Rakestraw would not simply unlock his phone so officers could search it and clear these matters up.  The obvious message the jury is sent, even with a cautionary instruction, is that an innocent man would have done what was asked by the police.   The simple and undeniable fact is that if Rakestraw's statement did not have inculpatory value, the government would not seek to admit it at trial, and there would have been no need for the instant motion.

The government argues that the defendant's refusal to unlock his cell phone so the agents could look at its contents and his refusal to answer certain questions, coupled with his later request for counsel, shows that he understood that he could end the interview at any time.  The Court disagrees.  Declining to unlock a cell phone and answer certain questions is far different from exercising the right to end the interview and stop answering all questions. Indeed, after Detective Barber stated that the interview was terminated because Rakestraw requested counsel, Rakestraw continued to ask questions which law enforcement answered.  And the officers continued to try to convince Rakestraw to unlock his cell phone.  Thus, Rakestraw's request for counsel did not necessarily mean that he wanted to end the interview and remain silent.  Rather, it meant that the interview could not continue without a lawyer present.  *See Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).  While no lawyer in his or her right mind would have advised Rakestraw to continue with the interview, a twenty-one-year-old young man with no training in the law would not have known that.  As such, the Court cannot conclude that Rakestraw's request for a lawyer also meant he knew that he could end the interview.

The government also argues that Rakestraw knew he could end the interview at any time because of his prior contacts with law enforcement. But the government did not introduce evidence regarding whether the defendant was given *Miranda* warnings when

previously arrested, let alone the specific warnings provided.  In fact, the defense presented evidence that in 2018 when arrested on the instant charges, Rakestraw was provided with thorough *Miranda* warnings, which included his right to end the interview at any time.  He was also asked, unlike in 2015, if he was willing to waive his rights and speak with law enforcement.  After being advised of the charges against him, he declined to be interviewed.

The failure to explain to Rakestraw that he could end the interview at any time deprived him of the opportunity to reassess and make an informed decision of whether continuing with the interview was in his immediate and/or long-term interest.   As the Supreme Court has made clear, that opportunity is essential in the context of an implied waiver of rights.  Because the defendant was not given that opportunity, the government cannot prove that the defendant impliedly waived his *Miranda* rights like the defendant in *Berghuis.*

## **CONCLUSION**

For the reasons stated above, it is recommended that the District Court grant the Motion to Suppress and exclude the defendant's statements at trial.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If any objections are filed, this action should be designated case number: **CR 18-01695-TUC-JAS**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 29th day of June, 2022.

_____
Eric J. Markovich
United States Magistrate Judge

- 29 -