WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-01695-TUC-JAS (EJM) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Michael Anthony Williams - 005, Samuel Lee Berrelle Rakestraw, III – 004, | |
| Defendants. | |

Pending before the Court is a Joint Motion to Preclude Rap Music, Videos, and Associated Content filed by counsel for defendants Michael Anthony Williams and Samuel Lee Berrelle Rakestraw.  Doc. 1615.  The defense argues that the rap video, which depicts the defendants and others rapping a song, and the songs themselves should be precluded from admission into evidence at trial because the probative value of this evidence is substantially outweighed by the danger of unfair prejudice.  Specifically, the defense argues that the videos and songs have no probative value because the author of the lyrics is unknown, and the lyrics are fictional and not tied to any charged offense or allegation in the Third Superseding Indictment.  Moreover, the depictions in the video and the lyrics of the rap songs are so inflammatory that the admission of this prejudicial evidence will deprive the defendants of a fair trial.

The government argues that the rap video and songs are probative because they

directly relate to charged offenses.  Specifically, the songs constitute admissions made by these defendants about criminal acts and allegations in the Third Superseding Indictment, and detail the acts committed to plan, further, commit, and conceal the charged offenses. The government does not directly address the defendants' argument concerning the unfair prejudice that could result from the admission of the video and songs or suggest a way to reduce any prejudice.   Rather, the government argues that courts have routinely admitted rap videos and songs where the probative value is high, like in the case at hand.

The Court concludes that the danger of unfair prejudice and the risk of misleading and confusing the jury that will result from the admission of the rap video and songs substantially outweighs the probative value of this evidence.  The Court finds that the rap video and music are unfairly prejudicial for two related reasons.  First, the rap lyrics are so highly inflammatory that they could cause the jury to convict the defendants on impermissible grounds.  Second, the rap video and songs have the potential to become a feature of the trial, and as a result, confuse and mislead the jury.  The Court finds that the probative value of the rap video and songs is minimal because the video and songs are cumulative of the other substantial evidence that the government will introduce at trial; the author of the lyrics is unknown; some of the lyrics cannot be definitively deciphered; and the lyrics do not mirror or exhibit an unmistakable connection to the facts of the charged offenses.  For these reasons, the Court recommends that the District Court grant the Motion to Preclude the rap video and music from evidence at trial.

## FACTUAL BACKGROUND

### A.  The Charged Offenses.

On April 6, 2022, a federal grand jury sitting in Tucson, Arizona returned a Third Superseding Indictment against Michael Williams, Samuel Rakestraw, and seventeen other individuals.  Doc. 1425.  The charged offenses pertain to an alleged criminal enterprise operated by a gang known as the Western Hills Bloods ("WHB").   Williams and Rakestraw are charged with the following four felony offenses.  Count One charges Williams and Rakestraw (and other co-defendants) with participating in a RICO conspiracy, in violation

of 18 U.S.C. §§ 1962(d) and 1963(a), the objects of which are: (a) acts involving murder (18 U.S.C. §§ 1959(b)(1) and 1961(1)); (b) offenses involving drug trafficking (21 U.S.C. §§ 846 and 841); and (c) acts involving the obstruction of justice (18 U.S.C. § 1512). Count Two charges Williams and Rakestraw (and other co-defendants) with Violent Crime in Aid of Racketeering – Conspiracy to Commit Murder, in violation of 18 U.S.C. § 1959(a)(5). Count Three charges Williams and Rakestraw (and other co-defendants) with Violent Crime in Aid of Racketeering – Murder, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. Count Four charges Williams and Rakestraw (and other co-defendants) with Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death, in violation of 18 U.S.C. §§ 924(j), 924(c)(1)(A)(i), (ii), (iii), and 2.

Michael Williams is also charged with the following additional offenses which are not alleged against Rakestraw: (1) Counts 12, 13, and 16: Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) Counts 14 and 17: Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; (3) Count 24: Conspiracy to Possess with the Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841; (4) Count 25: Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841; (5) Count 33: Conspiracy to Possess with the Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 846 and 841; (6) Counts 34 and 37: Possession with the Intent to Distribute Marijuana, in violation of 21 U.S.C. § 841; and (7) Count 38: Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841.

## B. The Motion to Preclude.

On May 9, 2022, defense counsel filed a Joint Motion to Preclude Rap Music, Videos, and Associated Content. Doc. 1615. The defense argues that a rap video, which depicts Michael Williams, Samuel Rakestraw, and other co-defendants, and rap songs allegedly sung by Williams, Rakestraw, and other rappers, should be excluded under Federal Rule of Evidence 403 because any probative value of the video and songs is substantially outweighed by the danger of unfair prejudice. Relatedly, the defense also

argues that the admission of the rap video and songs will confuse the issues and mislead the jury because they will become a feature at the trial.

The defense first sets forth the origins of rap music generally and its evolution into subgenre known as gangsta rap.  Specifically, the defense points out that rap music is a Black American art form "that employs well-known literary and poetic techniques." *Id.* at 2-3.   Rap music has been described as "an expressive artistic outlet for a marginalized urban social bloc, and a contemporary response to joblessness, poverty, and disempowerment." *Id.* at 2.  However, it is a fictional artform that is not "reliable, factual evidence of what it recounts or shows." *Id.* at 3.  Even though rap music is one of the most popular musical genres across racial and cultural segments, "anti-rap attitudes are likely also rooted in anti-Black prejudice." *Id.* at 3.

"'Gangsta rap' has been described as the 'most controversial style of the rap music genre,' which has 'achieved global prominence through its vivid [and often] violent depiction[s] of urban ghetto life in America.'" *Id.*   It universally features extensive profanity and violence, and hypermasculine topics, such as, "objectifying women, bragging about using or selling drugs, displaying tattoos and grills, owning and using guns, and flaunting expensive clothing, jewelry or other forms of wealth." *Id.* at 4.  Gangsta rap uses outlaw figures who are upheld as heroes, which is related to the Black experience in America where the gangster is viewed as a "rare example of black male authority over his domain." *Id.*  The hypermasculine persona is the result of "a long tradition of challenging the oppression of white society" and frightens the mainstream by exploiting its fears.   This persona embodies a role dating back to the time of slavery where a Black person refuses to submit to his oppressors, but rather is fearless and unruly. *Id.* at 6.

Gangsta rap has become popular beyond the Black community; as a result, it is profitable and is "the preference of most aspiring rappers today." *Id.* at 4.  Studies have shown that violence and hypermasculine lyrics are pervasive in gangsta rap because it helps boost record sales. *Id.* at 5.  Audiences often regard rappers as less credible, valuable, or successful when they are not sufficiently tough or "gangster." *Id.* at 6.  For those reasons,

gangsta rappers often employ violent and rebellious themes in a local and "gang" setting for entertainment and commercial purposes.  *Id.*

With that backdrop, the defense argues that the video and songs in the case at hand include all the violent and hypermasculine elements of gangsta rap that are necessary for the artist to be taken seriously and to help with commercial success.  Specifically, the music video (My N's Out Here Bustin'), features the defendants and co-defendants miming the firing of handguns and rifles, drinking alcohol, and exhibiting "youthful masculine aggression, violent intent, criminal lifestyle and corruption."  *Id.* at 14.   Additionally, the lyrics of all three songs contain threats of violence, boast about possessing guns, drive-by shootings and murder, express disdain for other N's, degrade women, and use lewd and profane references.  *Id.*[1]

The defense argues that a jury who is unfamiliar with gangsta rap will draw inaccurate, unwarranted, and highly prejudicial conclusions based on what they see and hear in the video and songs.   As a result, the prejudicial effect of this inflammatory evidence "would be devastating – and unfairly so."  *Id.* at 16.    And that is especially true because the musical genre is gangsta rap, as opposed to rock or country music.  *Id.*

The defense cites to studies that show that rap music is highly and uniquely prejudicial because the participants viewed rap lyrics more threatening than these other musical genres.  *Id.* at 17.  The studies found that these views were the result of race because rap music is associated with Black audiences and other genres are not.  *Id.* at 18. Other studies have shown that "[e]xposure to rap music . . . increase[d] the ease of associating [B]lack people with negative traits like hostility, being violent, and being sexist[.]" *Id.*  And yet another study showed that the participants who listened to rap music "were likely to view the [B]lack man presented to them in the experiment as more inherently violent and less intelligent."  *Id.*

The defense argues that the significant racial disparity in the way lyrics are

---

[1]  References to "N," "N's," and "the N-word" are used instead of the racist word that was, and unfortunately still is, used to refer to Black people.

perceived by listeners can have grave consequences in a criminal justice context. *Id.* at 19. For instance, participants in a study where a hypothetical 18-year-old Black man was charged with murder who were shown violent and sexually explicit rap lyrics allegedly written by this man "were significantly more likely to think the man was capable of committing murder." *Id.* Moreover, the study found that the "exposure to the lyrics evoked a negative reaction in participants that was more intense than the reaction" to the fact that the man was charged with murder. *Id.*

The defense argues that the probative value of the video and songs is very low because rap music is fictional, and therefore, the Court cannot presume that simply because an author wrote about certain topics, s/he has acted in accordance with those views. *Id.* at 20. The defense maintains that the rap video and songs at issue are highly imitative and contain all standard gangsta rap tropes, such as, the penchant for violence, display of guns, the discussion of crime, the belittling of competitors and women, references to local gang rivalries and taunting. *Id.* at 20-21. The rap lyrics also use ambiguous words "piled together in vague and non-consecutive phrases, leaving a totality that means little, except in the ears of the individual listener." *Id.* at 23. For these reasons, the defense argues that the rap video and music have little probative value because the government is trying to make evidence out of poetry. *Id.*

Finally, the defense argues that the probative value in the "N's Out Here Bustin'" song is further reduced because it was written and recorded prior to any of the violent acts that the indictment alleges against these defendants. *Id.* at 24. This song was recorded near the beginning of 2014, which was at least eight months before the first violent act alleged in the indictment (the E.M. homicide); and Michael Williams is not charged with that offense. *Id.* The associated music video to this song was published to YouTube on April 8, 2015. There are three overt acts alleging that Michael Williams was involved in violent incidents on May 15, 2015, September 11, 2015, and January 1, 2018. Thus, the defense reasons that "unless the government is contending that Mr. Williams is the rap Nostradamus, the music, lyrics and accompanying videos have no probative value

whatsoever." *Id.*

The defense also argues that the danger of prejudice overwhelms any probative value in light of the other evidence that the government will admit at trial.  *Id.* at 25.   For example, the government has evidence in the form of testimony from cooperators and agents, hundreds of thousands of lines of social media communications, and tens of thousands of text messages and video events from eighteen phones seized during this investigation, to prove gang names, symbols, membership, motive, and modus operandi. *Id.* at 25-26.  Thus, the inflammatory video and songs are cumulative.  *Id.*[2]

Finally, the defense makes two additional evidentiary-based arguments for why the rap video and songs should be excluded.  First, the video and songs are improper character evidence under Federal Rule of Evidence 404 because they suggest that the defendants committed the charged offenses in conformity with the negative persona projected in the rap music.  Second, the video and songs are not party admissions under Rule 801(d)(2)(A) because the lyrics are fictional, and do not accurately depict the past or future conduct referenced in the lyrics.[3]

## C. The Government's Response.

The government first points out that the RICO conspiracy in Count One is a conspiracy to participate in the affairs of the criminal enterprise through a pattern of racketeering.  Doc. 1667 at 7.   As a result, the overt acts alleged in Count One "are not just limited to the acts that are criminal or constitute substantive racketeering charges[.]" *Id.*  The government maintains that "[e]nterprise evidence in a RICO prosecution like this one may include gang aliases, gang paraphernalia, gang literature, gang symbols, and other indicia of gang affiliation, which the government would use at trial to establish the defendants' affiliation with the WHB," which is the "enterprise" in this case.  *Id.* at 8.

---

[2]  Relatedly, the defense argues that the admission of this cumulative evidence will unduly delay this trial which is already set for six weeks.

[3]  The defense also argues that the rap music should be excluded under the First Amendment.  Because that argument is easily dispensed with in text *infra*, the First Amendment argument made in the defense's pleading will not be set forth in greater detail.

As a result, the government argues that it seeks to admit the rap video and songs to show the defendants' "involvement in the WHB and their explicit participation in racketeering activities. This evidence is probative of the defendants' knowledge of the enterprise, association with the enterprise, and their agreement that they or other gang members would commit racketeering acts." *Id.* at 10. The government argues that the video and songs are admissible because "they make a fact of consequence, the existence of the WHB enterprise and the enterprise's racketeering activity, more probable than it would be without the evidence. *See* Federal Rule of Evidence (Fed. R. Evid.) 401." *Id.* at 11. The government claims that many of the lyrics and depictions in the video "directly relate to real-life events and include real information about the WHB Enterprise." *Id.* at 27. For example, these defendants "rap about the WHB, Southpark Family Gangsters, 36, 29, and their 'homie K.'" *Id.* Additionally, the rap lyrics set forth the motive for the murder of Floyd Davis, a rival gang member suspected of killing WHB leader Marcus Darton. *Id.* at 12. And "the defendants use WHB code words" for drugs and murder, and use gang terminology. Additionally, the rap video shows the defendants' association with the enterprise via "the use of gang monikers, gang colors, gang hand signs, displaying gang tattoos, and statements regarding the hierarchy of the gang." *Id.*

If the Court determines that the video and songs are relevant and not unfairly prejudicial, the government argues that the rap video and songs are admissible either as: (1) verbal acts; (2) admissions of a party opponent; (3) adopted statements; or (4) co-conspirator statements. *Id.* at 21. The Court will not set forth the proffered bases for the admission of this evidence because, at this point, the Court is primarily concerned with the relevance of the evidence.

The government does not address the potential prejudice that would result from the admission of the video and songs. Nor does the government suggest a mechanism to lessen any prejudice. Instead, the government repeats its argument that the rap video and songs "are highly probative, on-topic, and important evidence tending to establish that the defendants and co-conspirators belonged to the charged enterprise and engaged in conduct

to further its purpose and goals." *Id.* at 25.

On September 1, 2022, the government filed a Notice of Rap Lyrics/Songs/Videos. Doc. 2064.  That document sets forth the lyrics of the three rap songs that the government seeks to introduce at trial.  However, the relevance of the proffered lyrics was not set forth.

**D. The Evidentiary Hearing.**

The Court held an evidentiary hearing on the Motion to Preclude over the course of three days:  September 2, 2022, September 27, 2022, and September 29, 2022.  Professor Erik Nielson, a rap music expert, testified on September 2, 2022.  At the conclusion of the hearing, the Court ordered the government to file a supplemental pleading that identified the relevance of the specific rap lyrics that it seeks to introduce at trial.   That pleading was filed on September 23, 2022.  Doc. 2101.    ATF Special Agent Paul Parkinson, who interpreted the rap lyrics, testified on September 27 and 29, 2022.   The testimony of both witnesses is set forth in great detail below.

**1. Professor Erik Nielson**

**Direct Examination by Mr. Flores:**

Erik Nielson is employed at the University of Richmond as a professor and chair of the liberal arts department.  9/2/22 Tr. at 8.  His courses focus on African American literature, hip-hop culture generally, and rap music specifically.  *Id.*  He recently co-taught a course called the Voice of Hip-Hop in America with a rap artist named Mad Skillz, as well as courses on African American literature in the 20th century.  *Id.*  He is currently teaching a class called Rap on Trial.  *Id.*   Although his focus was initially on African American musical and literary traditions, he has become specifically "interested in the relationship between Black artistic expression in the U.S. and the law, law enforcement, and how they have impacted one another." *Id.* at 9.

Professor Nielson has published ten peer reviewed articles and recently wrote a book called "Rap on Trial: Race, Lyrics, and Guilt in America."  *Id.*   He also writes routinely for publications such as Rolling Stone, the New York Times, and The Atlantic.

1    *Id.*  Professor Nielson has testified as an expert witness on rap music about a dozen times.

2    *Id.* at 9-10.  He has been retained as an expert on rap music about a hundred times.  *Id.* at

3    10.   Based on these qualifications, the government did not object to the defense request

4    that Professor Nielson be deemed an expert witness in rap music.  *Id.*

5            Testimony turned to "how rap music came about" and "how it's now morphed into

6    what it is today."  *Id.* at 11.   He explained that the roots of hip-hop are traditionally traced

7    to the early to mid-1970's in the South Bronx in New York City.  *Id.*   Rap music came out

8    of "centuries of artistic tradition."  *Id.*    For example, Professor Nielson explained that in

9    a class that he teaches called the Voice of Hip-Hop, he provides students with a poem told

10   in the first person that is rhymed, bawdy, violent, and sexually explicit.  *Id.*   The students

11   "think they're reading gangsta rap" when, in fact, the poem is 120 years old.  He explained

12   that the poem reflects "a long tradition of sort of celebrating the larger-than-life sort of bad

13   man and things like that."  *Id.*    The influence of this type of fiction that celebrated the

14   urban underworld of the pimps and hustlers, combined with the Blacksploitation films of

15   the 1970's and the confrontational rhetoric of the Black arts movement, were "the

16   beginnings of what hip-hop and especially rap music would become."  *Id.* at 12.  Professor

17   Nielson explained that rap music can be traced to "verbal games that would have originated

18   within the African American community."  *Id.* at 13.  Although he would not want to

19   exclude the Latino influence on hip-hop, the rap musical form "definitely comes out of

20   Black culture."  *Id.*

21           Professor Nielson clarified that "[h]ip-hop is the broader cultural movement that

22   would have included elements like break dancing, graffiti writing, and so forth, and then

23   rap was the sort of musical verbal element of hip-hop."  *Id.* at 13-14.  Rap music has grown

24   into multiple subgenres such as gangsta rap, which itself has multiple subgenres.  *Id.* at 14.

25   Gangsta rap differs from politically conscious rap which tends to be "far more focused on

26   political structures and making sort of social or political commentary."  *Id.*   Although

27   gangsta rap does have that element, it tends to focus on illicit activity.  *Id.*  It has been

28   described as "nihilistic" in that there is "no real world view that you're trying to present."

*Id.*

Gangsta rap lyrics are sexually explicit, depict violence, contain a lot of profanity, and depict all kinds of illicit activity. *Id.* at 14, 17. Gangsta rap "could be sexually explicit without any real violence[;] it could talk about the drug trade or drug distribution without actual violence and it would still definitely classify as some form of gangsta rap." *Id.* at 17. But violence is one of the most important themes. *Id.*

The most dominant manner of violence is the use of guns. *Id.* at 18. Rappers are "highly specific" when rapping about guns. *Id.* They rap about "a veritable arsenal of weapons" like a Glock 9mm, a .40 caliber Smith and Wesson, an AK-47, and/or an AR. *Id.* There are artists that mention 7.62 caliber ammunition which is fired out of an AK-47, which is probably the most popular rifle in rap music. *Id.* at 19. In fact, there are "artists who are named after AK-47s." *Id.* An AK-47 is also referred to as "K." *Id.* Professor Nielson often sees the term "chopper" used to describe a gun, although not a specific type of gun. *Id.*

Rap lyrics also talk about the targets or subjects of violence. *Id.* at 20. For instance, the group N.W.A.'s classic song "Fuck the Police," "where the police were targeted in the song, fictionally, of course[.]" *Id.* Professor Nielson explained that it is very common for rap artists to "set up some sort of rival," whether it's a real person or imagined person, to begin "a battle." *Id.* Professor Nielson explained that "often part of the structure of these songs is [that] if you mess with me or if you step to me or if you challenge me, I'm going to do X, Y, Z. Whether there's anybody who is ever going to challenge you doesn't matter, it's really just about asserting your own dominance within your environment." *Id.* Rappers will certainly target one another; in fact, "basically every famous rap artist has at some point targeted a rival rapper" because it helps boost sales. *Id.* at 20-21. "[I]t's well known that rappers will often try to provoke one another to engage in beefs . . . where they go back and forth on record" as a marketing tactic. *Id.* at 21. In fact, if a lesser-known rapper is able to provoke a well-known rapper who responds, then the aspiring rapper has elevated his status in the industry. *Id.* The provocation can include "taunting, insults, you name

1    it." *Id.* at 23.

2          "[A]nother major feature of gangsta rap is the emphasis on localities, geographies."

3    *Id.*   The songs are "kind of a map" in that they provide street names, businesses, and

4    landmarks that the artist is familiar with to highlight his/her own geography. *Id.*  Relatedly,

5    rap songs discuss local gangs.  *Id.*   Professor Nielson explained that if a rapper's

6    community is gang active, then s/he is "naturally going to talk about . . . the gang active

7    people in your community" because that is your potential fan base.  *Id.* at 24.   Prior to

8    social media, an aspiring rap artist "had to go through the traditional gatekeepers" which

9    would have been record labels and radio stations.  *Id.*  "Now the model is much more about

10   trying to cultivate a local base, then hopefully using social media" to become national at

11   some point.  *Id.*  So if an artist is going to "build that local base and that local base happens

12   to be gang members" then songs will reference the locality.

13         Sexually explicit lyrics and lyrics that are degrading to women are also common in

14   rap music.  *Id.* at 24-25.   Drugs are prominent as well.  *Id.* at 25.   Professor Nielson

15   explained that "[t]he earlier rappers would talk about selling but the mantra was you don't

16   get high off your own supply."  *Id.*  "Now rappers will talk about doing every kind of drug

17   there is."  *Id.*   But what is most common is "the drug distribution business as a theme;" for

18   instance, "establishing yourself as the head of some major drug cartel[.]" *Id.*   Rap music

19   also incorporates the theme that "you don't want to be perceived as weak" because

20   "weakness obviously does not correspond to victory."  *Id.* at 26.  It is also common for

21   rappers to reference deceased family members, friends, and/or fellow rappers in their lyrics.

22   *Id.* at 27.

23         The references to violence, drug dealing, profanity, sex, and degradation of women

24   found in gangsta rap lyrics is "incentivized by the industry."  *Id.*   As a result, it is not

25   surprising that a "local up-and-coming gangsta rap artist" would incorporate these elements

26   into lyrics.  *Id.* at 28.   In fact, if a local artist wants to be a successful gangsta rapper s/he

27   has to rap about drugs, guns, violence, and sex.  *Id.*

28         Gangsta rap lyrics generally focus on an unlawful lifestyle and/or outlaw figures.

*Id.*  That phenomenon dates back to the 120-year-old poem which creates "a mythical figure, this larger-than-life criminal," and "celebrates that sort of bad man figure."  *Id.* at 29.  This theme is seen "throughout not just rap music but a lot of Black popular culture."  *Id.*

Professor Nielson's opinion is that the phrase "keeping it real" means "being authentic."  *Id.*  However, he clarified that "being authentic does not necessarily mean that what you are uttering is meant to be true."  *Id.*  Rather, it means "that you are supposed to be true to yourself and the sort of music that you're producing."  *Id.*  Professor Nielson explained that there was a time in rap history when if you rapped about violence and grew up in Beverly Hills, you would not have been seen as "keeping it real."  *Id.* at 30.  But, today, people are less focused on "trying to believe that the artist is actually leading the life that he or she depicts in the lyrics."  *Id.*  There are gangsta rappers who went to college.  *Id.*  One example is a rapper named Rick Ross, whose "songs are all about his connection to the criminal underworld, his connections to the cartels in South America."  *Id.*  However, Ross not only went to college, he was a corrections officer.  *Id.*  But after that became known to the general public, his career actually improved.  *Id.* at 30-31.  Professor Nielson's opinion is that rap music generally and gangsta rap specifically "is a form of fiction."  *Id.* at 31.  He clarified that he is not saying that the lyrics do not correspond to the author's reality because "all fiction in some way or another draws off an author's lived experiences."  *Id.*

Testimony turned to the effect of gangsta rap on the general public.  *Id.* at 32.  Professor Nielson testified that the general public views rap music as "highly inflammatory.  People have a strong negative, often visceral, reaction to rap music that they do not have to any other fictional forms, even more violent or sexually explicit forms."  *Id.* at 34.  Those feelings have "been borne out repeatedly in the scholarship."  *Id.*  For example, in a study in 1999, a social psychologist took stock violent lyrics that came from a folk song and put the lyrics on a page and gave them to two groups of people.  *Id.* at 35.  One group was told the lyrics came from a rap song, and the other group was told that the

lyrics came from a country song. *Id.* The people who believed the "lyrics came from a rap song found them far more threatening and in need of regulation than the exact same lyrics that were characterized as country." *Id.*

That study was replicated in 2016. The "findings were identical except they added one other element which was that people" who were told these were rap lyrics "were far more likely or significantly more likely to view these or to read these lyrics or interpret them literally as compared to the same lyrics from, say, a country song." *Id.* at 35-36. The researcher's conclusion "was definitely that this was racially implicated, that it relates to the race of the author." *Id.* at 37. There was also a finding that the participants of the study "believed that the fans of rap music are more likely to be a danger to society whereas fans of rock music might be more likely to be a danger to themselves." *Id.* at 38.

There was also a study applied to the jury context where several groups of people were provided with information about a hypothetical 18-year-old Black man. *Id.* at 39. One group was told that the man was charged with murder but were not exposed to his violent and sexually explicit rap lyrics; a second group was told about the murder and rap lyrics; a third group was told about the lyrics but not the murder charge. *Id.* The result of the study was "that people who were exposed to the rap lyrics . . . thought he was more likely to be capable of committing a murder after they read those." *Id.* at 40. But more significantly and surprising "was that the negative reaction to the rap lyrics was more intensively negative than the reaction to knowing that this person was being charged with a murder." *Id.* The results show that "these stereotypes and biases absolutely persist" for rap music. *Id.*

Oftentimes rappers do not write their own lyrics. *Id.* at 42. A "ghostwriter" is used where "it's done quietly but the primary artist presents him- or herself as having written them." *Id.* Many times there are multiple rappers who perform a song. *Id.* at 41. In fact, that is what has become kind of the model "where you have these collectives or groups and they will all cross-promote one another by appearing on each other's songs." *Id.*

The video of a rap song allegedly sang by Michael Williams was played in court.

- 14 -

Ex. 4A.   Professor Nielson testified that there is nothing "about this video that is out of the ordinary as far as its presentation to the public on social media[.]" *Id.* at 43.   In fact, Professor Nielson was struck by a couple things in the video that are common in most gangsta rap videos and music: (1) street sign intersections which reflect a neighborhood; (2) having friends or associates in the video; and (3) the lyrics have "the same conventions, tropes" that were discussed earlier.   *Id.* at 43-44.   This video "fall[s] in line with what you would expect to hear for somebody who was trying to become commercially successful." *Id.* at 44.

Professor Nielson testified that rap music "is verse and it contains all of the same literary devices" and metaphor that is found in traditional poetry.   *Id.* at 45.   But rap music "adds other layers of complexity and sophistication, especially when it comes to jargon" and various slang terms that "can be difficult if you're not familiar with the genre."   *Id.* Because rap music uses metaphors, it is subject to interpretation by the listener.   *Id.*   The lyrics are "intended to be slippery" in that they can mean different things to listeners and meanings can even change over time.   *Id.* at 45-46.    It is possible that rap lyrics could be interpreted ten different ways by ten listeners.   *Id.* at 46.   "It's actually one of the things that makes rap and hip-hop so vibrant is that people are able to bring multiple interpretations to it and see various things that maybe are not the same as what somebody else experiences.   It's elastic like that."   *Id.* at 46-47.

Testimony turned to legislative trends regarding the use of rap lyrics as evidence at a trial.   *Id.* at 47.   In the book "Rap on Trial," a series of recommendations are offered to curb the unfair practice on introducing rap music at a criminal trial.   *Id.*   Professor Nielson and the other authors "proposed a statutory solution so that at the state and federal level there would be laws introduced that would severely restrict the ability for prosecutors to use rap lyrics as evidence in criminal cases."   *Id.*   Professor Nielson explained that there is such a bill pending in New York state, "one that's been put forward at the federal level that we are optimistic will become law," and a slightly different bill that passed in California which is waiting for the governor to sign.   *Id.*   The legislation is an effort to address a trend

"where oftentimes the state will introduce creative expression in order to secure convictions in many cases where there is little other credible evidence." *Id.* at 57. The concern is that rap lyrics are "so highly prejudicial that it has the capacity, the potential to deny somebody their right to a fair trial." *Id.*

### Direct Examination by Mr. Payson:

After being asked to put his modesty aside, Professor Nielson agreed with defense counsel that the LA Times has called him the "go-to guy" on the issues surrounding the use of rap music in criminal trials. *Id.* at 49. He also agreed that he has conducted interviews with multiple news agencies on this issue – *e.g.*, PBS News Hour, Good Morning America, New York Times, L.A. Times, Washington Post, and Rolling Stone. *Id.*

Testimony turned back to the ambiguity of meaning in rap music. *Id.* Professor Nielson believes that rap music is analogous to professional wrestling. *Id.* at 50. He explained that in professional wrestling there are "big guys going at each other in the ring," but "the audience understands that that's not really what's happening." *Id.* Nevertheless, "the wrestlers themselves don't break character" because it is important to the audience experience to maintain those characters. *Id.* "That is often true of rap artists as well, that the performance continues beyond just what is happening in a studio but it's also important for self promotion that they'll maintain this character." *Id.* at 50-51.

Professor Nielson again testified that rap is like poetry and is subject to many different interpretations based on the listener's experiences. *Id.* at 51. Rap lyrics are sometimes "very vague intentionally[.]" *Id.* And many times the words used in the lyrics are not clear. *Id.* at 51-52. Professor Nielson testified that in all the cases that he has been involved with, "the transcriptions that people try to produce are inaccurate." *Id.* at 52. It is difficult to understand words based on the cadence, the slang, and/or the audio quality. *Id.* For example, in a song called Brother Like a MF which was allegedly sung by Michael Williams, Agent Parkinson first interpreted a word used in a lyric as "C-40." *Id.* The same lyric was later transcribed differently – "hit him with a brand-new 240." *Id.* at 52-53. Professor Nielson testified that he and defense counsel "have been unable to definitively

determine what the lyric [is]." *Id.* at 53.   Professor Nielson has never heard the term "C-40" used in a rap lyric.  *Id.*  He testified that he had to Google that term and "the first number of hits" were "a reference to a pellet gun." *Id.*  Professor Nielson's opinion is that law enforcement officers should not be allowed to interpret rap lyrics.  *Id.* at 54.  Significant problems have occurred when law enforcement officers do so.  *Id.*

Testimony turned to the collaborative effort used to produce rap music.  *Id.* at 57.  Professor Nielson testified that "typically speaking there are multiple people involved in the production of a video" like the one watched in court.  *Id.* at 58.   They include the performers, the cameraman, a videographer to edit the video, perhaps a sound engineer, and a person to upload the video onto social media.  *Id.*  Professor Nielson further testified that "[i]t is very possible that the person performing the lyrics in this video is not actually the author of those lyrics." *Id.*   Professor Nielson believes that given the production value of this video, it is very unlikely that it was produced in the course of a single day.  *Id.* at 61.

Professor Nielson again testified that rap music (including gangsta rap) is a fictional form; although he noted that within that fiction there can be elements of reality.  *Id.* at 59.  He testified that gangsta rap is "generally made up," and contains braggadocio, hyperbole, exaggeration; these are the "hallmarks of rap music and actually hallmarks of a whole host of examples of Black artistic expression."  *Id.* at 59-60.   Moreover, "it is absolutely possible that by reciting a lyric that somebody else wrote, you are not adopting it as your own in any way."  *Id.* at 60.

Rap music is "the most listened to genre in the country right now" in large part "because of the emergence of gangsta rap."  *Id.* at 14-15.  Rap music is also global.  *Id.* at 62.  Professor Nielson explained that an artist has to be able to produce gangsta style rap "to break into the commercial sort of mainstream rap scene." *Id.* at 15-16.  That is because "gangsta rap or the subgenres beneath it is still the dominant form of rap music, at least in the mainstream."  *Id.* at 16.   And this dominance translates into commercial success, as some of the richest entertainers in the world are rap artists. *Id.* at 16, 62.  Professor Nielson

1   explained that up-and-coming artists feel the need to produce gangsta rap to "break into

2   the rap industry" and ultimately obtain commercial success.  *Id.*   In order to be successful

3   in gangsta rap, an artist has to employ conventions such as dedication to a gang, shooting

4   guns (of every type), being violent generally and/or specifically to a rival, and misogyny.

5   *Id.* at 64-65.

6                          **<u>Cross-Examination by Government Counsel:</u>**

7           Professor Nielson agreed with government counsel that he would testify as an expert

8   at trial about the following matters: (1) "the lyrics in the rap songs in evidence in this case

9   are consistent with the mainstream fictional genre of rap;" and (2) "rap lyrics are subject

10  to interpretive ambiguity, are ubiquitous, constitute braggadocio, and are often fantastical

11  or fictional rather than autobiographical confessions."  *Id.* at 67.   He does not believe that

12  his testimony would include "specific interpretation about the rap songs that are in evidence

13  in this case," or "opining on artistic intent[.]" *Id.* at 68.   He also would not be "testifying

14  about any of the evidence gathered in this case."  *Id.*   In fact, he does not believe he was

15  provided with police reports, crime scene photos, or transcripts of witness interviews.  *Id.*

16  at 68-69.

17          With respect to Professor Nielson's amicus brief filed with the Supreme Court on

18  an appeal from the Fifth Circuit, the rap lyrics admitted at the criminal trial reflected the

19  actual crime that was charged.  *Id.* at 69.   Professor Nielson explained that "the lyrics were

20  themselves characterized and charged as a true threat and then prosecuted as that."  *Id.*   He

21  added that "that's distinct from what's going on here."  *Id.*   With respect to the rap lyrics

22  in the case at hand that reference "chops" or "chopsticks," Professor Nielson testified that

23  he does not know if he has ever heard of the term "chopstick," but "chops" or "chopper"

24  refers to an AK-47.  *Id.* at 70.

25          Professor Nielson again testified that rap music is fiction; but what he is not "saying

26  is that within these fictional works there are not realistic depictions of things that actually

27  did happen or could happen[.]" *Id.* at 71. But he agreed with counsel that there are a few

28  examples "of rap lyrics that do correspond pretty clearly to reality[.]" *Id.* at 72.   He also

agreed that a song called "The Race" talks about the rapper cutting off his ankle bracelet and going on the run while he was facing a murder charge. *Id.* at 73. Professor Nielson added that most of the song "sounded like standard fair gangsta rap." *Id.* But he did concede that the lyrics suggested that the rapper was including elements of real things that were going on at the time. *Id.* at 74. This song was released while the rapper was on absconder status, and "the novelty of that is what made it so popular." *Id.*

Professor Nielson agreed with counsel that he thought it was unfair that "a specific lyric Drakeo rapped in which he referred to somebody named RJ being tied up in the back and yelling while driving a car" was introduced into evidence at his trial. *Id.* at 77. He explained that he thought "including that lyric was ridiculous because nobody actually claimed that he did any of those things." *Id.* Professor Nielson further explained that what he is "concerned about is the extent to which in these cases prosecutors argue that there is a close connection between the lyrics when really there isn't." *Id.* at 78. When asked if the inverse was true, that it would be fair if the evidence in a case closely resembled the rap lyrics, Professor Nielson testified as follows:

> [T]he reason why I think it is unfair to introduce rap lyrics is because we know that they are so inflammatory and prejudicial that introducing them at all can tilt the balance against the defendant, and so I'm very concerned by the -- their use generally. I can say that I've --in the hundred cases I've worked on, I have yet to really see a song where I thought: Wow, he's actually rapping about something he definitely planned to do.

*Id.* Professor Nielson added that he did not "see anything in the lyrics that [he] saw with these defendants that would change [his] view[.]" *Id.* at 79.

Professor Nielson agreed with counsel that he previously testified that "territoriality" is often seen in the subgenre of gangsta rap. *Id.* at 82. He also agreed that territoriality would often correspond to reality. *Id.* The video shown in court includes visual references to territoriality and "maybe even lyrical" references which is common in gangsta rap. *Id.* at 83. Professor Nielson explained that this particular subgenre often includes a "high degree of fidelity" in terms of reproducing geographies and communities

by using street signs and intersections which "map to reality." *Id.* at 83.   He added that this is "what's so interesting about this subgenre because it has this base of . . . factual topography and then layered on top of it is all of this fictional stuff."   *Id.*

Professor Nielson has seen gangsta rap lyrics that talk about "freeing friends or releasing friends or associates from prison." *Id.*   He agreed with counsel that it would be "pretty easy to verify whether that is, in fact, the case," provided you "actually knew who they were referring to." *Id.* at 84.   Professor Nielson also agreed that gang colors are often seen in gangsta rap.   *Id.*   In the video watched in court, he saw the color red which is traditionally associated with the Bloods street gang.   *Id.*   Professor Nielson does not consider himself an expert in gang culture or social science.   *Id.* at 85.

Counsel questioned Professor Nielson about his testimony on January 18, 2018, in a trial in the District of Maryland.   *Id.* at 88.   Counsel pointed to the following question and answer:

> Q: And when you watch gangsta rap, can you tell from watching it whether the person is describing an actual situation or making something up?
>
> A:  In isolation, no, but in total, yes.

*Id.* at 89.   Counsel asked Professor Nielson if his response was "referring to in total viewing the circumstances of a particular lyric or in total viewing your knowledge and body of rap in gangsta rap in general?"   *Id.*   Professor Nielson testified that "I think at that time I was talking about gangsta rap in general because I see that, after I said, 'but in total, yes,' I said, 'I mean, if rappers committed half the murders that they rapped about, there would be nobody left on earth.'"   *Id.*

Professor Nielson was asked if his opinion about the admissibility of rap lyrics at a trial would change if there were "unique facts in the lyrics" "that did match some of the evidence" in the case.   *Id.*   Professor Nielson testified that he would need to know a lot more information, such as whether the rapper may have gotten the information from the street.   *Id.*   In response to counsel's question of whether Professor Nielson has ever come

across a case where he thought the use of rap lyrics at a trial was fair, he testified that it was logical that rap lyrics were admitted at trial in the "true threats case where somebody's lyrics were construed as a true threat." *Id.* at 90.   But he added that he did not agree with that conclusion. *Id.*

Professor Nielson agreed with counsel that political speech raises "a very high First Amendment concern." *Id.*  Because Professor Nielson apparently believed that counsel was insinuating that rap music did not contain political speech, he explained that "[r]ap music, even the most political rap music, is often dismissed by judges as apolitical or nonpolitical." *Id.*   When asked if any of the rap songs in the case at hand "could in any way be construed as political speech," Professor Nielson testified as follows:

> I think one argument I would make is that to some extent they are political as a whole.  I mean, when you have, in a country with our legacy of racism, a criminal justice system that targets young African American men, expressing this kind of speech which goes against the grain, which sends up all types of taboos and which is not often respected at all by a White mainstream audience, you are engaging in something political. . . . And you could potentially – and you face punishment for it.

*Id.* at 91.

Professor Nielson has conducted trainings which included law enforcement officers and prosecutors about using rap songs at trials.  *Id.* at 92.  Professor Nielson agreed with counsel that one of the "themes of [his] writing and public message is that prosecutors and law enforcement should be more careful in playing rap songs in criminal trials;" but he added that that's a "gentle way of putting it[.]" *Id.* at 93.  Counsel asked Professor Nielson whether the government's decision to only "play two full songs and two verses of a third song" is consistent with what he is advocating.   *Id.*  Professor Nielson responded as follows:

> No, I wouldn't.  You know, it goes both ways.  You know, what that also is is cherry picking, right?   I mean, what you're also doing is you're decontextualizing these songs by not revealing the other songs.  It's up to his defense attorneys what they think the smart move is there, I'm not a lawyer.  But it's kind of akin to what it looks like may be happening in this case anyway, which is you're zeroing in on just specific lines but taking them

1

2    totally out of context.  I would say that only producing a song or it sounded
     like in one just a half of a song, that seems to me like it could also be an abuse
3    of that. . . I don't think it stands to reason because you've limited it to three
     songs that it's going to be any less prejudicial . . . I think maybe it could be
4    more so because maybe a jury would benefit from seeing this entire person's
     body of work.
5

6    *Id.* at 93-94.

7         Professor Nielson again testified that the video played in court has production value

8    because "there appeared to be some thought into that production." *Id.* at 95.   The video is

9    "perfectly within the genre of gangsta rap," which is the most listened to type of music.  *Id.*

10   at 95.  Professor Nielson testified that to determine if the 100,000 views on YouTube of

11   the defendants' collective body of work is significant, he would need to know how many

12   songs are included in those views. *Id.* at 96.  If there are a thousand songs, then that number

13   of views is not impressive; but if it's a handful of songs, then the views are not insignificant.

14   *Id.*

15                         **Redirect Examination by Mr. Flores:**

16        Testimony returned to rap artists borrowing lyrics from other artists.  *Id.* at 97.

17   Professor Nielson agreed with counsel that the song "Dome Body" produced by the

18   defendants includes an artist named Mozzy who is a very well-known rapper.  *Id.* at 98.

19   He also agreed that if Mozzy was part of a collaboration with unknown artists, Mozzy

20   would have a lot of input on the theme of the song and/or the lyrics because "he's the bigger

21   known person." *Id.*

22        Professor Nielson testified that if the defendants had about twenty songs on

23   YouTube which received 100,000 views, then it "would demonstrate potential" and be

24   promising for the artists.  *Id.* at 99.  And it "seems consistent with somebody who is trying

25   to make it" in the rap music industry.  *Id.*    It also shows that the defendants are "clearly

26   more serious" than "somebody who's just writing lyrics at home and then publishing them

27   on some social media" given the collaboration with Mozzy.  *Id.*

28        Professor Nielson agreed with counsel that it is definitely possible that some of the

                                        - 22 -

defendants' "rap lyrics are incorporating things that the artist may have heard from the streets[.]" *Id.* at 100.  Professor Nielson testified that lyrics that are "exaggerated or even completely untrue as to the real facts" is how he "would characterize rap lyrics as a general rule." *Id.* at 100-101.

Professor Nielson again testified that the territorialities and geography seen in rap music "are often very true to reality" and then "a whole lot of other stuff is kind of layered on top of that isn't true." *Id.* at 101-102.   He explained that "an analogy that might be helpful is historical fiction." *Id.* at 102.  Many of "the details in historical fiction map to what actually happened or what we historians believe actually happened.  But a lot of the characters in there are added, made up, there are exchanges that" nobody knows if they actually happened. *Id.*   Professor Nielson added that a work of historical fiction would never be used in place of a high school textbook because it's understood that it is not reliable; the same is true for rap lyrics. *Id.*

Professor Nielson again testified that an artist's intent can only be discerned from the artist or someone who has spoken to the artist. *Id.*   A rap artist's intent cannot be determined from the fictional rap lyrics that s/he wrote. *Id.* at 103.  Professor Nielson again testified that empirical data shows that rap music is inflammatory and prejudicial both inside and outside of a jury context. *Id.*

### Examination by the Court:

Professor Nielson testified that an artist (whether well-known or unknown) does not have to be in a gang to produce gangsta rap. *Id.* at 107.   In response to the Court's question of whether he has an explanation for why gangsta rap is the genre that could catapult a local artist's career, Professor Nielson testified that "if you consider popular culture more broadly, I think violence often does sell and, again, I don't just mean in the rap context." *Id.* at 108.   He explained that the famous gangsta rap group N.W.A., did not, by and large, lead a criminal lifestyle, but it "created a way for and continues to create a way for artists to connect with communities that do actually have violence surrounding them, that do face poverty and addiction, and so those are common themes in gangsta rap[.]" *Id.* at 108-109.

Gangsta rap can be reflective of the artist's living situation in terms of violence and drugs; but it also attempts "to speak to folks who are in those situations." *Id.* at 110.  Thus, a goal of gangsta rap is to raise attention beyond those communities.  *Id.*  When an aspiring rapper is trying to establish a base, rapping about violence and drugs are "one prominent way to create a connection to your listener" and reach the desired audience.  *Id.* at 109-110.  There has also been pressure from the music industry "for artists to conform much more often to this gangsta type style and so up-and-coming artists are keenly aware of that."  *Id.*

In response to the Court's question of whether an artist who raps about violence or drug dealing may be taking credit for the acts of others, Professor Nielson testified as follows: "I think that's very possible.  I think with criminal activity generally, you definitely see artists who claim to be engaged in the kinds of behavior that perhaps other people in their communities are when they really aren't."  *Id.* at 111.

There are very few examples of where a White defendant was charged with a crime and the prosecution sought to introduce the defendant's rap lyrics.  *Id.* at 113.  However, Professor Nielson has worked on cases in California where that scenario occurred with Latino artists.  *Id.*

The Court asked Professor Nielson if law enforcement officers should not attempt to interpret rap music because they lack the expertise to do so and/or because they are viewing the music "through the lens of potential criminality[.]" *Id.* at 114.  He responded that it is definitely the lack of credentials because the "police officers who testify in these cases not only don't have that but often have no real understanding or familiarity with the genre and will say that openly and honestly."  *Id.*

**Follow-up Examination by Mr. Flores:**

Counsel followed up on the Court's question about a rapper taking credit for another person's crimes.  Professor Nielson testified that a famous rapper named Rick Ross "borrowed his name from Freeway Rick Ross, who was a well-known notorious drug dealer/trafficker" in Los Angeles.  *Id.* at 117.   He testified that this is a great example of a rapper "wanting to enhance his status as a rapper by taking credit for what someone else

1    has done." *Id.* at 117-118.

2         With respect to law enforcement officers interpreting rap lyrics, Professor Nielson

3    testified that he does not "think seeing it through the lens of criminality is, in and of itself,

4    disqualifying." *Id.* at 119.  Rather, he sees it as "likely to lead to very skewed conclusions

5    that are probably based on some confirmation bias.  That is, I already know this guy's a

6    criminal so now I'm going to read these lyrics and that's now I know that person committed

7    these acts." *Id.*  Again, he is not saying the officer is unqualified to render an opinion; it

8    just would be bad opinion. *Id.*

9              **Follow-up Examination by Mr. Payson:**

10        Professor Nielson has never seen the government attempt "to use country music

11   lyrics against a defendant in a criminal trial." *Id.* at 122.  He explained that a journalist

12   that he works closely with went back to the 1950s "to try to find examples where fictional

13   forms that weren't rap music" had been used or attempted to be used at a criminal trial. *Id.*

14   at 122-123.  The journalist discovered "four examples in all of those years" and those cases

15   were either reversed or did not result "in any kind of serious convictions." *Id.* at 123.  By

16   contrast, "just in a couple of decades we've identified several hundred" cases where rap

17   lyrics were admitted or sought to be admitted at criminal trials. *Id.*   The defendants in the

18   cases involving rap lyrics are overwhelmingly Black or Latino. *Id.*   Professor Nielson's

19   opinion is that this phenomenon "is definitely racially based." *Id.*  When asked to elaborate

20   on the basis for his opinion, Professor Nielson explained that film actors and country music

21   artists commit crimes and "often engage in hyperviolent, hypersexual forms of

22   entertainment." *Id.* at 123-124.   But "we're just not seeing those types of artists being

23   targeted at all by the criminal justice system." *Id.* at 124.  Professor Nielson believes that

24   race is at the center of this phenomena given the racial outcomes that are seen in the

25   criminal justice system in terms of Black people being more likely to be arrested, more

26   likely to be charged with a crime if arrested, and more likely to receive a stiffer sentence if

27   convicted of a crime. *Id.*

28

1          **2.      Special Agent Paul Parkinson**

2          **Direct Examination by Government Counsel:**

3          Special Agent Parkinson has been employed by the Bureau of Alcohol, Tobacco,

4    and Firearms ("ATF") since 2014.  9/27/22 Tr. at 6.  He investigates federal violations of

5    firearms, arson, and explosives offenses, as well as violent crime.  *Id.* at 7.    Agent

6    Parkinson started in the ATF Tucson office in 2015 after graduating from the ATF

7    academy.  *Id.*   He currently works in another field office outside of Arizona.  *Id.*

8          While in the Tucson office, Agent Parkinson worked on an investigation into a

9    group known as the Western Hills Bloods ("WHB").  *Id.*     He reviewed information

10   downloaded from phones of WHB members, reviewed Facebook accounts for members,

11   and listened to recorded conversations of members.  *Id.* at 7-8.   As a result, he became

12   familiar with "terms that members of the Western Hills Bloods would use when

13   communicating with each other," as well as "outsiders[.]" *Id.* at 8.   Agent Parkinson also

14   viewed photographs of tattoos of WHB members.  *Id.*

15         Agent Parkinson became familiar with the manner of communication of Michael

16   Williams and Samuel Rakestraw as a result of listening to audiovisual material and

17   recorded interviews.  *Id.*  9.  He also became familiar with James Jones (aka YM Da Kid

18   and YM) who, prior to his death in 2017, was a member of WHB and a local rap performer.

19   *Id.* at 9-10.

20         As part of his investigation, Agent Parkinson because aware of rap songs (both

21   audio and audiovisual) that WHB members would post to social media.  *Id.* at 10.  A report

22   of investigation authored by ATF Special Agent Don Berlin reflects that he reviewed a

23   music video uploaded onto YouTube on April 8, 2015, called "Out Here Bustin'."  9/27/22

24   Tr. at 11; Gov. Ex. 6.  Agent Berlin's report reflects that Michael Williams posted that

25   video.  *Id.*   The music video was played in court.  Gov. Ex. 1.  Agent Parkinson identified

26   the rapper as Michael Williams and also recognized his voice.  9/27/22 Tr. at 13.  He also

27   recognized the Western Hills neighborhood depicted in the video.  *Id.* at 14.

28         Agent Parkinson testified about various screenshots from the video.  *Id.*   at 15.

There is a screenshot that shows Mr. Williams, Mr. Rakestraw, and defendant Mark Holguin (another WHB member) displaying gang signs. 9/27/22 Tr. at 15; Gov. Ex. 6 at 12. Specifically, Mr. Williams is prominently displaying the WHB gang hand sign – *i.e.*, creating a W by touching his thumb and the ring finger, and putting forward his index, middle and pinky fingers. 9/27/22 Tr. at 15-16. Agent Parkinson explained that this hand sign represents W for WHB, and also 36th Street because when turned sideways the fingers appear to make the number six. *Id.* at 16. Agent Parkinson saw this hand sign frequently during the course of his investigation. *Id.* There is another screenshot of Mr. Rakestraw making a B with his hands, which stands for Blood. 9/27/22 at 24-25; Gov. Ex. 6 at 34. Agent Parkinson also saw this gang sign repeatedly during the course of his investigation. 9/27/22 Tr. at 25.

There are various screenshots that show defendant Marcell Gray, James Jones, defendant David Williams, and Jimmy Grigsby. 9/27/22 Tr. at 17, 21; Gov. Ex. 6 at 15, 19, 30-33. Jones and Grigsby are associates of the WHB. 9/27/22 at 23-24. These individuals are wearing red clothing in the screenshots, which is a color associated with the WHB. *Id.* at 19, 24.

There is "a screenshot of Michael Williams standing atop the Western Hills sign in the Western Hills neighborhood." 9/27/22 Tr. at 18; Gov. Ex. 6 at 17. Agent Parkinson testified that Mr. Williams is wearing red clothing (*i.e.*, a red shirt, red hat, and red shoes). 9/27/22 Tr. at 19. A screenshot shows WHB members Raymond Symonette, Samuel Rakestraw, Michael Williams and James Jones sitting atop a Western Hills sign, and wearing red clothes. 9/27/22 Tr. at 21-22; Gov. Ex. 6 at 24.

Another screenshot shows "a T-shirt commemorating the life of Marcus Darton [aka Mar-K or K] with the words 'Hills in Paradise' ascribed atop his photograph with the dates of his birth and death." 9/27/22 Tr. at 19; Gov. Ex. 6 at 18. Agent Parkinson testified that "Mr. Darton was killed by rival gang members from the Freestone Bloods gang," specifically, Floyd Davis and Marshall Davis. 9/27/22 Tr. at 19-20. Agent Parkinson described the shirt as being "worn by other members of the gang as a way to pay tribute"

to deceased gang members. *Id.* at 20. The phrase "Hills in Paradise" (or HIP) is a reference to the Western Hills and is "very similar to RIP, rest in peace." *Id.* at 21. Agent Parkinson saw this reference throughout social media postings. *Id.*

A screenshot shows Michael Williams holding an "in memoriam shirt for Mr. Chandler Booker," which has the acronym "HIP" on it. 9/27/22 Tr. at 22; Gov. Ex. 6 at 25. Mr. Rakestraw is also seen in this screenshot. *Id.*

Mr. Williams' large tattoo on his back can be seen in another screenshot. 9/27/22 Tr. at 23; Gov. Ex. 6 at 27. Agent Parkinson testified that it is a WHB tattoo, and he has seen the tattoo before on Mr. Williams and other gang members. 9/27/22 Tr. at 23.

Agent Parkinson's opinion is that the music video took several hours to record because some portions of the video were shot during daylight hours and other portions at night. *Id.* at 25. Agent Parkinson testified that Mr. Williams made this video a prominent part of his Facebook page. *Id.* at 26. For example, there is a screenshot dated June 17, 2015 from the video on his Facebook page. 9/27/22 Tr. at 26; Gov. Ex. 6 at 47. And there are other screenshots from the video added later. 9/27/22 Tr. at 26; Gov. Ex. 6 at 48. The caption on these screenshots says that the pictures posted are of the video "Out Here Bustin'," and references the term "WHoop." *Id.* Agent Parkinson testified that "WHoop" is "a call sign for Blood gang members with particular reference to the Western Hills having the W-H capitalized." 9/27/22 Tr. at 26. Agent Parkinson also testified that he has seen references to "WH36p," which refers to the 36th Street boundary of WHB territory. *Id.* at 27.

There is a screenshot with Mr. Williams "holding his hands in a way to simulate as if he were holding a rifle and firing it[.]" 9/27/22 Tr. at 27-28; Gov. Ex. 6 at 58. There are more screenshots with several gang members displaying gang signs and depicting shooting a rifle. 9/27/22 Tr. at 28. For example, Mr. Williams, Mr. Gray, Mr. Holguin, and Mr. Jones can be seen depicting the W with their hands, and Mr. Rakestraw is depicted using his hands to fire a rifle. *Id.*

During the course of his investigation, Agent Parkinson became familiar with the

term "Young Wreckin Krew" and its relation to the WHB.  *Id.* at 29.  He saw social media postings where individuals "proclaim themselves to be members of the Young Wreckin Krew."  *Id.* at 29-30.  Specifically, in their social media postings, both Mr. Williams and Mr. Rakestraw say that they are members of Young Wreckin Krew.  *Id.* at 31.

Testimony turned to Agent Parkinson's interpretations of various lyrics in the Bustin' song.  *Id.*  Agent Parkinson first testified that context was very important in his understanding of what the lyrics mean.  *Id.* at 32.  Also, for words or phrases that he was not familiar with, he researched through Google searches, including Urban Dictionary.  *Id.* With respect to the lyric "[i]f you ain't from Park or Hills," Agent Parkinson testified that "the South Park neighborhood area that's near Western Hills is aligned with the Western Hills Bloods.  South Park family gang has many members that are aligned with and friendly with members of the Western Hills."  *Id.* at 32-33.  Similarly, he testified that the phrase "Deuce Nine," which is 2-9, stands for "29th Street which is a major street in the South Park area," which is an important boundary for the WHB.  *Id.* at 33.

Agent Parkinson was asked to provide his interpretation of the following lyrics from the Bustin song:

> I move around with that stick, that steel.
> Try me, I'm going to kill,
> Better write your will,
> I tell Mack to hold that wheel, that wheel,
> When I'm hanging out that window, window,
> Burner come with extendo, extendos.

*Id.* at 34.  Agent Parkinson testified that the word "Mack" is the moniker of Samuel Rakestraw, so he understood that this reference was to Rakestraw.  *Id.*  Agent Parkinson testified that there was an investigation into the connection of WHB gang members to a drive-by shooting of Mia Scott.  *Id.* at 35.  However, he added that Mr. Williams was never a suspect in that shooting.  *Id.*

Agent Parkinson testified that the lyric "I do the shit for my N-word K, . . . I think about that, the shit every day," refers to Marcus Darton (aka Mar-K).  *Id.*  This lyric was

sung around the time the T-shirt with the picture of Darton was shown in the video. *Id.* Agent Parkinson explained that the homicide of Darton was the reason for the retaliation against two brothers, Floyd and Marshall Davis. *Id.* at 36. Marshall Davis was a member of the Freestone Blood gang who was killed in 2014. *Id.* The motivation for his murder was his alleged participation in the killing of Darton. *Id.*

Marshall Davis had already been killed prior to the release of the Bustin' song on April 8, 2015. *Id.* at 36-37. However, Floyd Davis was still alive when Bustin' was released. *Id.* at 37. Ana Rodriguez, a cooperating defendant, had not met up with Floyd Davis prior to the release of Bustin'. *Id.*

Counsel turned to the following lyrics that purportedly relate to information provided to law enforcement by Rodriguez:

> We'll have the bitch to come chill with you
> Just to cause diversion, huh
> Now we up in your house
> Standing behind your curtains,
> Ain't no talkin' when it comes to it
> I see your ass in person,
> Leave your ass worthless,
> I feel like it's worth it.

*Id.* at 37. Agent Parkinson testified that Rodriguez "said that Floyd Davis told her that they believed that that was the mode that was used to – in part of Marshall Davis's homicide." *Id.* at 38. And a few weeks after Bustin' was released, a similar method of obtaining access to Floyd Davis was used, and Ana Rodriguez had a similar role as the "bitch" referred to in these lyrics. *Id.*

Agent Parkinson testified that the following people were present when Darton was murdered: Floyd and Marshall Davis, from the Freestone's side, and David Williams, Michael Williams, and Marcell Gray, from the Western Hills side. *Id.* at 39. Darton was considered to be a "big homie," meaning a leader of the WHB gang. *Id.*

Testimony turned to the following lyrics:

> I do the shit for my N-word K, my N-word K,
> I think about the shit every day,
> Firm grip when I hold the cane,
> That's a green light,
> That means right away, bang.

*Id.* at 40.

Agent Parkinson interpreted the phrase "green light" in the lyrics to mean "a kill order." *Id.* at 40. He explained that it is "a common street phrase." *Id.* It was also significant that the phrase "green light" in the song comes immediately after references to Darton. *Id.* at 41. Agent Parkinson testified this "green light" phrase "shows that there was a hierarchy that called for this and sanctioned and approved it." *Id.* Agent Parkinson testified that the word "bust" is a "common street term for shoot and according to a source 'bustin'' is shooting N-words nonstop." *Id.* at 41-42.

Agent Parkinson testified about the following lyrics:

> So don't get out of line,
> I'm from Tre Six,
> But I fuck with some N-words from Deuce Nine.
> Try me, I'm going to shoot mine.
> At these bitch N-words's throats,
> Call me when it's go time.

*Id.* at 42.

He testified that the reference to "Tre Six" (which means three six) in the lyrics is "a reference to the 36th Street boundary in the Western Hills neighborhood." *Id.* at 42. With respect to the lyric "[b]ut I fuck with some N-words from Deuce Nine," Agent Parkinson testified that the phrase "fuck with" is "a positive reference meaning that they're cordial with or friendly with." *Id.* at 42-43. The Court asked Agent Parkinson how he came to the conclusion that "fuck with" shows a positive relationship when the next lyric is "Try me, I'm going to shoot mine." *Id.* at 43-44. Agent Parkinson responded that the subsequent lyric "is a departure from the previous line so it's a new context." *Id.* at 44. More specifically, he tried to explain that "[s]o when he's talking about the people from Deuce Nine, speaking in friendly terms, the next line, 'Try me I'm going to shoot mine'"

referencing to shoot his guns at these others, meaning rivals, and then at their throats, at the rivals's throats.  So it's a departure from the people from two nine street that he's close to rivals." *Id.* at 45.   Counsel asked Agent Parkinson if the phrase "fuck with" in the lyrics is similar to social media posts that said, "Fuck with rats, you're as good as a rat." *Id.* Agent Parkinson testified as follows: "[y]es, another way to think about it is if you associate with a rat, you're as good as a rat." *Id.*   As a result, Agent Parkinson interprets the lyric "fuck with Deuce Nine" to mean "associate with some people from Deuce Nine." *Id.* at 46.   And his interpretation is consistent with information that he learned during his investigation that the WHB gang was "at least not antagonistic rivals with members of the South Park Blood[s]." *Id.*

Agent Parkinson testified that the lyric "We gotta do this shit for my bros N-word" shows this "brotherhood closeness" of WHB gang members. *Id.* at 47.   He testified that the "lyrics were consistent with what we learned in the investigation about the gang." *Id.*

Testimony turned to other lyrics where "green light" is mentioned.  Specifically, the following: "If the big homie set that green light, then all my N-words go gonna go, I'm gonna go." *Id.*  Agent Parkinson testified that this lyric "refers to the kill order sent by the or decreed by the big homie, the leader in the gang." *Id.* at 48.   And his investigation revealed that several members of the WHB gang were present at the Floyd Davis homicide, which is consistent with the lyric: "Then all my people gonna go, gonna go[.]" *Id.*

Counsel turned to a lyric purportedly referencing the "code of silence" among gang members: "smoke a N-word and don't talk about it.  So don't ax me over that phone." *Id.* Agent Parkinson testified that "smoke" is a common street term for killing someone; "[a]nd then don't ask me over that phone was something that we know that the members of the Western Hills did with other people and counseled them and told them not to talk about the murder of Floyd Davis, for example, over the phone." *Id.* at 49.   In fact, in recorded conversations between David Williams and Ana Rodriguez, David Williams repeatedly encouraged her not to talk to the police and "to stick to the story[.]" *Id.*   Additionally, in Facebook postings between Mr. Rakestraw, defendant Megan Borges, and a rival gang

member named Kenyatta Dilyou, both Rakestraw and Borges confronted Dilyou and called him a rat and a snitch.  *Id.* at 49-50.    And the investigation led Agent Parkinson to believe that WHB members actually targeted Dilyou after those postings. *Id.* at 50.

The song "Brother Like a MF," which was posted on Mr. Williams' Facebook page on July 23, 2017, was played in court.  9/27/22 Tr. at 51; Gov. Ex. 3.   In September 2017, Agent Parkinson found this song on YouTube via a link on Mr. Williams' Facebook page. 9/27/22 Tr. at 52; Gov. Ex. 8.   The entire caption referenced Lil Mike, Sammy Mack, and YM Da Kid. 9/27/22 at 53.   Agent Parkinson heard all three men's voices on the recording. *Id.*  The voice at the beginning of the song is James Jones (aka YM Da Kid).

Counsel turned to the following lyric – "Shoot a N-word up, and then watch the news.  She was on my dick, until she heard that I killed her dude" – and tried to tie this lyric to comments made by Christina Monge during an interview.  *Id.* at 54.   Agent Parkinson testified that Monge recalled an incident when her live-in boyfriend, Reginald Johnson, was out late with the other members of the Western Hills.  *Id.*  She recalls him making it "a point to get up early, which was unusual for him, to watch the news."  *Id.* The news report that she saw him watching involved a drive-by shooting, although Monge did not mention the victim.  *Id.*   Agent Parkinson testified that the drive-by shooting "likely" involved Mia Scott.  *Id.*   Additionally, Agent Parkinson testified that a download of defendant Shawmaine Moore's phone revealed that "on the day of the homicide of Floyd Davis, just a few hours after and from what I understand before it was made public, [Moore] did a search of the news for the incident at the airport, the shooting at the airport."  *Id.* at 55.

Testimony turned to the following lyric: "These N-words speakin' on me.  Guess I'm hot now."  *Id.*   Agent Parkinson testified that "[b]ased on the investigation and context," the lyric "speakin' on me" appears to refer to the singer (YM Da Kid) talking about "having people cooperating with law enforcement talking about him."  *Id.* at 55-56. With respect to the lyric "Blood, I'm aiming for that eyebrow," Agent Parkinson testified that the word "Blood" is "kind of a preface to a statement."  *Id.* at 56.

1    Agent Parkinson next testified about his interpretation of the following lyrics: "And
2    if I ain't got it on me, [y]ou bet Blood do[.] And if we got it . . . on us, [t]hen we all shoot."
3    *Id.* at 57.  He testified that "there's several instances when the gang acted as a gang to carry
4    out a violent act.  And so this is a call to – saying that if one gang member is involved, then
5    all of the gang members will rally behind that person and be involved to the point of being
6    violent and shooting."  *Id.* at 57-58.

7    Agent Parkinson testified that the lyric, "Dope fiend kitchen[.]  We was cooking
8    like a muthafucka," was significant to him because the investigation revealed that WHB
9    gang members "sell crack cocaine and that in many instances they convert powder cocaine
10   to crack cocaine through a process of cooking it, often within the kitchen of sometimes
11   their homes, often in the kitchen of the shops or the rental houses from which they sell
12   drugs."  *Id.* at 58.  Specifically, Monge testified about this cooking process in shops or
13   houses and "several shops or houses affiliated with Western Hills members" were "taken
14   down" by the Tucson Police Department during the investigation.  *Id.*   And the evidence
15   seized showed that the cooking process was consistent among the houses and shops.  *Id.* at
16   58-59.

17   Agent Parkinson was asked to give his interpretation of these lyrics that appeared to
18   be sung by Mr. Rakestraw: "Red flags. We're from the hood.  This is some gang shit."  *Id.*
19   at 59.  He testified that "red flag" in the gang context refers to the red bandana worn by
20   Blood gang members.  *Id.*  The "hood" is a "reference to being part of the gang and the
21   territory" that is part of their gang activities.  *Id.*  Similarly, the phrases "Hills with it" and
22   "Hills" are "an identification of which gang they represent" or are "affiliated with."  *Id.* at
23   60.   The lyric "that's my brother, different moms" shows the brotherhood of the gang
24   members; and only men are members of the WHB gang.  *Id.* at 62.  Also, the lyric, "My
25   N-words talkin' about family," is a reference to being part of the gang and the gang being
26   family.  *Id.* at 60.  The lyric, "I catch some family talkin', they got circumcised," is a
27   reference to gang members or associates "cooperating with police or snitching and, as a
28   result of that, they got cut down in some way."  *Id.*

1    The lyric "I let it flame" has two meanings to Agent Parkinson.  *Id.* at 59.  The first

2    is when a gang member dresses in predominantly red, "that's called being flamed out." *Id.*

3    "Let it flame" is also a reference to firing a gun.  *Id.*

4    Testimony turned to lyrics that appeared to be sung by Michael Williams.  *Id.* at 61.

5    Specifically, "Lil Mike, boi, YWK, we hold the K, they killed my N-word K."  *Id.* Agent

6    Parkinson testified that "YWK" refers to the Young Wreckin Krew.  *Id.*  "They killed my

7    N-word K" is a reference to the murder of Marcus Darton.  *Id.*   Agent Parkinson agreed

8    with counsel that there is another reference to "green light" immediately after the reference

9    to Darton.  *Id.*

10   Agent Parkinson next testified about the significance of the following lyrics: "Hit

11   him with a brand-new 240, just to test it out." *Id.* at 62.  A "240" is a reference to an "M240

12   machine gun" which fires 7.62 caliber ammunition.  *Id.*   Agent Parkinson explained that

13   the reference to this firearm and ammunition was significant because "Ms. Rodriguez told

14   us that she was with David Williams when he test fired a rifle and she identified the

15   location" and law enforcement "found 7.62 shells consistent with what she described[.]"

16   *Id.*   And shells from 7.62 caliber ammunition were recovered from the scene of the Floyd

17   Davis homicide.  *Id.* at 63.

18   The rap song "Dome Body Dome Shot" was then played in court.  Gov. Ex. 2.  This

19   song was posted to Michael Williams' Facebook account on April 12, 2015.  *Id.* at 69.

20   Defendant Marcell Gray also posted references to this song on a Facebook account on

21   September 23, 2015.  *Id.* at 70.  Agent Parkinson testified that YM Da Kid (James Jones)

22   was rapping at the beginning of the song.  9/27/22 Tr. at 63-64.  The lyric "Fuck a Stone"

23   sung by Jones is a disparaging "reference to a Freestone Blood gang member, the rival

24   gang."  *Id.* at 64.   Agent Parkinson explained that if the lyric was "fuck with Stones," it

25   would have a completely different meaning.  "It would indicate a friendship or cordiality

26   with Stones."  *Id.*   With respect to the lyric "Hit 'em with their chopsticks," Agent

27   Parkinson testified that "'chopsticks' is a common street term for a firearm or rifle."  *Id.*

28   Agent Parkinson believes that when Michael Williams begins singing, his first

words are "Hills with it, see a Yabba." *Id.* at 65.  Agent Parkinson testified that "Yabba" is a disparaging reference to a Freestone gang member.  *Id.*   He bases that conclusion on the fact that "Yabba killer" is "prominently displayed on an in memoriam shirt of some deceased Western Hills member[.]" *Id.*   The "Hills with it" lyric means that the WHB gang was "on board to carry out the violence."  *Id.*

Testimony returned to Facebook postings made by Mr. Rakestraw and Ms. Borges and their relation to rap lyrics.  *Id.* at 66.  Agent Parkinson testified that the lyrics "You N-words pussy on Facebook hellafakin', you N-words can't get what when these levies breakin'" are significant because it was a disparaging comment about rivals of the WHB being active of Facebook.  *Id.*

Testimony turned to the relevance of cameras in the drug "shops" and certain lyrics that refer to cameras at the shops.  Agent Parkinson first testified that the lyrics "If you ain't trying to push" means that if you're not trying to sell drugs, because "push" is a common street term for selling drugs.  *Id.* at 68.   The lyrics "you ain't from the turf then" is another reference to not being loyal or part of the gang.  *Id.*   The lyrics "Because all my N-words clockin' in to put work in," is a commentary that gang members are expected to "put work in both at the shops selling drugs and put work in on behalf of the gang."  *Id.* The lyrics, "Got N-words working the cameras.  In case the cops hit us," refers to the shops having security cameras to give the people selling drugs at the shops "either lead time to get rid of the drugs or know that the police are coming and plan an escape."  *Id.* at 68-69. Agent Parkinson explained that several of the shops had security cameras.  *Id.* at 66. Additionally, in recorded jail calls between defendants Cliffton Martinez and Labarr Martinez, they "were lamenting that Reginald Johnson and Marcell Howell should not have been caught by police" because of the security cameras.  *Id.* at 67.  Finally, Agent Parkinson testified that the lyric "slidin' out with the chops" means "coming out with guns ablazing."  *Id.* at 69.

Agent Parkinson testified that the lyric "Free Sly like a mothafucka" means "a call to free" defendant Shawmaine Moore, whose nickname is Sly, from prison.  *Id.*  at 70.

- 36 -

**<u>Cross-Examination by Mr. Flores:</u>**

Agent Parkinson does not recall attending trainings that dealt specifically with rap music. *Id.* at 72-73. And he has not had any training on interpreting rap music. *Id.* at 73. He is not a fan of rap music and does not listen to it on a regular basis. *Id.* He has heard rap songs but has not "sought it out or chose to listen to it[.]" *Id.*

Counsel explored Agent Parkinson's testimony on direct that he listened to a lot of recorded conversations "in order to help him understand these songs." *Id.* at 74. Agent Parkinson listened to jail calls, although he cannot recall specific calls. *Id.* When asked for one example, he testified about the jail call between Cliffton Martinez and Labarr Martinez discussing security cameras at the shops "to provide insight into what some of the lyrics meant." *Id.* at 74-75. Agent Parkinson agreed with counsel that neither Michael Williams, Samuel Rakestraw, nor James Jones were part of those recorded conversations. *Id.* at 75. He also agreed with counsel that he cannot point to a recorded conversation involving Williams, Rakestraw, or Jones that would "put some kind of context into this rap music." *Id.*

Agent Parkinson estimates that he listened to about a dozen of the rap songs at issue, including the three played in court. *Id.* at 76. He does not have any indication of who wrote the lyrics of any of the songs. *Id.* But he seems to recall being told during interviews that Michael Williams wrote the "Bustin'" song. *Id.* at 77. But the interviews were not of Williams, Rakestraw, or Jones, and he cannot recall the interviewee(s). *Id.*

Agent Parkinson agreed with counsel that he testified on direct examination that certain screenshots from the Bustin' video show areas around the 36th Street neighborhood that he believes was the territory of the WHB. *Id.* at 78-79. He acknowledged that there are other gangs in that area, but to his knowledge they do not claim the Western Hills neighborhood. *Id.* at 80. His understanding is that the Vista Bloods are north of 36th Street. *Id.* He is not familiar with the boundaries of the Vista Brown Pride gang. *Id.*

Agent Parkinson conceded that he does not need the music video to establish the area allegedly controlled by the WHB. *Id.* He also conceded that he does not need the

video to establish gang affiliation in light of the tattoos, alleged gang colors, and alleged gang signs depicted in the screenshots. *Id.* at 80-81.   Agent Parkinson agreed with counsel that "there's a lot of evidence indicating that Mr. Williams and others are part of this gang" apart from the video. *Id.* at 81-82.  In fact, Agent Parkinson testified that even without the rap songs, he can "say confidently that these are gang members[.]" *Id.* at 82.  Similarly, Agent Parkinson testified that the screenshot that captures the in memoriam T-shirt depicting Marcus Darton (aka Mar-K), "is certainly helpful in determining or in showing the purpose of a lot of the gang violence." *Id.* at 82-83.  And there is other evidence that will be presented "through eyewitnesses that will discuss the rivalry between Freestones and Western Hills Bloods[.]" *Id.* at 83.

Testimony turned to a statement in a law enforcement report that refers to Young Wreckin Krew as a subset of Western Hills or WHB gang members comprised of Michael Williams, Samuel Rakestraw, Sherman Shields, Marcell Gray, Shawmaine Moore, and David Williams.  9/27/22 at 84; Doc. 2101 at 4.  Agent Parkinson did not speak with Michael Williams, Mr. Rakestraw, or Sherman Shields about their alleged membership in the Young Wreckin Crew.  *Id.* at 84.   The statement in the report that the "Young Wreckin Krew is known for killing, selling drugs, making rap music, and profiting off of the WHB" came from Bernard Rayford, a cooperating witness.   *Id.* at 85. Agent Parkinson's understanding is that Rayford got this information "based on his life in Tucson and being in the streets, so to speak, and based on his conversations with other members of the Western Hills Bloods[.]" *Id.* at 86.

Agent Parkinson was made aware the morning of the evidentiary hearing that Michael Williams and Mr. Rakestraw "incorporated a company called the Young Wreckin Krew in order to advance their rap careers." *Id.* at 86-87.  "As part of the investigation, he never looked into that[.]" *Id.* at 87.   Agent Parkinson was shown public documents from the Arizona Corporation Commission which reflect that Michael Williams and Mr. Rakestraw incorporated Young Wreckin Krew in 2018.  Def. Ex. 33; 9/27/22 Tr. at 87-88.  Agent Parkinson agreed with counsel that a corporation would need to be formed "to

legally conduct business in Arizona."  9/27/22 Tr. at 88.  He also agreed that the names Sherman Shields, Marcell Gray, Shawmaine Moore, and David Williams do not appear in those incorporation documents.  *Id.*

Agent Parkinson was aware that there was a group of individuals in Tucson called the Wrecking Crew, but he was "not familiar with their rap."  *Id.* at 89-90.  He was also aware that Michael Williams's older brother was a member of the Wrecking Crew; but he did not know it was a rap group.  *Id.* at 90.  When asked to concede that he "never investigated thoroughly enough to determine that the Wrecking Crew was actually a rap group that was led by Mr. Michael Williams's older brother," Agent Parkinson responded that his "investigation indicated that the Wrecking Crew was a subset of violent gang members, not rappers."  *Id.*   In response to counsel's question whether he simply "took the word[] of a confidential informant who was bargaining his way out of prison," Agent Parkinson testified that he does not recall "all of the reference materials" or sources, but it seems to him "that there was more information that Young Wreckin Krew was active in carrying out gang business than just making rap music."  *Id.*

Agent Parkinson testified that he wants to make sure justice is served in this case, and "justice is served once a jury reaches a verdict."  *Id.* at 91.  He also testified that when reading and listening to the rap lyrics, he was "of the mind" that he wanted justice served. *Id.* at 92.

Testimony turned to Agent Parkinson's interpretation of the lyrics.  Agent Parkinson believes that the song "Bustin'" "provides motive for the homicide of Floyd Davis[.]" *Id.* He agreed with counsel that he testified on direct examination that the word "dump" used in the lyric "they'll dump on you . . . if you ain't from Park or Hills . . . can mean empty the clip of one's firearm[.]" *Id.*

Agent Parkinson also agreed that he testified that the lyric, "I tell Mack to hold that wheel" refers to Mr. Rakestraw driving a car, and the lyric "When I'm hanging out the window" refers to a drive-by shooting.  *Id.* at 92-93.   Agent Parkinson explained that he did not previously testify that these lyrics refer to the Mia Scott shooting because that

shooting occurred after the release of "Bustin'." *Id.* at 93.  Counsel pointed Agent Parkinson to the government's pleading which says that these lyrics could be referring "to the Mia Scott shooting but it also puts the co-defendants acting together to commit acts of violence[.]" *Id.*   Agent Parkinson agreed with counsel that Michael Williams was clearly not involved in the Mia Scott shooting because he was incarcerated at that time.  *Id.*  Agent Parkinson cannot recall if Mr. Rakestraw was also incarcerated at that time, but it would not surprise him if that was the case.  *Id.* at 93-94.  Agent Parkinson agreed with counsel that the lyrics do not reference a victim, and neither Michael Williams nor Mr. Rakestraw are charged in the indictment with a drive-by shooting.   Counsel pointed out that there was a drive-by shooting of Kenyatta Dilyou, and asked Agent Parkinson if he was aware that Mr. Rakestraw was falsely accused of being involved in that crime.  *Id.* at 94-95.  Agent Parkinson testified that "I know Mr. Rakestraw was arrested for it," but he does not know "the extent of his involvement[.]" *Id.*  He added that he knows that the case was dismissed. *Id.* at 95.

Agent Parkinson did internet searches to find definitions of terms to assist in his interpretation of the Bustin' lyrics. *Id.* at 97-98.   Counsel proceeded to go through the definitions of terms and phrases that resulted from the internet searches which Agent Parkinson used to interpret certain lyrics.  The definition "Lil" is an abbreviation for "little," and denotes a relatively younger or newer gang member who falls under the mentorship of an older gang member known as big homies.  *Id.* at 99.   As a result, the reference in the lyrics to "Lil Mike," signified that Michael Williams was a newer or younger gang member.  *Id.* at 100.  Agent Parkinson denied counsel's assertion that he "cherry-picked" parts of the sources that reference gang membership.  *Id.*  For example, Agent Parkinson denied that he ignored the part of the article that he relied upon which discussed how prevalent "Lil" is in the hip hop industry.  *Id.* at 101.

Agent Parkinson used the Urban Dictionary to find a definition of "bustin'" as "shooting ends, nonstop, shooting repeatedly, like shooting coppers."    *Id.* at 102-103.  Agent Parkinson again denied that he "cherry-pick[ed] the best meaning to fit" his theory

of the case.  *Id.* at 103.   Agent Parkinson testified that "[b]ased on my understanding of the lyric and the context, I found references that supported that."  *Id.*   He agreed with defense counsel that he "did that over and over" for different words.  *Id.*   Agent Parkinson never checked the source of the definitions on Urban Dictionary.  *Id.*

Agent Parkinson agreed that "two people can listen to the same song and actually hear different words."  *Id.* at 105-106.  For example, Agent Parkinson believes that a lyric is: "I do the shit for my N[-word] K."  *Id.* at 106.  Agent Berlin believed the lyric is: "I do this shit for my N[-word] K."  *Id.*  Agent Parkinson agreed with counsel that "the" and "this" can have different meanings.  *Id.*  However, he believes that this lyric means violence toward other people, regardless of whether the lyric uses "the" or "this."  *Id.* at 107. Counsel asked Agent Parkinson if "I'm doing this shit" could mean that Michael Williams is rapping and putting out this video to pay homage to his dead friend.  *Id.*  Agent Parkinson said that he doesn't know.  *Id.*  When asked if the reason he doesn't know is because that's another reasonable interpretation of the lyric, Agent Parkinson responded "Well, I don't know if it's reasonable."  *Id.*  He added that "the reasonableness, I believe, comes in the context."  *Id.*

With respect to the lyric, "Now it's a green light," Agent Parkinson agreed that his report reflects that he initially interpreted that lyric to mean "right away."  *Id.*  He also agreed that he "testified on direct that 'green light' meant order to kill" or a "kill order." *Id.* at 108.  Agent Parkinson admitted that "green light" can have a different meaning.  *Id.* at 111.  For example, when he told Agent Berlin, "Let me know when you want to give the CI [Ana Rodriguez] the green light," he was not giving a kill order or conspiring to kill anyone.  *Id.* at 110.  Although Agent Parkinson agreed that "green light" does not mean kill order every time the phrase is used, he added that it depends on the context in which it is made.  *Id.* at 111.

The Urban Dictionary defined "spray" as blinding or rapidly shooting a weapon.  *Id.* Agent Parkinson again testified that he believes this is how the word was used in the rap lyrics based on the context.  *Id.*   He agreed that the government incorporated this definition

in its pleading setting forth the rap lyrics it wants to introduce at trial. *Id.* at 112.

Agent Parkinson acknowledged another instance when two people heard the same rap lyrics differently. *Id.* at 116. Specifically, in the government's pleading, the following lyric is quoted: "Don't play it right. Then you a day away." *Id.* Agent Berlin's report shows his translation of the lyric as "dead weight." *Id.* Agent Berlin agreed with counsel that it is difficult to get to a proper interpretation of the lyrics if people hear the words differently. *Id.* at 116-117.

Counsel turned to lyrics that Agent Parkinson previously testified were related to the Marshall Davis homicide. *Id.* at 117. Specifically, "We'll have a bitch come . . . chill with you. Just to cause diversion. Now we up in your house. Standing behind the curtains." *Id.* Agent Parkinson agreed that Floyd Davis was alive when the video that contained these lyrics was published. *Id.* He also agreed that Ms. Rodriguez "hadn't even been talking to Floyd Davis when this video was published[.]" *Id.* at 117-118. As a result, counsel asked Agent Parkinson whether his theory is causing a diversion was the modus operandi for the murder of Marshall Davis. *Id.* at 118. Agent Parkinson testified that "it's not what I believe, . . . it's what was reported to me" by Ms. Rodriguez. *Id.* Specifically, Rodriguez told Agent Parkinson that Floyd Davis told her that he "believed that there was a woman involved in" the set-up of his brother. *Id.* at 118-119.

Counsel asked if what Ms. Rodriguez reported was the only evidence that he used to interpret these lyrics as referring to Marshall Davis being set up by using a female. *Id.* at 119. Agent Parkinson testified that Ms. Rodriguez "was specific about what David Williams told her to do, to include using the word see if Floyd will come 'chill' with you, 'chill and drink with you.'" *Id.* Counsel reminded Agent Parkinson that his question pertained to Marshall Davis. *Id.* Agent Parkinson testified that the lyrics "seem to be a blueprint." *Id.* However, he agreed with counsel that Ms. Rodriguez "reported that she had not had recent contact with Floyd Davis around the time of this video." *Id.* at 120. Counsel followed up by asking, "so unless the author of this lyric could tell the future, could predict the future, these lyrics are not referring to anything regarding Floyd Davis,

correct?" *Id.*   Agent Parkinson testified that "I think the author of these lyrics . . . used these lyrics moving forward and it's my understanding, based on the content and the context . . . that it was used previously and, as we later found out with Floyd Davis, used again." *Id.*  When asked to explain what he meant by the phrase "used previously," Agent Parkinson testified "based on the context, this appears to be the MO that they used for Marshall Davis, 'they' meaning whoever carried out that murder, and then it was again used later on Floyd Davis." *Id.* at 121.   When counsel asked Agent Parkinson what information he had except Ms. Rodriguez's statement "that suggests Marshall Davis was lured to his death by a female," Agent Parkinson testified that he could not answer that without his reports and notes. *Id.*

The Court asked Agent Parkinson how the lyric could refer to the murder of Marshall Davis given that it is in the future tense: "we will have a bitch come chill with you." *Id.* at 124.  Agent Parkinson testified that "[a]s it reads, that appears to be a future – yeah.  So it's my understanding . . . that this was the MO that the gang used to carry out their acts of violence." *Id.*

With respect to the next verse, "Now we're up in your house standing behind the curtains," counsel asked Agent Parkinson if he had any evidence that Marshall Davis was killed in his home. *Id.* at 122.  Agent Parkinson could not answer that question without his notes. *Id.*  But he agreed that Marshall Davis was killed in a parking lot of an apartment complex after he was ambushed getting out of his car.  *Id.* at 123.  He also agreed that no one has ever been charged with the murder of Marshall Davis.  *Id.*

Agent Parkinson added that he seems to recall that "Ms. Rodriguez told us of another incident when there was a rival gang member in an apartment of a nearby associate and that their plan was to then, from that apartment, carry out violence against that person." *Id.* at 122.  Counsel asked Agent Parkinson if "that means that these lyrics can now refer to a third occurrence" that he does not "have a lot of facts about."  *Id.*  Agent Parkinson testified that "what I'm saying is these lyrics appear to be the MO for how they operate." *Id.* at 122-123.

Counsel further explored Agent Parkinson's theory that causing a diversion using a female was the MO of the WHB. *Id.* at 125-126. Agent Parkinson agreed that the following violent acts are alleged in the indictment: (1) the Floyd Davis homicide; (2) the Edward Murphy homicide; (3) the Kiana Griffin shooting; (4) the Kenyatta Dilyou shooting; (5) the Mia Scott shooting; and (6) the hookah lounge shooting allegedly against Michael Williams. *Id.* at 126. When asked to identify which of these violent acts involved a female causing diversions, Agent Parkinson only identified the Floyd Davis shooting. *Id.* Counsel asked Agent Parkinson for the basis of his opinion that the gang's modus operandi is to use a female to cause a diversion given that five of the six violent acts do not involve that MO. *Id.* at 127. Agent Parkinson testified that, if he recalls correctly, in the Kenyatta Dilyou shooting "a female was used to lure him out or to lure the parties together." *Id.* at 127-128. Counsel asked whether "that shooting was allegedly motivated for girlfriend reasons." *Id.* at 128. Agent Parkinson does not "know what all the reasons were motivating that shooting." *Id.* But Agent Parkinson agreed that the remaining violent acts alleged in the indictment did not involve using a female to create a diversion. *Id.* at 127-128.

Testimony turned to lyrics allegedly referencing a code of silence. Specifically, the lyric: "I smoke an N and don't talk about it, so don't ask me over that phone." *Id.* at 128. Agent Parkinson agreed with counsel that he testified on direct that this lyric refers to David Williams continually telling Ms. Rodriguez during phone calls "not to talk to the police about the homicide." *Id.* at 129. Counsel asked whether those phone conversations were in direct conflict with the alleged "code of silence" lyrics, "Don't axe me over the phone." *Id.* Agent Parkinson testified that, on the contrary, David Williams is telling Ms. Rodriguez "to follow the advice of, 'Don't axe me over that phone.'" *Id.* Agent Parkinson has no knowledge of whether David Williams is "the author of these lyrics." *Id.* at 130.

The Court pointed out that reference in the lyric to not talking on the phone cannot relate to the Floyd Davis homicide because that occurred after the song was released. *Id.* at 139. Agent Parkinson testified that the "statement refers to the philosophy of the gang of not speaking about their crimes over the phone." *Id.* Counsel pointed out that there are

thousands of text messages "where they're talking about selling drugs, buying guns, [and] possessing guns." *Id.* at 130. Agent Parkinson conceded that "[c]ertain crimes are openly discussed" in the phones and in text messages, to include drug dealing." *Id.* at 131.

Counsel turned to lyrics that Agent Parkinson believes reference the territory of the WHB. *Id.* Specifically, the lyric "I'm from Tre Six" is a reference to the WHB. *Id.* at 132. The lyric, "But I fuck with some N's from Deuce," refers to the South Park and shows a positive relationship between South Park and WHB. *Id.* Agent Parkinson's understanding is that "Deuce Nine" refers to 29th Street. *Id.* Agent Parkinson is aware that there is a 29th Street gang, but he does not know if they are affiliated with South Park. *Id.* Agent Parkinson's understanding is that South Park refers to the area in and around South Park Avenue in Tucson, Arizona. *Id.* Agent Parkinson agreed with counsel that 29th Street "runs through that boundary near South Tucson," and it "goes all the way up to Wilmot and 29th Street . . . which is considered the east side of Tucson. *Id.* at 133. As a result, counsel asked Agent Parkinson if he may have been incorrect in correlating Deuce Nine with South Park. *Id.* Agent Parkinson testified that "based on my understanding of the lyrics and the other information that investigators obtained, this was the only context that made sense" to me. *Id.*

Counsel turned to the following lyrics: "I say my life is trustin' this trigga (This trigga). Look, I said it once. I ain't perfect (I ain't perfect). Pistol cocked and I'm searchin' (I'm searchin'). Leave you bitch [N's] worthless (Worthless). 'Cause I felt the shit. And it's all worth it." *Id.* at 133-134. Counsel pointed out that the government's pleading states that the lyrics evidence that "Michael Williams will not associate or trust with anyone outside of his gang, and that he relies on his ability to kill rivals for his own safety[.]" Doc. 2101 at 11; 9/27/22 Tr. at 133. Contrary to this statement in the pleading, Agent Parkinson testified "there's nothing in here about being loyal only to his gang or being trusting only to his gang in this verse." 9/27/22 Tr. at 134. However, Agent Parkinson testified that the lyrics on the prior page of the pleading – "I ain't fuckin' with none of you [N's] ([N's]). I ain't trustin' none of you [N's] ([N's]) – do tend to show Michael Williams not associating

1    or trusting anyone other than his gang.  *Id.* at 135.   Agent Parkinson testified that he

2    interpreted the reference in the lyrics to "trusting his life in this trigger" to mean that "he's

3    going [to] rely on his ability to kill rivals for his own safety." *Id.* at 136.

4         Testimony turned to the Dome Body song.  *Id.* at 139.   Agent Parkinson agreed that

5    he testified on direct that the rappers in this song are YM Da Kid, potentially Mr.

6    Rakestraw, and allegedly Michael Williams.    *Id.* at 140.   He agreed that Agent Berlin

7    completed his review of this song in March of 2016.  *Id.*  Agent Berlin noted in his report

8    "that there was a wall post from an account associated to Marcell Gray on September 23rd

9    of 2015[.]" *Id.*  That is the only reference in the report about the posting of this song.  *Id.*

10   at 141.   When asked if he was aware that Michael Williams was in state custody on

11   September 23, 2015, Agent Parkinson testified that he cannot say definitely without his

12   "reference materials," but it was possible.  *Id.*   Agent Parkinson agreed that Michael

13   Williams was also in state custody on October 4, 2015, the night of the Mia Scott shooting.

14   *Id.*   When asked if it was clear that Michael Williams could not have posted this song

15   during these time frames, Agent Parkinson testified that the only information he has is that

16   Gray posted the song in September 2015; he does not know when the song was posted onto

17   SoundCloud.  *Id.* at 141-142.

18        Agent Parkinson agreed that Dome Body involved a rapper named Mozzy.  *Id.* at

19   142.  In fact, the title of the song says, "YM DA KID, 'Dome Body' featuring Mozzy, Lil

20   Mike, and Sammy Mack[.]"  *Id.*   Agent Parkinson is aware that Mozzy is a successful rap

21   artist.  *Id.*   Agent Parkinson does not know who authored the lyrics for Dome Body.  *Id.*

22   Agent Parkinson agreed that lyrics in this song have been interpreted differently.   One

23   person interpreted a lyric as "Get it blazing with the winner."  *Id.* at 144.   "Agent Berlin

24   hears, 'Get it blazing with the wetter, not a chrome hot.'"  *Id.*   Agent Parkinson agreed that

25   "whenever a lyric is interchanged, it could change the meaning of it[.]"  *Id.*   Agent

26   Parkinson added that when he listened to the lyric, "'wetter' is what I most recently heard."

27   *Id.*  Agent Parkinson agreed with counsel that "that's something that's happened before...

28   between [him] and Agent Berlin," where both listened to the same song and talked about

- 46 -

the "potential differences" in what was heard.  *Id.* at 144-145.  He also agreed that it's possible that other listeners could hear something differently than what he and Agent Berlin heard.  *Id.* at 145.   There is another lyric in Dome Body that is heard differently by two listeners.  In the government's pleading, it says the lyric is: "The 40 isn't edible."  *Id.*  Agent Berlin believed the lyric was: "Phony as an animal."  *Id.*

Testimony turned to lyrics in Dome Body that Agent Parkinson interpreted as references to threatening Facebook postings made by Megan Borges and Mr. Rakestraw. *Id.* at 146.  Those lyrics are:  You [N's] pussy on Facebook.  Hella fakin' (Hella fakin'). You [N's] can't get wet.  When these levies breakin' (These levies breakin').   Doc. 2101 at 23.   Agent Parkinson testified that these lyrics are "relevant because of the conversations on Facebook that had incited so much back and forth between the rivals."  9/27/22 Tr. at 146.  When asked if the reference to Facebook was "the only commonality between that verse" and postings by Ms. Borges and Mr. Rakestraw, Agent Parkinson testified that "the context of this causes me to believe that the Facebook posts between Borges and Rakestraw are relevant."  *Id.* at 147.  He added that "I think that my review of the evidence in this case has given me an insight into much of what the Western Hills gang members talk about, including these lyrics."  *Id.*  at 148.  However, he agreed with counsel that he has never been qualified, or attempted to be qualified, as an expert to interpret rap lyrics.  *Id.*

With respect to the use of the word "shop" in the lyrics, Agent Parkinson again testified that he "related this back to a conversation" between Labarr Martinez and Cliffton Martinez.  *Id.*  Neither Michael Williams nor Mr. Rakestraw were part of the conversation. *Id.* at 149.   As far as Agent Parkinson is aware, neither of these men authored the lyrics. *Id.* at 148-149.   Agent Parkinson agreed with counsel that the word "shops" has been referred to as a crack house, and both words are used nationwide, and are not specific to the WHB.  *Id.* at 150.

The word "Yabba" used on the Dome Body song was also interpreted differently by Agent Berlin.  He heard "Hills with it, see ya', yup, I'm trying to knock 'em down." *Id.* at 151.  Agent Parkinson's understanding is that "Agent Berlin hadn't heard the term 'Yabba'

in context at that point." *Id.* Specifically, he does not believe that Agent Berlin was "familiar with the term 'Yabba' as a disparaging term toward the Freestone gang members." *Id.* at 152.

Agent Parkinson interpreted the lyric "Fuck a Stone" as a reference to the rivalry between the WHB and the Freestones. *Id.* Agent Parkinson agreed with counsel that there are fact witnesses, including Ms. Rodriguez, that know about that rivalry. *Id.* at 152-153.

## **Cross-Examination by Mr. Payson:**

Agent Parkinson does not have any formal education in rap music and is not a fan of rap music. *Id.* at 155. He has never attended a rap concert. *Id.* at 156. When asked if he dislikes rap music, Agent Parkinson responded: "I don't favor it." *Id.* at 155. He explained that he objects to "[m]uch of the content and the profanity and the vulgar language[.]" *Id.* at 156. Because he does not listen to rap music, he does not have an opinion on whether rap music has artistic value. *Id.* He has heard of several rappers or rap groups, such as Kanye West, Cypress Hill, and Wu-Tang Clan. *Id.* at 156-157.

Agent Parkinson used the Urban Dictionary as a source to confirm his understanding of what the rap lyrics at issue mean. *Id.* at 157. He described the Urban Dictionary as a "changing dictionary based on the trends in popular jargon of the time." *Id.* He does not know if "anyone can just send in the definition of a word[.]" *Id.* The Urban Dictionary has multiple definitions for some words, including the words that he queried. *Id.* at 157-158. Agent Parkinson agreed that in most instances, he picked the definition "that matched the understanding that [he] had of the lyrics." *Id.* at 158.

Agent Parkinson agreed with counsel that the Urban Dictionary definition of "Urban Dictionary" is "what you get when you cross Wikipedia with mental retardation." *Id.* at 159. It also states that "Urban Dictionary is supposed to be a user inputted dictionary for words. However, it has become a mindless forum of jokes, viewpoints, sex, and basically anything but the real definition of a word." *Id.* Agent Parkinson testified that he found many of the Urban Dictionary's definitions of words to be accurate and mirror the definition set forth in a regular dictionary. *Id.* at 159-160. Agent Parkinson does not recall

ever using the Urban Dictionary to interpret language in court. *Id.* at 160.  And he does not know the people who provided the definitions for the words that he queried. *Id.* at 161.

Counsel turned to the Urban Dictionary's definitions of certain words. *Id.* at 160. One definition of "ride dirty" is "[t]o roll in your car with drugs, guns, or other shit you don't want the cops to find, usually drugs." *Id.*  Another definition is "[t]o not have taken a shower in a while or wiped one's ass properly." *Id.*  There are two definitions for "dinner plate," which is used in the lyrics. *Id.* at 162-163.  In his report, Agent Parkinson referenced the definition of a girl that you "want to have sexual intercourse with," which he explained is sometimes referred to "on the streets as a 'dinner.'" *Id.* at 163.  Agent Parkinson did not include the other definition, which is "a way of making money" to feed oneself. *Id.* at 162-163.

Agent Parkinson agreed that he testified on direct that "fuck with" has a positive connotation -- *i.e.*, to be cordial or friendly with -- in the context in which it was used in the lyrics. *Id.* at 164-165.  But he agreed that the word "fuck" can mean something very negative, so the word has a double meaning that can be taken out of context. *Id.* at 165.

Agent Parkinson agreed with counsel that he testified on direct that the Young Wreckin Krew is a group of violent people and rappers. 9/29/22 Tr. at 6.  He also testified that this group included:  Michael Williams, Samuel Rakestraw, Sherman Shields, Marcell Gray, Shawmaine Moore, and David Williams. *Id.*  Agent Parkinson obtained some of his information about YWK from Bernard Rayford. *Id.* at 8.  When asked if Rayford was the only source for the information, he testified that "I know that YWK and Young Wreckin Krew has come up," but he cannot recall in which conversations without his reports or notes. *Id.* at 9.  Agent Parkinson is aware that Michael Williams and Samuel Rakestraw have a YWK tattoo; he is "not aware of all the tattoos on the others." *Id.* at 6-7.  He agreed that he learned shortly prior to this hearing that Michael Williams and Samuel Rakestraw incorporated YWK. *Id.* at 7.  He also agreed that none of the other men that he believes are in the YWK are listed in the incorporation paperwork. *Id.*  Agent Parkinson is aware that Michael Williams and Samuel Rakestraw are rappers; he does not know if David

Williams, Shawmaine Moore, Marcell Gray, or Sherman Shields are rappers. *Id.* at 8.

Agent Parkinson is not aware of any information that Mr. Rakestraw was involved in the Marshall Davis homicide. *Id.* at 10.   He also does not recall Michael Williams's "name specifically being mentioned as being involved." *Id.* at 11.   Agent Parkinson knows that there are at least four suspects in that homicide, but he cannot recall their names without his reference material. *Id.* at 11-12.   When asked if Michael Williams or Samuel Rakestraw were suspects, Agent Parkinson would not directly answer the question; instead, he testified that he's "not aware of what Mike Williams's involvement or Samuel Rakestraw's involvement is in that homicide." *Id.* at 11.

Testimony turned to the song "Brother Like An MF," which was posted on July 23, 2017. *Id.* at 12. Agent Parkinson agreed that the song was posted a couple years after the Floyd Davis homicide. *Id.*   He believes that one of the rappers is YM DA Kid, which is James Jones. *Id.* at 13.   Agent Parkinson agreed that his testimony on direct was that he would have attempted to include Jones in this investigation if he had not passed away in 2017. *Id.* at 13-14.    Jones would have been included in the investigation based on information received about his involvement in the Mia Scott shooting in October 2015 and drug crimes. *Id.* at 14.   Agent Parkinson agreed with counsel that the instant case was presented to federal prosecutors in the Fall of 2015. *Id.* at 14-15.   He also agreed that Jones was not among the nine people presented to the prosecutors for prosecution. *Id.* at 15.

Counsel turned back to the Urban Dictionary. *Id.* at 19.   With respect to the lyric, "Hills with it," Agent Parkinson cited to the definition of "getting ready to fight." *Id.* at 19-20.    Agent Parkinson acknowledged that the Urban Dictionary provides another definition: "Cool, be on top of things, in the know, in with current styles or trends." *Id.* at 20.   Agent Parkinson interpreted the phrase "We're gonna slide" to mean "to fight." *Id.*   Agent Parkinson agreed that there are many definitions of "slide," including "coming or going" to a place. *Id.* at 21.

Counsel returned to the song "Brother Like An MF" and errors made in translating

the lyrics. *Id.* at 22.   Agent Parkinson agreed that he sent an email to Agent Korn in September 2017 in which he said a lyric was "YM K." 9/29/Tr at 23; Def. Ex. 13.   Agent Parkinson testified that perhaps this was a typographical error because this song was sung by YM DA Kid. 9/29/22 Tr. at 23. He does not know what "YM K" stands for. *Id.* In the email, Agent Parkinson also translated a lyric as: "Hit 'em with a brand-new C40." 9/29/22 Tr. at 23; Def. Ex. 13.   Agent Parkinson is not familiar with the term "C40." 9/29/22 Tr. at 24.   He does not know that a "C40" is the model of a Volvo car or a pellet gun. *Id.* He testified that, to the best of his knowledge, a pellet gun was not used in the charged offenses. *Id.* He agreed that this lyric has recently been translated as "a 240." *Id.* As a result, Agent Parkinson's interpretation of "a 240" is that it is a reference to an M240 fully automatic machine gun which is a heavy weapon used by the United States military. *Id.* at 25-26. He testified that a "normal civilian" cannot buy this gun and that they are very expensive. *Id.* at 26.   This gun fires 600 to 800 rounds a minute. *Id.* To the best of his knowledge, "no such weapon was ever used in this case." *Id.* at 26-27.   However, the 7.62 ammunition used for this machine gun is "a very common round" that is used in many different types of firearms. *Id.* at 27.

Agent Parkinson translated another lyric as "Right out the woods we shot, send them on a crash." 9/29/22 Tr. at 29; Def. Ex. 13.   Agent Parkinson agreed that he interpreted this lyric to mean that Floyd Davis "was ambushed by Williams and other Western Hills Bloods members who laid in wait for Davis in the desert." 9/29/22 Tr. at 29.   Agent Parkinson also agreed that the official translation of this lyric is: "It's right out the whip." *Id.* at 28.   And if that is the correct translation, "then that would not make sense in the context of the Floyd Davis homicide." *Id.* at 30.   Agent Parkinson agreed that a "whip" is typically a car. *Id.* He also agreed that Mr. Rakestraw is not charged in the indictment with a drive-by shooting and had nothing to do with the Mia Scott drive-by shooting because he was in the Pima County Jail at the time it occurred. *Id.* at 30-31.   Although Mr. Rakestraw was initially charged with the Kenyatta Dilyou shooting, the charges were later dismissed when Dilyou told law enforcement that Mr. Rakestraw was not involved. *Id.* at 31.   Agent

Parkinson agreed with counsel that the meaning of this lyric completely changes depending on whether the word "woods" or "whip" was used.  *Id.* at 32.

Agent Parkinson interpreted the lyric, "Shoot N up," as to carry out a gang shooting. *Id.* at 32-33.  When asked if the word "shoot" denotes "gang," Agent Parkinson testified that "based on the context of the entire song, that's the understanding that I had based on that lyric." *Id.* at 33.  But he agreed that "shoot" is not synonymous with "gang." *Id.*  In response to counsel's question if Agent Parkinson just added the word "gang," Agent Parkinson testified that he did so "[b]ased on the totality of the song." *Id.*

Testimony turned to the lyric: "Then watch the news, she was on my dick until she heard that I killed her dude." Def. Ex. 3 at 1; 9/29/22 Tr. at 34.  Agent Parkinson agreed that YM DA Kid sang this lyric.  9/29/22 Tr. at 35.  When asked if he had any information to suggest that YM DA Kid was involved in a homicide, Agent Parkinson testified that he cannot recall.  *Id.*

Agent Parkinson interpreted the phrase "Poppin' Ns" used in a lyric to mean "shooting rivals." *Id.* at 35-36.  His interpretation of the word "apocalypse" used in the same lyric is "a final battle." *Id.* at 36.  Thus, his interpretation of the lyric in which this phrase and word are used is: "Shootin' Ns in a final battle." *Id.*  Agent Parkinson is not aware of a "final battle" that occurred or was planned in this case. *Id.*  Nevertheless, Agent Parkinson disagreed with counsel's assertion that this "apocalypse" lyric "is just fantasy" and does not "correspond to anything in real life that this investigation has turned up." *Id.* at 36-37.  Counsel asked Agent Parkinson to detail any evidence that exists which shows that a final battle or an apocalypse occurred or was planned.  *Id.* at 37.  Agent Parkinson testified that witness interviews have "documented that the ongoing feud driven by the Western Hills gang members is intended to kill all the members of the Freestones gang." *Id.*  Agent Parkinson specifically pointed to the interviews of Ana Rodriguez and Bernard Rayford.  *Id.*

Counsel turned to another discrepancy in the translation of a lyric.  The official transcript sets forth the following lyric: "I think I'll die in Hills." *Id.* at 38.  However,

Agent Parkinson later emailed a prosecutor to correct the lyric to: "I think I died, did." *Id.* Thus, the lyric does not say "Hills." *Id.* Agent Parkinson agreed that his interpretation of the incorrect lyric was that "he'll die as an active Western Hills gang member[.]" *Id.* at 39. Therefore, he agreed that the actual lyric does not support that interpretation. *Id.*

Agent Parkinson interpreted the lyric, "I catch some family talkin'," to mean that "he caught members of the gang cooperating with police." *Id.* at 39-40.   He interpreted the lyric, "They got circumcised," to mean "administered punishment by cutting them down." *Id.* at 40.   Agent Parkinson testified that he used the phrase "cutting them down" to mean murder or some form of punishment. *Id.*   Agent Parkinson agreed that the lyric is in the past tense and that he believes Mr. Rakestraw sang this lyric. *Id.*   Agent Parkinson is not aware of any "information that Mr. Rakestraw ever killed any snitches[.]" *Id.* Moreover, "[t]here are no snitches that have been killed in this case[.]" *Id.* at 42. Agent Parkinson agreed that Mr. Rakestraw is "not specifically" confessing to anything that he may have done. *Id.* at 40-41.

Testimony turned back to the "Bustin'" song; specifically, the lyrics that reference using a female to cause a diversion. *Id.* at 44.   Agent Parkinson agreed that he testified on direct examination that the lyric suggested an "MO used by the gang" and "that it is consistent with the evidence found" in the Marshall and Floyd Davis homicides   *Id.* at 44. Agent Parkinson again testified that without reviewing his reports, he cannot definitely say whether there is any evidence Mr. Rakestraw or Michael Williams was involved in the Marshall Davis homicide. *Id.* at 45.   Agent Parkinson agreed with counsel that the homicides of the Davis brothers did not occur in a house and there was "nobody waiting behind curtains." *Id.* at 45-46.

With respect to the Floyd Davis homicide, Agent Parkinson agreed that Ana Rodriguez had not seen Davis for years at the time she ran into him at a supermarket. *Id.* at 46.   To his knowledge, neither Mr. Rakestraw nor anyone else ever instructed Rodriguez to go find Floyd Davis. *Id.*   However, Agent Parkinson added that "it was reported that Mr. Rakestraw was part of the planning when the directions were given that she should

1   lure him to a hotel room." *Id.* at 47.   But, again, he does not believe that Mr. Rakestraw

2   asked Rodriguez to do anything.   *Id.* at 47.

3           Finally, counsel returned to Agent Parkinson's interpretations of additional rap

4   lyrics.   *Id.*   Agent Parkinson agreed with counsel that he interpreted the lyric, "And if my

5   N-word need him buried, he ain't got to ask," to mean that "if a fellow gang member

6   wanted a person killed, it will be done[.]" *Id.* at 47-48.   He also agreed that the prosecutors

7   submitted another interpretation of that lyric in a pleading: it "might refer to fundraising

8   operations Western Hills Bloods members would do for other members' funeral expenses."

9   *Id.* at 48.   Agent Parkinson conceded that "that's a valid interpretation." *Id.* at 49.

10                        **Redirect Examination by Government Counsel:**

11           Agent Parkinson explained that to interpret the lyrics, "[y]ou can't break each word

12   down and get the full meaning of the song without the context of the entire song."   *Id.* at

13   53.   With respect to lyrics possibly referring to fundraising for funeral expenses, Agent

14   Parkinson agreed with government counsel that there is an alternative interpretation in the

15   pleading that is consistent with his interpretation; that is, "a reference to the violent acts

16   that Western Hills members commit on behalf of other members[.]" *Id.* at 52.   Agent

17   Parkinson agreed that the lyric, "Hills with it," immediately precedes the lyric, "I think I

18   died, did," which was initially misinterpreted as, "I think I'll die in Hills." *Id.* at 52-53.   In

19   Agent Parkinson's opinion, the "Hills with it" is undoubtedly a reference to Western Hills.

20   *Id.* at 53.

21           Government counsel emailed Agent Parkinson asking for his help in preparing the

22   pleading that sets forth the lyrics in the three songs at issue.   *Id.*; *see* Doc. 2101.   In

23   response, Agent Parkinson produced a document setting forth definitions of words or

24   phrases used in the lyrics.   9/29/22 Tr. at 53; Gov. Ex. 9.   However, he did not intend his

25   document "to be the sole interpretation of the lyrics in this case."   9/29/22 Tr. at 53.   His

26   intention in preparing the document was not to provide what he "thought the lyrics meant,"

27   but rather provide definitions that he "found matched what [he] understood the lyrics to

28   mean based on the totality of the circumstances."   *Id.* at 53-54.

In the video of the song "Bustin'," it is significant that Michael Williams and other people in the video are making the gesture of firing a firearm when contemporaneously saying the word "bustin.'" *Id.* at 55.   As a result, it is significant "to watch the video as you're listening to the lyrics in order to get the full picture of the possible meanings[.]" *Id.*

There are witness accounts that Michael Williams was in the area of one of the shops at the time of a shooting.  *Id.* at 56. In fact, Williams was shot, and it is believed that the shooting took place at or outside of a shop.  *Id.*

Agent Parkinson again testified that the word "'chop'" is a "common street term for the abbreviated form of chopper, which is a firearm." *Id.* at 57.  The word "also suggests what it does, it chops somebody down, the act of chopping." *Id.*   Text messages extracted from Michael Williams's cell phone seized on August 30, 2018, contain conversations between Williams and other people where the word "chop" or "chops" is used, and the context shows that "chop" or "chops" is referring to firearms.  *Id.* at 58.  There were "quite a few other conversations about firearms within Mr. Williams's phone downloads," as well as pictures of firearms.  *Id.*   A download of Michael Williams's Facebook account revealed that the word "burner" is used in a "conversation in which Mr. Williams asked a third party: 'Any burners?'"  The third-party responds: "'Two N-words trying to get rid of sum'"?  *Id.* at 59.  Williams then sends the third-party a picture of a firearm.  *Id.*   Bernard Rayford also said that Michael Williams "had shown him the chopper before."  *Id.* at 69.  It is this type of evidence that helped Agent Parkinson interpret some of the rap lyrics.  *Id.* at 59-60.

Agent Parkinson recalls defense counsel asking if any violent acts committed against snitches were alleged against Mr. Rakestraw.  *Id.* at 60.  Counsel pointed Agent Parkinson to a Facebook conversation between Borges, Rakestraw, and Kenyatta Dilyou, in which Dilyou is accused of snitching.  *Id.*   Agent Parkinson testified that Mr. Rakestraw wrote that Dilyou and N-word Jason Watkins were "rats," and "dats . . . a snitch N-word for you[.]" *Id.* at 61.   There is also what appears to be a grand jury transcript posted which lists Mr. Rakestaw's and Michael Williams's names.  *Id.* at 61-62.

Testimony returned to the phrase "fuck with" and whether it has a positive or

negative connotation.  *Id.* at 62.  In the Facebook conversation discussed above, Dilyou says to Borges: "You don't fucc with me?"  *Id.*  Borges responds, in part, by saying "not after you was in that paperwork giving up everybody name, including mine[.]" *Id.* at 63. Given the context of the conversation, Agent Parkinson interprets Dilyou's use of "fuck with" to mean: "Are we still cordial?  Are you still going to associate with me?"  *Id.*  Later in the conversation, Borges uses the same phrase when she says: "I lost a lot behind all that, and at the end of the day, I got a baby with a N-word from Park and I don't fuck with enemies like that." *Id.* at 63.   Agent Parkinson believes that "enemies" refers to Dilyou. *Id.*  He believes the reference to Park in the conversation relates to the fact that Borges shares a child with Jermaine Maxwell, who is associated with the Park gang.  *Id.* at 63-64. According to Agent Parkinson, the "gist of the conversation is that Megan Borges is . . . in this conversation expressing loyalty to the Western Hills and the Park gangs[.]" *Id.* at 64. Similarly, Borges makes the following statement during the Facebook conversation with Dilyou: "You can say what you want, it don't hurt my feelings N 'cause I still fuck with Hills, hmm, lol, least I'm not a snitch."  *Id.*   Additionally, Michael Williams uses the phrase, "fuck with Park or Hills" in the Bustin' song, and the phrase, "I'll fuck with it," in a text message.  *Id.* at 65.  Agent Parkinson believes these references also denote a positive connotation.  *Id.*  Again, this is the type of evidence that affects how Agent Parkinson interprets the use of a phrase in a rap song.  *Id.* at 64.

Mr. Rakestraw also refers to Dilyou being a "snitch" that "we" got a problem with during this Facebook conversation noted above.  *Id.*   Agent Parkinson took this comment "to be a threat to someone believed to be providing information to law enforcement."  *Id.* at 65.

Testimony turned to the code of silence.  Rochelle Valadez testified that she was in a relationship with Floyd Davis at the time he was killed.  *Id.* at 66.  After Davis was killed, she was in a relationship with defendant Marcell Gray.  *Id.*  She testified that defendant Shawmaine Moore spent the night at her house shortly after the murder of Floyd Davis. *Id.*  That testimony was corroborated by an audio recording extracted from Moore's phone

of a conversation between him and Valadez. *Id.* at 67.    In the recording, Ms. Valadez is hesitant to tell Moore any information about Floyd Davis. *Id.*  Specifically, she told Moore that "that's how people end up murdered." *Id.*  Ms. Valadez was not aware that Moore was recording their conversation. *Id.* at 68.  Agent Parkinson testified that the code of silence is also shown by Moore telling the recipient of a text message to erase something they had talked about. *Id.* at 73.

In her interview with law enforcement, Ms. Valadez stated that "I don't fuck with guys like that.  I'm just letting you know, like, N-words men in Western Hills." *Id.* at 68. Agent Parkinson interpreted this comment to mean that "she does not associate with those guys." *Id.*  Ms. Valadez identified the following people who were present when Marcus Darton was murdered: David Williams, Michael Williams, Gil from the Freestone gang, Marshall Davis, and Floyd Davis. *Id.* at 68.  She also said that Darton was "an OG, which is original gangster, a leader of the gang." *Id.* at 68-69.  This information also affected Agent Parkinson's interpretations of the rap songs. *Id.* at 69.

Jail calls also reference words and phrases used in the rap songs.  For instance, the phrase "big homie" was used multiple times during a recorded jail call involving Jermaine Maxwell. *Id.* at 71.   And in another jail call Cliffton Martinez references cameras being in the shops. *Id.* at 70.

According to Ana Rodriguez, the Bustin' song was recorded on March 6th. *Id.* at 71.  Agent Parkinson testified that March 6th is significant because "March is the third month of the year and the 6th date, so if you put them together, three six is a tribute to the 36th Street boundary which is prominent in the Western Hills gang." *Id.*  Also, a download of Mr. Williams' phone reflects that a third party "wished him a happy hood day on March 6th. *Id.* at 72.  He also addressed Williams as "blood," but spelled it "B136d." *Id.*   Mr. Williams responded:  "Happy turf day on Blood, love you, too[.]" *Id.*   Once again, this information assisted Agent Parkinson in understanding the totality of the rap video and its significance. *Id.*

With respect to the use of the word "lurking" in a rap song, a download of

Shawmaine Moore's phone revealed he sent the following text message: "lrkin on these yabbz head." *Id.* at 74.  Agent Parkinson testified that Moore's use of the word "lrkin" was consistent with the use of the word in the rap song and with the definition of that word in the Urban Dictionary.  *Id.* at 74.  He again testified that "yabbz," which is either misspelled or an abbreviation of yabbas, "is a disparaging term used to identify Freestone Blood gang members."  *Id.*  This text message was sent May 2, 2015, which was two weeks prior to the Floyd Davis homicide, and "around the time" that Ana Rodriguez was in contact with Floyd Davis.  *Id.* at 74-75.

Information extracted from Moore's phone also reflects a conversation between Moore and Michael Williams about going to the "shop." *Id.* at 76.  Agent Parkinson testified that the word "shop" in the context of the conversation meant to him "the location that was controlled by the Western Hills Bloods from which they sell drugs."  *Id.*  There is another text message to Sammy Mack where Moore stated that he was with Michael Williams at the "spot," which Agent Parkinson "know[s] to be another reference to the shop." *Id.* at 76-77.

With respect to the code of silence, Agent Parkinson received information "regarding Moore's standing regarding his conversations with police officers."  *Id.* at 75. Agent Parkinson explained while "it didn't rise to the level of being considered a snitch," Moore made statements that angered other gang members.  *Id.*  As a result, gang members said they "would deal with him in a physical manner" after he was released from prison. *Id.*  Agent Parkinson considered this information when interpreting the word "circumcised" in the rap lyrics.  *Id.*

Testimony turned to David Williams' phone conversations with Ana Rodriguez in which he tells her not to talk on the phone about crimes or to the police.  *Id.* at 77.  As far as Agent Parkinson is aware, David Williams "did not know that he was being recorded." *Id.*  Specifically, Williams tell Rodriguez: (1) "quit talking crazy on the phone;" (2) "I don't need you saying stupid shit on the phone;" and (3) "I keep telling your stupid ass stop saying stupid shit, motherfucker." *Id.* at 78.  With respect to the "code of silence," David

Williams tells Rodriguez: "That's the only way they can get to it 'cause ain't nobody else saying shit." *Id.* With respect to their text messages and phone calls, Williams tells Rodriguez: "Every time we talk on these phones, erase it." *Id.* at 79. David Williams also told her to keep her phone on silent because he did not "want anyone to know about this other phone that they used to communicate on." *Id.* at 82. Agent Parkinson considered these statements "when reviewing rap lyrics about negative connotations to speaking on the phone[.]" *Id.* at 79.

David Williams used the phrase "big homies" when describing Mar-K and Chanky, which is "moniker for Chandler Booker." *Id.* at 79-80. The context of this conversation with Rodriguez is David Williams "talking about how the police officers are not investigating the deaths of his other big homies, Marcus Darton and Chandler Booker." *Id.* at 80. Williams was "comparing that to the police investigation of Floyd Davis." *Id.* Agent Parkinson testified that David Williams also mentioned that when Marshall Davis got killed "the cops was everywhere, and this was giving Ms. Rodriguez another example of police scrutiny but trying to alleviate her concerns again by reiterating that not talking to the police was their way out of that situation." *Id.* at 80-81. These conversations occurred after the Floyd Davis murder. *Id.* at 81. Again, Agent Parkinson considered these conversations when interpreting the rap lyrics. *Id.*

Agent Parkinon testified that Labarr Martinez's use of the phrase "slide on" is consistent with how he interpreted the use of that phrase in the rap lyrics. *Id.* at 83. With respect to the use of the word "apocalypse" in the rap lyrics, Agent Parkinson testified that "Ms. Valdez [made] a statement to Shawmaine Moore that war between the Western Hills Bloods and the Freestones was imminent." *Id.* at 84.

Agent Parkinson testified that hollow point bullets were recovered at the scene of the Floyd Davis homicide. *Id.* Hollow point bullets were also recovered at the Michael Williams residence when he was arrested. *Id.*

The lyric that refers to either a 240 or C40 directly follows the lyric that "refers to catching a body[.]" *Id.* at 85. Agent Parkinson interpreted that phrase as referring to a

murder.  *Id.*   He added that the lyric "just to test it out" that follows the reference to 240 or 40 is consistent with information developed during the investigation.  *Id.* at 86.   Agent Parkinson testified that the phrase "the 40 isn't edible" is not "talking about a 40-ounce can of beer being edible but that it's a .40 caliber firearm or a round of .40 caliber that is not edible."  *Id.* at 87.   His conclusion is based on other lyrics: the reference to 7.62 ammunition; the phrase "sat him on his ass;" and "trying to kill an N-word."  *Id.* at 86.  Also, .40 caliber casings were recovered at the scene of the Floyd Davis homicide.  *Id.* at 88.   And the word "edible" is significant because Davis suffered "significant damage to the face and to the mouth and jaw and teeth."  *Id.*

Agent Parkinson testified that he does not expect "every single lyric in any rap song to be 100 percent true, [or a] 100 percent autobiographical narration."  *Id.* at 86.   Agent Parkinson does a lot of recorded interviews, and it is common to "find mistakes or problems with some transcription."  *Id.* at 87.

## **DISCUSSION**

The First Amendment protects music "as a form of expression and communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989).  However, the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).   The First Amendment simply bars the admission of evidence relating to a defendant's beliefs "when those beliefs have no bearing on the issue being tried."  *Dawson v. Delaware*, 503 U.S. 159, 165, 168 (1992).   "The crucial question is whether the evidence at issue [is] used for permissible purposes or merely to show that [a defendant] was morally reprehensible due to his abstract beliefs."  *United States v. Fell*, 531 F.3d 197, 229 (2d Cir. 2008 (internal quotations omitted) (*quoting United States v. Kane*, 452 F.3d 140 (2d Cir. 2006)).

The Court finds that the government is not seeking to admit the rap video and songs for impermissible purposes in violation of the defendants' First Amendment rights.  The lyrics are not being offered to show that the defendants are morally reprehensible due to their beliefs.  In fact, as discussed below, the lyrics cannot even be said to be evidence of

the defendants' beliefs because the author of the lyrics is not known.  Rather, the rap lyrics are being offered to allegedly prove elements of the charged offenses and motive and intent. Thus, the question becomes whether the video and songs are relevant to the charged crimes and/or motive and intent, and if so, whether the probative value of this evidence is substantially outweighed by the risk factors laid out in Fed. R. Evid.  403.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401.  Relevant evidence may be excluded, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403. "Unfair prejudice 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999) (*quoting United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).

Rule 403 balancing lies within the "broad discretion" of the district court based on the factual circumstances of each case.  *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010).   As a result, none of the cases that address the admission of rap videos, music, and/or lyrics at trial control the outcome in the case at hand.  However, as discussed below, these cases set forth factors that are important for the Court in determining whether the probative value of the rap video and songs is substantially outweighed by the danger of unfair prejudice and the risk of confusing and misleading the jury.[4]

All courts recognize that a significant concern with the admission of gangsta rap music at trial is that the lyrics present a serious risk of inflaming the jurors and influencing them to convict a defendant on impermissible grounds. *See United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011); *United States v. Bey*, 2017 WL 1547006 (E.D. Pa. 2017); *United*

---

[4]  There are no Ninth Circuit cases that address the admissibility of rap lyrics in a criminal trial.

1    *States v. Williams*, 2017 WL 4310712 (N.D. Cal. 2017); *State v. Cheesboro*, 346 S.C. 526

2    (2002).  Courts have also universally recognized that rap music features fictional imagery,

3    metaphors, and exaggerated storylines.  *See Id.*   As a result, it is difficult to identify the

4    probative value in fictional or other forms of self-expressive endeavors because it cannot

5    be presumed that the author has acted in accordance with the views that he wrote about.

6    *State v. Skinner*, 218 N.J. 496, 521 (2014).  Relatedly, rap music can mislead or confuse

7    the jury because it will become a feature of the trial and overshadow the acts giving rise to

8    the charges.  *United States v. Stephenson*, 550 F. Supp. 3d 1246, 1252-53 (M.D. Fla. 2021).

9    Thus, the risk of inflaming and influencing the jurors to the point of compromising a

10   defendant's right to a fair trial is a significant factor to be considered in determining

11   whether to admit rap music.

12         Courts have precluded the admission of prejudicial rap videos and lyrics when they

13   are cumulative of other evidence that the government will use to prove what is depicted in

14   the videos and/or articulated in the lyrics.  *Gamory*, 635 F.3d at 493; *People v. Coneal*, 41

15   Cal. App. 5th 951, 966-967 (2019); *Williams*, 2017 WL 4310712 at *8.   In fact, the

16   admission of this cumulative evidence could cause an undue delay in the trial stemming

17   from the witnesses who will attempt to interpret the lyrics and/or educate the jury about

18   rap music.  *Williams*, 2017 WL 4310712 at *7.

19         The probative value of rap lyrics is greatly reduced when it is unknown who wrote

20   the lyrics, when the lyrics were written, when the songs were recorded and perhaps edited,

21   and/or when they were uploaded to YouTube or similar social media.  *Gamory*, 635 F.3d

22   at 493; *Stephenson*, 550 F. Supp.3d at 1252-53.   In fact, the inability to differentiate

23   between fact and fiction is intensified when the author of the lyrics is not known and the

24   government plans to explain ambiguous lyrics, and not the individuals who wrote the

25   songs.  *Stephenson*, 550 F. Supp.3d at 1253; *Williams*, 2017 WL 4310712 at *7.

26         Rap lyrics are more likely to be found probative and admitted at trial when they

27   mirror the charged crime(s) or describe activity that resembles aspects of the central

28   crime(s) alleged.  *See United States v. Stuckey*, 253 Fed. App'x 468, 482 (6th Cir. 2007);

1    *United States v. Wilson*, 493 F. Supp.2d 484, 488-89 (E.D.N.Y. 2006).  In fact, circuit

2    courts have admonished trial judges against admitting rap videos or lyrics with merely a

3    tenuous connection to the defendant or issues in the case.  *See United States v. Gamory*,

4    635 F.3d 480, 493 (11th Cir. 2011); *Boyd v. City & Cnty. of S.F.*, 576 F.3d 938, 949 (9th

5    Cir. 2009).

6          With that backdrop, the Court turns to its analysis of whether the probative value of

7    rap video and songs is substantially outweighed by the danger of unfair prejudice and risk

8    of misleading and confusing the jury that would result from the admission of this evidence.

9    To determine the admissibility of evidence under Rule 403, a court must balance: (1) the

10   strength of the evidence; (2) the need for the evidence in light of the contested trial issues

11   and the other evidence available to the government; and (3) the danger that the evidence

12   will inflame the jurors and cause them to convict on impermissible grounds.  *United States*

13   *v. Sriyuth*, 98 F.3d 739, 747-48 (3d Cir. 1996).

14         After balancing these factors (albeit in reverse order), the Court concludes that the

15   prejudice resulting from the admission of the rap video and songs substantially outweighs

16   the probative value of this evidence for the following reasons.  First, the admission of the

17   video and songs creates a substantial danger of unfair prejudice because: (1) the highly

18   inflammatory nature of the rap video and songs create a serious risk that the jury will

19   convict the defendants on impermissible grounds; and (2) the video and songs will become

20   a feature of the trial and create a risk of confusing or misleading the jury.  Second, the rap

21   video and songs are cumulative evidence in light of the substantial amount of other

22   evidence that the government will introduce at trial.  As a result, the need for the video and

23   songs is minimal and the admission of this cumulative evidence will unduly delay what is

24   already expected to be a lengthy trial.  Third, the probative value of the rap video and songs

25   is minimal because the author of the lyrics is unknown, Agent Parkinson has no expertise

26   in interpreting rap lyrics, certain lyrics are heard differently by different listeners, and the

27   lyrics do not mirror or exhibit an unmistakable factual connection to the charged offenses.

28   As a result, the Court recommends that the rap video and songs be precluded from evidence

at trial.

**1.      The Danger of Unfair Prejudice is Substantial**

The admissions of the rap video and songs creates a substantial danger of unfair prejudice for two reasons.  The rap video and songs are so inflammatory that they create a serious risk that the jury will convict on impermissible grounds.  Relatedly, the rap video and songs will become the feature of the trial and create a risk of confusing and misleading the jury.

**A. The Rap Videos and Songs are Highly Inflammatory and Present a Serious Risk that the Jury will Convict the Defendants on Impermissible Grounds.**

There can be no dispute that the rap video and songs are highly inflammatory.  They contain language and imagery related to drugs, gun crime, violence, and misogyny.  The lyrics are also filled with profanity and use of the N-word.  *See Gamory*, 635 F.3d at 493 (error to admit rap lyrics that "presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny and could be reasonably understood as promoting a violent and unlawful lifestyle.")   In *Williams*, the court found that the danger of unfair prejudice was substantial because "the videos depict images of young African-American men, guns, and drugs atop musical lyrics that denigrate other African-Americans, women, and cooperating witnesses."  2017 WL 4310712 at *7. (internal quotation omitted).   Therefore, the court concluded that it is "undeniable that certain scenes [in the rap video] may arouse an emotional response, evoke a sense of horror, or appeal to an instinct to punish."  *Id.*  Likewise, in *Stephenson*, the court found that the lyrics and depictions of the defendants and other alleged gang members in the lyrics "create a significant risk that the jury will view [them] as a violent drug dealer[s] and gang member[s] and find [them] guilty of the charged offenses for improper reasons."  F. Supp.3d at 1253.

The rap video and songs in the case at hand essentially mirror those in *Williams* and *Stephenson*.  The rap video depicts images of young African-American men who simulate shooting guns atop musical lyrics that denigrate other African-Americans and women.  And

the lyrics of all three songs are replete with references to violence, guns, and drugs. Therefore, as in these cases, the Court concludes that the admission of the rap video and songs raises significant concerns that a jury will convict the defendants for improper reasons.   And that conclusion is supported by Professor Nielson's expert testimony.

Professor Nielson explained that rap music is a fictional art form; however, within that fiction can be elements of reality.  9/2/22 Tr. at 59.   Rap music has been described as "nihilistic" in that there is "no real world view that you're trying to present."  *Id.* at 14. Gangsta rap is "generally made up," and contains braggadocio, hyperbole, and exaggeration.  *Id.* at 59-60.   These hallmarks of rap music are also present in a "whole host of examples of Black artistic expression."  *Id.* at 59-60

Professor Nielson explained gangsta rap music tends to focus on illicit activity, an unlawful lifestyle, and/or outlaw figures.  *Id.* at 14, 28.  This theme is seen "throughout not just rap music but a lot of Black popular culture."  *Id.* at 29.   Rap lyrics depict violence, use of guns, drug dealing, and other illicit activity.  *Id.* at 14, 17.  In fact, violence is one of the most important themes and the most dominant manner of violence is the use of guns. *Id.* at 17-18.   Rappers are "highly specific" when rapping about guns; they rap about "a veritable arsenal of weapons."  *Id.* at 18.   Rap lyrics also talk about the targets of violence. Sexually explicit lyrics and lyrics that are degrading to women are also common to rap music; the lyrics also contain a lot of profanity.  *Id.* at 14, 17, 24-25.  Rap lyrics also focus on localities or geographies, which make the songs "kind of a map" in that they provide street names, businesses, and landmarks that the artist is familiar with.  *Id.* at 23.  Rap songs also discuss local gangs.  *Id.*

As a result of the content of the lyrics, rap music is "highly inflammatory.  People have a strong negative, often visceral, reaction to rap music that they do not have to any other fictional forms, even more violent or sexually explicit forms."  *Id.* at 34.    Those feelings have been demonstrated by several studies.

Identical studies conducted in 1999 and 2016 found that participants of the study who believed "the lyrics came from a rap song found them far more threatening and in

need of regulation than the exact same lyrics that were characterized as country." *Id.* at 34.   The 2016 study further found that participants "were significantly more likely" to view or interpret the rap lyrics "literally as compared to the same lyrics from" a song from another musical genre. *Id.* at 35-36.   That study also found that the participants "believed that fans of rap music are more likely to be a danger to society whereas fans of rock music might be more likely to be a danger to themselves." *Id.* at 38.   The researchers' conclusion was that the perceived race of the author of the songs impacted these feelings, views, and beliefs. *Id.* at 37.

There was another study applied to a jury context where participants were provided with information about a hypothetical 18-year-old black male. *Id.* at 39.   One group was told that the man was charged with murder but was not exposed to his violent and sexually explicit rap lyrics; a second group was told about the murder and exposed to the rap lyrics; and a third group was told about the rap lyrics but not the murder charge. *Id.*   The result of the study was that people who were told about the murder charge and "exposed to the rap lyrics . . . thought he was more likely to be capable of committing a murder[.]" *Id.* at 40.   Even more surprising was that the reaction to the rap lyrics was more negative than the reaction to knowing that a person was charged with murder. *Id.*

Professor Nielson believes the results of these studies show that "these stereotypes and biases absolutely" persist for rap music. *Id.*   As a result, Professor Nielson shares the concern of many others that rap lyrics are "so highly prejudicial that it has the capacity [and] potential to deny" a defendant the right to a fair trial. *Id.* at 57.   More specifically, he believes that it is unfair to introduce rap lyrics at a trial because they are so inflammatory and prejudicial that they can tilt the balance against the defendant. *Id.* at 79.

The Court agrees with Professor Nielson and the reasoning of the courts discussed above.   As such, the Court concludes that the admission of rap video and songs in the case at hand creates a serious risk of prejudice that could deny the defendants their right to a fair trial.   Specifically, the highly inflammatory rap video and songs could result in a jury convicting the defendants based on what they allegedly rapped about, as opposed to the

1    criminal acts that they allegedly committed.  As a result, the danger of unfair prejudice

2    resulting from the admission of the inflammatory rap video and songs weighs strongly in

3    favor of exclusion of this evidence.

**B. The Admission of Rap Video and Music Will Become a Feature of the Trial and Overshadow the Acts Giving Rise to the Charges, Thus Creating a Risk of Misleading and Confusing the Jury.**

7         The prejudicial effect of the admission of rap lyrics is heightened, and the probative

8    value is lessened, when they have the potential to become a feature of the trial and

9    overshadow the acts giving rise to the charges.  The result is a risk of confusing and/or

10   misleading the jury.  In *Stephenson*, the court excluded the rap videos because they would

11   overshadow the acts giving rise to the charges given that "the parties have each identified

12   expert witnesses they intend to call if the videos are admitted in evidence[.]" 550 F.

13   Supp.3d at 1252-53.  The court reasoned that "[t]his presents a great risk of jurors having

14   difficulty separating the issues and according the limited weight to the videos.  In essence,

15   the YouTube videos will become a feature of the trial.  The likely curative effect of any

16   limiting instruction will be minimal at best." *Id.*  The same is true in the case at hand.

17        If the rap video and songs are admitted at trial, Agent Parkinson will testify about

18   his interpretation of certain lyrics, and Professor Nielson will testify in an attempt to

19   educate the jury about rap music.   This battle of the experts, which will occur over the

20   course of several days at trial, has the potential to overshadow the acts that resulted in the

21   instant charges.  And, as discussed below, the government has ample evidence aside from

22   the rap video and songs to support the charged offenses.  Thus, focusing on that other

23   evidence, rather than the rap video and songs, will ensure that lyrics do not overshadow

24   the acts that resulted in the charged offenses.   And, once again, it ensures that the

25   defendants are tried for what they allegedly did, and not what they rapped about.

26        Relatedly, the inflammatory nature of the rap video and songs can mislead and

27   confuse the jury.  As courts and Professor Nielsen have explained, the visceral reaction to

28   the video and lyrics may well impact the jury's ability to understand that rap lyrics are not

necessarily autobiographical statements, but rather, a well-recognized musical genre that often utilizes exaggeration, metaphor, and braggadocio for the purpose of artistic expression.   For example, the court in *Bey* noted that the difficulty in identifying probative value in fictional or other forms of self-expressive endeavors is that one cannot presume that, simply because an author has chosen to write about certain topics, he or she has acted in accordance with those views."  2017 WL 1547006 at * 7.   In *Williams*, the court was wary of the probative value of the rap music because "[t]he inability to differentiate between fact and fiction is intensified here where the government plans to explain ambiguous lyrics through the interpretation of cooperators and/or informants, not the individuals that wrote the songs[.]".  2017 WL 4310712 at *7.

This Court is also wary of the probative value of the extremely prejudicial rap video and songs given that Agent Parkinson, and not the individuals who wrote the songs, will interpret ambiguous lyrics.  And the concern in the case at hand is even greater than in *Williams* because Agent Parkinson, even though he has no experience in interpreting rap lyrics or first-hand knowledge about the jargon or slang terms used by rap artists, will likely be viewed by the jury as an expert given his lengthy involvement in the investigation that led to the charged offenses.  Agent Parkinson would be putting the weight of the government behind his interpretations of the lyrics, unlike a cooperator and/or informant (as in *Williams*) whose motivation to testify is subject to easy and effective cross-examination, even though he lacks the credentials to interpret rap lyrics.

The rap lyrics and Agent Parkinson's interpretation of the lyrics create a grave risk that the jury will convict the defendants based on what they allegedly rapped about.  As a result, the Court concludes that there is a significant risk that admission of the rap videos and music will confuse and mislead the jury because this evidence will become a feature of the trial and overshadow the acts giving rise to the charges.  Therefore, this factor weighs in favor of exclusion of the rap video and songs.

**2.      There is Not a Need for the Rap Video and Songs in Light of the Other Evidence the Government Will Admit at Trial and the Admission of This Cumulative Evidence Will Unduly Delay an Already Lengthy Trial.**

**A.  The Rap Video and Songs are Unnecessary Cumulative Evidence.**

The probative value of rap music is reduced when it is cumulative of other evidence that the government will introduce at trial.  The court in *Williams* noted that the admission of the rap videos and music in a RICO/VCAR prosecution may "needlessly present cumulative evidence since the government presumably has other means of proving the associations presented in these videos."  2017 WL 4310712 at *8.  That was one of several reasons why the court precluded the admission of this evidence.  Similarly, in *Gamory*, the Eleventh Circuit held that the district court erred in admitting a rap video, in part, because that evidence was cumulative of other evidence to establish that the defendant was "JB and he owned Hush Money Entertainment."  635 F.3d at 493.  Finally, in *Coneal*, the court held that the trial court erred in admitting rap videos because they were cumulative in light of "the substantial evidence of [the defendant's] gang membership, including numerous screen shots from the rap videos."  41 Cal. App. 5th at 966.  *See also United States v. Graham*, 293 F. Supp.3D 732, 740 (E.D. Mich. 2017) (court noted that during the trial it may exclude cumulative or redundant rap evidence that goes to a fact firmly established by the government).   As in these cases, the rap video and songs at issue here are cumulative of the substantial amount of other far more probative evidence that will be admitted at trial.

Agent Parkinson's testimony made clear that he believes that the government has a substantial amount of evidence to prove the imagery in the video -- *e.g.*, gang membership, gang signs, wearing gang colors, tributes to slain gang members, the rivalry between WHB and the Freestones.  In fact, Agent Parkinson admitted that he does not need the video to prove gang affiliation because the screen shots depict the WHB gang members, gang tattoos, gang colors, gang signs, and the t-shirt paying tribute to Marcus Darton.  9/27/22 Tr. at 80-81.

Similarly, the government has never suggested that it does not have substantial evidence of what is purportedly referenced in the rap lyrics -- *e.g.*, gang affiliation, loyalty

to the gang, the code of silence, violent acts, drug dealing, the gang rivalry -- that the government believes has evidentiary value.  Agent Parkinson admitted that there is a lot of other evidence to show that the defendants are part of the WHB and are rivals with the Freestones apart from the rap music and even the screen shots.  *Id.* at 81-82.  In fact, when providing his interpretation of the lyrics that he felt were relevant to this case, Agent Parkinson always referenced other evidence (*e.g.*, witness interviews) that purportedly support his interpretation or understanding of a lyric.  Agent Parkinson repeatedly referred to interviews of Bernard Rayford and Ana Rodriguez when discussing other evidence that will be admitted at trial to support his interpretation of lyrics.  The government has included both Rayford and Rodriguez on their witness list for trial.  They will undoubtedly testify about their first-hand knowledge of WHB gang members, the evidence of gang affiliation, gang loyalty, the rivalry with the Freestones, the code of silence, violent acts, and drug dealing, all of which are purportedly referenced in the rap songs.  Thus, the effect of Agent Parkinson's cumulative "expert" testimony interpreting the lyrics is to bolster the credibility of testifying witnesses and evidence, which is strongly discouraged.  *See Skinner*, 218 N.J. at 520.

Based on the foregoing, the Court concludes that any probative value of the inflammatory and prejudicial rap video and songs is reduced by the other substantial evidence that the government maintains exists to prove the instant charges.  As a result, this factor weighs in favor of exclusion of this cumulative evidence.

### B. This Lengthy Trial Will Be Unduly Delayed by the Admission of Cumulative Evidence.

The concern about cumulative evidence is heightened when the admission of rap lyrics has the potential to unduly delay the trial as a result of the need to introduce testimony to explain the lyrics.  For example, in *Williams*, the district court excluded the admission of rap music, in part, because of the undue delay stemming from the defense expert's attempts to educate the jury about gangsta rap, which the court found could waste precious time considering the prospective length of the trial.  2017 WL 4310712 at *8.

1   The concern of undue delay here is greater than in *Williams* because, in addition to

2   Professor Nielson's testimony, the government plans to call Agent Parkinson to interpret

3   many of the lyrics.  Thus, there is no doubt that the trial will be delayed both by Agent

4   Parkinson's interpretation of the rap video and lyrics, as well as Professor Nielson's

5   attempt to educate the jury about rap music generally and gangsta rap specifically.

6   The evidentiary hearing on the instant motion took more than two days.  There is no

7   doubt that the presentation of this evidence to a jury will take considerably longer.  This

8   Court is painfully aware of the crimes charged, the specific allegations against these

9   defendants, and much of the evidence supporting the charges and allegations.  The Court

10  was also very familiar with the rap video, the screen shots from the video, the songs

11  themselves, and translations of the lyrics, because most, if not all, of these materials were

12  provided to the Court prior to the evidentiary hearing.   As a result, the testimony and

13  exhibits were presented to the Court in a far more streamlined manner than they will be

14  presented to a jury who will be first learning about all of this information.

15  Specifically, there were many leading questions on direct examination which were

16  either not objected to or overruled to expedite the evidentiary hearing.   That will

17  presumably not be the case at trial.   And there are evidentiary issues relating to the rap

18  song, such as hearsay and foundation, which were not raised at the evidentiary hearing

19  because that was not the time for those objections.  To be sure, many of those evidentiary

20  issues will be resolved prior to trial; but a trial is fluid, and as a result, there are always

21  objections on evidentiary issues either not covered by pretrial rulings or issues not

22  anticipated during trial preparation.   And those objections will make the trial testimony

23  longer than the testimony at the evidentiary hearing.

24  Finally, but importantly, both government counsel and defense counsel now have a

25  large amount of testimony that can be used to impeach Agent Parkinson and Professor

26  Nielson at trial, which will further lengthen their testimony.  And both the government and

27  the defense may elicit further testimony from Agent Parkinson, Professor Nielson, and/or

28  other witnesses regarding the rap video and songs which were not necessary for this Court

- 71 -

to resolve the instant motion.   For example, the Court got the sense that the government will call other witnesses to interpret or at least discuss certain rap lyrics and/or depictions in the rap video.  Additionally, Agent Parkinson testified that certain lyrics have been and can be heard differently depending on the listener.  That point may be further explored at trial with Agent Parkinson, Professor Nielson, and/or other witnesses.

Based on the foregoing, the Court concludes that the battle of the experts over the meaning of lyrics will unreasonably delay the trial.  That factor also weighs in favor of excluding the rap video and songs at trial.

### 3.    The Probative Value of the Rap Video and Songs is Minimal.

The probative value of the rap video and songs is minimal for several reasons.  First, the author of the lyrics is unknown, which makes it impossible to determine if the lyrics are autobiographical statements of these defendants.  Second, Agent Parkinson is not an expert in interpreting rap lyrics and has never done so before the instant case.  Thus, his interpretations of the lyrics could be the result of confirmation bias.   And that may well be demonstrated by the definitions that he assigned to certain words and phrases used in the lyrics.  Third, certain words and phrases used in the rap songs are heard differently by different listeners; as a result, the jury is not aided by the admission of these lyrics that cannot be deciphered.  Finally, the lyrics do not mirror or exhibit an unmistakable factual connection to the charged crimes, which may be the most important factor that courts consider in determining whether rap lyrics have probative value.

### A.  The Probative Value of the Rap Video and Songs is Reduced Because the Author of the Lyrics, When They Were Authored and When the Rap Video and Songs Were Produced Are All Unknown.

The probative value of rap lyrics is reduced when the author of the lyrics is unknown.  In *Gamory*, the Eleventh Circuit found that the introduction of a rap video at trial was plain error, in part, because there was no "evidence that [the defendant] authored the lyrics or that the views and values reflected in the video were, in fact, adopted or shared by [the defendant]."  635 F.3d at 493.   Similarly, the district court in *Stephenson* refused

to admit rap videos, in part, because the probative value of the videos was so low given that it was "unknown when the videos were produced," and there was no evidence "as to when the lyrics were actually written, the songs recorded, or the videos filmed and edited." 550 F.Supp.3d at 1252-53.  By contrast, in *Stuckey* the Sixth Circuit held that the district court did not err in admitting into evidence handwritten rap lyrics composed by the defendant.  253 Fed. App'x 468, 483 (6th Cir. 2007).  *See also Daniels v. Lewis*, 2013 WL 183968, at *11 (N.D. Cal. 2013) ("Courts across the nation have allowed rap lyrics to be used against the defendants who penned them."); *People v. Daniels*, 2009 WL 568918, at *11 (rap lyrics written by the defendant which were seized from his cell were party admissions and admissible because the details in the lyrics were sufficiently close to the evidence of the crimes that the lyrics could be viewed as autobiographical).

Professor Nielson's testimony also addressed why knowing the author of the lyrics is significant in the decision of whether to introduce rap music at a trial.  As discussed above, Professor Nielson's opinion is that rap lyrics are fictional, even if they contain certain elements of reality based on the author's life.   However, even if lyrics contain an element of reality, it is important to keep in mind that many times rappers do not write their own lyrics; they instead use a "ghost writer," but the rapper presents himself as having written the lyrics.  9/2/22 Tr. at 42.   As a result, "[i]t is very possible that the person performing the lyrics in the video is not actually the author of the lyrics."  *Id.* at 58.  Moreover, reciting a lyric that somebody else wrote does not necessarily mean that you are "adopting it as your own in any way."  *Id.* at 60.  Rather, the intent of the author of a lyric (like with any artist) can only be discerned from the artist or someone who has spoken with the artist.  *Id.* at 103.

In the case at hand, there was no evidence presented to establish who wrote the lyrics for the three songs at issue, when the lyrics were written, or when the videos and songs were produced.  In fact, government counsel admitted that there is no direct evidence of who wrote any of the lyrics for the songs at issue.  11/4/22 Tr. at 16.  It appears that Michael Williams was a primary rapper in one song, and also performed in the other two

songs.  Samuel Rakestraw rapped a few lyrics in the songs, but to a much lesser extent than Williams.   YM DA kid raps in one song, and another song features a famous rap artist named Mozzy.  Because either of these men, or someone else, could have written the lyrics, the government has not established that they are the defendants' "autobiographical statements of acts relevant to the case."  *Stuckey*, 253 Fed. App'x at 482-83.  As a result, the Court concludes probative value of the lyrics is low given that the author of the lyrics is unknown and there is no evidence that the defendants adopted the views or beliefs expressed in the lyrics.[5]  Thus, this factor weighs in favor of precluding the admission of the rap music evidence at trial.

---

[5]   The government argues that the lyrics are admissible as party admissions under Fed. R. Evid. 801(d)(1).  It is not clear to the Court how the government would lay the foundation to admit the lyrics as admissions given that the author of the lyrics is not known.  Alternatively, the government argues that the lyrics are adoptive admissions because they appeared in the rap video and rapped the lyrics.   In support of that argument, the government submitted a supplemental pleading in which they cite and discuss *United States v. Hankton*, 51 F.4th 578 (5th Cir. 2022).  In that case, a defendant argued that the trial court erred in admitting a rap music video as an adoptive admission of a co-defendant who appeared in the video and put his finger to his lips in a "shh" sign as the rapper pulls the co-defendant next to him and mentions the co-defendant's nickname.  *Hankton*, 51 F.4th at 600.   It appears that the rapper was not a co-defendant, but the opinion is not clear on that point.  The opinion also does not address if the author of the lyrics was the rapper, but it certainly was not the defendant or co-defendant.  The court found that the video was properly admitted as an adoptive admission of the co-defendant, and that even if the video contained hearsay and was improperly admitted, any error was harmless because the lyrics did not mention the defendant.  *Id.* at 601.  The problem for the government in the case at hand is that it is not known whose admissions are purportedly being adopted – *e.g.*, the defendants, a co-defendant, YM DA Kid, Mozzy, or someone else – and whether what is being adopted is fact or fiction.  In fact, in *Hankton* the court found that the lyrics had an unmistakable connection to the crime – *i.e.*, the lyrics at issue talk about a person getting "hit fifty times" and the victim was shot fifty times.  *Id.*  As discussed in text *infra*, that unmistakable connection is missing in the case at hand.   Finally, even if the government could lay the foundation for the lyrics to qualify as an admission or an adoptive admission, that would only solve the hearsay problem.  The lyrics must still be found to be relevant; more specifically, that the probative value of the lyrics is not substantially outweighed by the prejudice that would result from their admission.  That is a hurdle the government simply cannot clear.

**B.  Agent Parkinson is Not an Expert in Interpreting Rap Lyrics.**

Agent Parkinson is clearly not an expert in interpreting rap lyrics.  In fact, he admitted as much.  He is not a fan of rap music, he does not "favor it," he does not listen to rap music, and he has never been to a rap concert.  9/27/22 Tr. at 73, 155.  He has no training or experience (apart from this case) in interpreting rap lyrics.  *Id.* at 72-73.  Moreover, he cannot recall listening to a recorded conversation involving Michael Williams or Samuel Rakestraw that would put the rap music at issue in context.  *Id.* at 75.

Agent Parkinson's lack of experience in interpreting rap lyrics is not surprising in light of Professor Nielson's testimony that law enforcement officers are not qualified to interpret rap lyrics for several reasons.  First, law enforcement officers are generally not familiar with this musical genre, which is the case for Agent Parkinson.  Second, although rap music "is verse and contains all of the literally devices" and metaphor found in traditional poetry, rap music "adds other layers of complexity and sophistication, especially when it comes to jargon" and slang that can be difficult to interpret if a person is not familiar with this genre.  9/2/22 Tr. at 45.  Third, rap lyrics are "intended to be slippery" and "very vague intentionally," and are therefore, like poetry, subject to interpretation by the listener based on the listener's experiences.  *Id.* at 45-46, 51.  Lyrics can mean different things to different listeners and meanings can change over time.  *Id.* 45-46.  *Id.*  Professor Nielson believes that the intent of the author of a lyric can only be discerned from the artist or someone who has spoken with the artist.  *Id.* at 103.

Professor Nielson's opinion is that a law enforcement officer's interpretation of rap lyrics is "likely to lead to very skewed conclusions that are probably based on some confirmation bias" – *i.e.*, "I already know this guy's a criminal so now I'm going to read these lyrics" to confirm that.  *Id.* at 119.  In fact, Professor Nielson testified that significant problems have occurred when law enforcement officers interpret rap lyrics.  *Id.* at 54.  As a result, he is concerned with prosecutors arguing that there is a close connection between the lyrics and the crimes when there is not.  *Id.* at 78.

The Court shares Professor Nielson's concerns.  Agent Parkinson's interpretation

of the lyrics is likely to have led to skewed conclusions that may be based on confirmation bias. Specifically, Agent Parkinson could well have interpreted the lyrics (even unintentionally) to confirm what he already knew based on his years-long investigation of the alleged criminal acts.[6]  That concern, coupled with Agent Parkinson's lack of experience in interpreting rap lyrics, both reduces the probative value of the video and songs and will create a risk of unfair prejudice when the government argues to the jury that there is a close connection between the lyrics and the crimes when, as discussed below, there is not.

### C. Agent Parkinson Assigns Definitions to Words or Phrases That Have Reasonable Alternative Definitions.

The concern about confirmation bias may well be reflected by the definitions that Agent Parkinson assigned to certain words and phrases in the lyrics that he believes refer to crimes or overt acts committed by WHB gang members, even though the words or phrases have reasonable alternative definitions.  For example, Agent Parkinson defined "green light" as a kill order. 9/27/22 Tr. at 108.  But he admitted that "green light" does not mean a kill order every time it is used. *Id.* at 110.  In fact, he agreed with counsel that he used the phrase "green light" in an email to Agent Berlin; he was not giving a kill order, but rather stating that they were ready to go.  *Id.* at 111. Agent Parkinson defined the phrase, "Hills with it," to mean "ready to fight." 9/29/22 Tr. at 19-20.  But he agreed with defense counsel that it could also mean "cool, be on top of things, in with current styles or trends." *Id.* at 20.  Agent Parkinson defined the word "slide" to mean "fight." *Id.*  But he agreed that it can also mean "coming or going to a place." *Id.*

Agent Parkinson used the Urban Dictionary to define words and phrases that he was unfamiliar with, or to corroborate his understanding of a word or phrase.  9/27/22 Tr. at 157.  The defense established that the Urban Dictionary is in no way akin to an actual dictionary because anyone can apparently add their definition of a word or phrase to the

---

[6]  For example, Agent Parkinson interpreted the lyric "Shoot N up" to mean carry out a gang shooting even though the word "gang" is not used in the lyric. *Id.* at 32-33.

Urban Dictionary's website.  *See id.* at 157-159.

The definitions that Agent Parkinson assigned to the words and phrases set forth above may well be accurate.  However, "with it," "slide," and "green light" are terms used in popular culture, and not just in rap music or by the WHB members.  And the alternate definitions, for at least "Hills with it" and "slide," also make sense in the context of the lyrics in which these phrases are used, and therefore, could evidence Professor Nielson's concern about confirmation bias.  That said, if these definitions were the only problems with the interpretation of the rap lyrics, the defense may be able to effectively deal with that on cross-examination.

**D.  The Lyrics are Heard Differently Based on the Listener.**

It is not surprising that words and phrases in the rap songs are heard differently depending on the listener.  Professor Nielson testified that in all the cases that he has been involved with, "the transcriptions that people try to produce are inaccurate." *Id.* at 52.   It is difficult to understand words based on the cadence, the slang, and/or the audio quality. *Id.*  That is the case here.

The first lyric that is heard differently is as follows.  Agent Parkinson heard a lyric as: "I do the shit for my N-word K."  9/27/22 Tr. at 106.  Agent Berlin heard the lyric as: "I do this shit for my N-word K." *Id.*   Agent Parkinson agreed that the meaning of this lyric could change depending on whether the word "the" or "this" was used. *Id.*  For example, if the word used is "this," it could mean that the rap song was made in tribute to Marcus Darton, and not that the WHB will seek revenge for his murder.  *Id.* at 107

A second lyric that is heard differently is as follows.   In the government's pleading, it states that the lyric is: "Don't play it right.  Then you a day away." *Id.* at 116.  Agent Berlin believes that "day away" is actually "dead weight." *Id.*  Agent Parkinson did not testify about how he interpreted "dead weight."

In their pleading, the government states that a lyric is: "Get it blazing with the winner."  Agent Berlin heard the lyric as, "Get it blazing with the wetter, not a chrome hot." *Id.* at 144.  Agent Parkinson also heard the word as "wetter," not "winner." *Id.*  If

the word used was "winner," Agent Parkinson testified that "winner" would refer to WHB winning the war against the Freestones.   There was no explanation for what "wetter" means.

Agent Berlin heard a lyric to say: "Hills with it, see ya', yup, I'm trying to knock 'em down."  9/27/22 Tr. at 151.   Government counsel and Agent Parkinson maintain that the word "yabba" is used in this lyric.  Agent Parkinson testified that he believes that "yabba" stems from the Flintstones cartoon and is a derogatory word used to refer to the Freestones gang.   He does not believe that Agent Berlin had heard the term "yabba" when he listened to the rap songs in which it is used.  9/27/22 Tr. at 151-152.  However, the Court notes that the government has repeatedly pointed out that "yabba killer" is prominently displayed on the in-memoriam t-shirts worn by gang members.  *Id*. at 65.  As a result, it is not clear why Agent Berlin would not have heard the term "yabba" given his extensive involvement in the investigation that led to the instant charges.

A lyric was initially heard as, "Hit 'em with a brand-new C40."  9/29/22 Tr. at 23. However, the government later claimed that it was "240" and not "C40."  *Id.*  Relatedly, in the government's pleading, it states that a lyric is: "The 40 isn't edible."   Agent Berlin heard the lyric to be: "Phony as an animal."  9/27/22 Tr. at 145.  Assuming that "40" was used in the lyric, no one explained what a "40" means.

A lyric was initially heard as "Right out the woods we shot, send them on a crash." 9/29/22 Tr. at 27.  The government later transcribed the lyric as "right out the whip."  *Id*. at 28.   Agent Parkinson testified that he initially interpreted the use of the word "woods" to mean that WHB members were waiting in the desert to kill Floyd Davis.  *Id*. at 29. Agent Parkinson agreed with defense counsel that the word "whip" is used to refer to a car. *Id*. at 30.  As a result, he also agreed that this lyric cannot relate to the Floyd Davis killing because it was not a drive-by shooting.  *Id.*

In its pleading, the governments sets forth the lyric: "I think I'll die in Hills."   *Id*. at 38. The government claims that this lyric shows loyalty to the gang.  Agent Parkinson later sent government counsel an email correcting the lyric to: "I think I died, I did."  *Id*.

1   Agent Parkinson said that his translation of the lyric is still accurate because the preceding

2   lyric says: "Hills with it, [t]il' I die."   9/29/22 Tr. at 52-53.  But the fact remains that even

3   the government cannot agree on the translation of this lyric.

4         The words and phrases in the lyrics that are heard differently by different listeners

5   reduces the probative value of these lyrics because their meaning can change based on

6   which word or phrase is correct (assuming any listener heard the word or phrase correctly).

7   Put another way, there is little value in the jury hearing lyrics that cannot be deciphered,

8   let alone what the lyrics mean.[7]

9                **E. The Lyrics Do Not Mirror or Exhibit an Unmistakable Factual**

10                       **Connection to the Charged Crimes.**

11        The probative value of rap music is strongest when the lyrics mirror or exhibit an

12  "unmistakable factual connection to the charged crimes."  *See Skinner*, 218 N.J. at 523.

13  *See also Green v. Commonwealth*, 197 S.W.3d 76, 86-87 (Ky. 2006) (rap video where

14  defendant rapped about killing his wife was admissible because he was rapping about the

15  very crime for which he was charged); *Bryant v. State*, 802 N.E.2d 968 (Ind. 2004) (rap

16  lyric, "[c]uz the 5-0 won't even know who you are when they pull yo ugly ass out the trunk

17  of my car," was admissible in trial of defendant charged with murdering his step-mother

18  who was found in the trunk of his car); *Hankton*, 51 F.4th at 600 (rap lyrics which reference

19  a N "getting hit fifty times" essentially mirror the charged crime where the victim was shot

20  fifty times); *Coneal*, 41 Cal.App.5th at 969 (court noted that "where lyrics are written

21  within a reasonable period of time before or after the charged crime and bear a sufficient

22  level of similarity to the charged crime, their probative value as a statement of fact is

23  increased."); *Graham*, 293 F. Supp.3d at 738, 740 (court found that rap lyrics were not

24  merely abstract beliefs but rather related to real life events); *United States v. Carpenter*,

25  _____

26  [7]  Government counsel maintains that the jury will ultimately determine which word or
    phrase is used in a lyric and what they mean.  11/4/22 Tr. at 6, 60.  If that is true, then the
27  jury should determine every word and phrase used in the lyrics, and not be provided with
    subtitles for the rap video or a transcript of the songs.  And the jury should also make the
28  factual determination of what a lyric means based on other evidence admitted at trial
    without the assistance of Agent Parkinson.  That is not the route the government intends to
    take.

- 79 -

2022 WL 16960577, at *3 (2d Cir. 2022) (rap lyrics and rap music which spoke "with specificity to the precise conduct" charged were properly admitted).   For instance, in *Stuckey*, the Sixth Circuit held that rap lyrics about killing witnesses were admissible because they "described facts matching the crime charged[.]" 253 Fed. App's at 482-483. The lyrics "concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street - precisely what the government accused" the defendant of doing to the victim.   *Id.*   The Court explained that the lyric was admitted as "autobiographical statements of acts relevant to the case" to prove the defendant had killed the victim, and not to show his propensity for violence.  *Id.*

Similarly, in *United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018), the court held that rap lyrics posted or authored by the defendant were relevant because "they match[ed] the details of the alleged crime."   Specifically, the court found that the lyric at issue – "It's always tucked, Kuz I'll B Damn If My Life Get Took" -- was relevant to the defendant's alleged conduct, carrying a gun, and his motivation for doing so, to protect himself.  *Recio*, 884 F.3d at 236.  The court reasoned that "It's Always Tucked" suggested the defendant always carried a gun tucked in his waistband, which made it more probable that he did so on the date of the offense.  *Id.*  And the lyric, "Kuz I'll B If My Life Get Took," was relevant because it tended to show that the defendant always carried a gun for his protection, "which made the fact that he 'always' carried a gun more probable." *Id.*[8]

By contrast, courts have found that the probative value of rap lyrics is low when they contain only general or vague references to violence rather than evidence of specific charged crimes.  *See Cheesboro*, 346 S.C. at 550 (probative value of rap lyrics was low because the lyrics were too vague); *Skinner*, 218 N.J. at 523 (probative value of rap lyrics

---

[8]  The court also found that the probative value of the lyric was not substantially outweighed by its prejudicial effect.  *Recio*, 884 F.3d at 483.  The court reasoned that "the Government introduced a rap lyric consisting of a single sentence that described only the conduct of which [the defendant] is accused – carrying a gun – and a reason for doing so – self-protection."  *Id.*  The lyric did not reference "other, irrelevant behavior, like threatening police or degrading women, that would have unfairly caused the jury to see [the defendant] as a culpable person."  *Id.*

was low because they lacked a strong nexus to the charged crime).  For instance, in *Bey*, the district court precluded the admission of rap lyrics at the defendant's felon in possession of a firearm trial for several reasons, including because the probative value was substantially outweighed by the danger of unfair prejudice under Rule 403.  *Bey*, 2017 WL 1547006, at *8.  With respect to probative value, the court noted that although the defendant's "songs are expressed through a first-person narrative and includes references to his life – such as the intersection where he lives and where he was arrested for the offense – his lyrics also clearly feature fictional imagery, metaphors, and exaggerated storylines." *Id.*  For example, the government did not establish that the defendant did some of what was described in the lyrics – carrying a pistol while in Porsches, had been shot in his chest and experienced burning "like vodka," had shot Jewish people, or kills "at will." *Id.*  The court held that "[c]herry-picking the lyrics that reference firearms and entering them into evidence would take them out of context." *Id.* at *7.

The Court notes that Professor Nielson also used the term "cherry-picking" to describe the government's desire to introduce into evidence the three rap songs that it contends support its theory of the case, rather than the entire body of the defendants' work. 9/2/22 Tr. at 93.  Therefore, as in *Bey*, the government may be "decontextualizing these songs by not revealing the other songs," and "zeroing in on just specific lines but taking them totally out of context." *Id*. at 93-94.  However, that is apparently what the defense prefers if rap songs are found to be admissible.

To be clear, the government is not cherry-picking by only using certain lyrics in a song that it believes support the charged offenses or how they were committed.   To the contrary, the government is seeking to introduce the entirety of two songs and a large portion of another.   The problem is that there are lyrics that contain inflammatory material that is entirely irrelevant to this case (*e.g*., misogyny and disrespect toward women).  And other lyrics that talk about violence generally are improper propensity evidence because the only purpose for their admission is to show the defendants' violent character. *Id.* *Compare Recio*, 884 F.3d at 235 (unfair prejudice did not result from the admission of lyric

that did not reference "other, irrelevant behavior, like threatening police or degrading women, that would have unfairly caused the jury to see [the defendant] as a culpable person."). Finally, unlike in *Recio* and *Stuckey*, the probative value of the remaining lyrics is minimal because the government has not established that the lyrics mirror or exhibit an unmistakable factual connection to the charged crimes.

At oral argument, the Court repeatedly questioned government counsel about how certain lyrics describe or refer to the facts of charged crimes. In response to one of the Court's many questions on this topic, government counsel argued that every word and phrase in the lyrics are not going to refer directly to something in the indictment. 11/4/22 Tr. at 28. Government counsel also argued that "there can be multiple relevant interpretations of these lyrics." *Id.* at 55. Agent Parkinson testified similarly. He also testified that he does not expect every single lyric in a rap song to be 100 percent true or a 100 percent autobiographical narrative. 9/29/22 Tr. at 86.

Ironically, the government's arguments demonstrate the exact problem that results from someone other than the author of lyrics trying to interpret what s/he believes the lyrics mean. That problem is exacerbated for gangsta rap lyrics like those in the case at hand that focus on violence, use of guns, and drug dealing in highly specific terms, even though rap music is a fictional art form. Likewise, the lyrics here are also consistent with gangsta rap lyrics generally in terms of the references to: (1) geography or territory (*e.g.,* "36th Street," "Hills," "Tre Six"); (2) friends or associates (*e.g.*, "Sammy Mack," "Mack," "Lil' Mike," "Deuce Nine"); (3) deceased friends (*e.g.*, "Mar-K," "K"); and (4) real or made up rivals (*e.g.*, "Freestones," "Yabbas"). Professor Nielson testified that in the hundreds of cases that he has worked on, he has yet to see a rap song where the singer is rapping about what he did or planned to do. 9/2/22 Tr. at 79. To the contrary, Professor Nielson has encountered rap artists who claim to be involved in criminal activity in their songs but are not committing crimes. *Id.* at 111. Agent Parkinson simply does not have the credentials to distinguish between gangsta rap lyrics that are autobiographical narratives and those that are fictional, even if the lyrics (like all fiction) correspond to or "draw[] off an author's

lived experiences."  9/2/22 Tr. at 31.   Those problems are demonstrated in Agent Parkinson's interpretations of the lyrics set forth below.

The Court divides the lyrics in the songs at issue into three categories:  (1) lyrics that the government claims are tied to allegations in the indictment and/or acts committed to further or conceal the crimes; (2) lyrics about WHB generally, but not specifically tied to the charges or acts that led to the charges; and (3) lyrics about violent street gangs generally.[9]   The Court notes that at oral argument government counsel suggested that because Count One of the Indictment alleges that producing the video and songs is an overt act, all of the lyrics necessarily refer to an allegation in the indictment, and for that reason, are probative.  The Court disagrees.  The rap video and songs do not automatically become probative simply because the production of the video and songs is alleged an overt act.[10]  Rather, a Court must assess whether the specific evidence that the government seeks to admit *to prove* an overt act or allegation in an indictment is in fact probative.  Thus, in the case at hand, the Court must assess whether what is depicted in the video and the lyrics of the songs are evidence of the charged offenses, an alleged overt act to further the conspiracy, and/or any other pertinent allegation in the indictment.  The Court turns to that analysis.

**1.   Lyrics Allegedly Tied to the Indictment.**

The "'Bustin'" song contains the following lyrics that purportedly refer to allegations in the indictment.  The first lyrics are:

They'll dump on you N's
If you ain't from Park or Hills

---

[9]  The government's interpretation of the lyrics and their purported relevance at trial comes from three sources: (1) Agent Parkinson's testimony; (2) reports and emails authored by Agent Parkinson and Agent Berlin, which were either admitted as exhibits at the evidentiary hearing or discussed during Agent Parkinson's testimony; and (3) the government's pleading captioned, Government's Supplemental Notice of Rap Lyrics/Songs/Videos, in which the government identified the evidentiary purpose of the specific rap lyrics that it intends to introduce at trial (filed pursuant to this Court's September 2, 2022 Order).  Doc. 2101.

[10]  The defense pointed out that the government did not even need to allege overt acts in charging the RICO conspiracy.  *See* 18 U.S.C. § 1962(d).

- 83 -

> I move around with that stick (That steel)
> Try me, I'm gonna kill (I kill)
> Better write your will
> I tell Mack to hold that wheel (That wheel)
> When I'm hangin' out of that window (Window)
> Burner come with extendos (Extendos)
> Breakin' backs just like Limbo (Like Limbo)
> Do you and your kinfolk (Huh)
> I do the shit for my N, K (My N K)
> I think about the shit every day
> Firm grip when I hold the cane
> That's a green light
> That means right away (Bang)

Doc. 2101 at 5.

In its pleading, the government represents that "Park or Hills" refers "to the WHB neighborhoods of South Park or Western Hills." *Id.* The government contends that "[d]ump' is a term that can mean to empty the clip of one's firearm." *Id.* The government asserts that the lyric "tell Mack to hold that wheel," when read in conjunction with the lyric, "When I'm hangin' out of that window (Window)" . . . could be referring to the Mia Scott shooting, but it also puts the co-defendant's acting together to commit acts of violence in furtherance of the criminal enterprise." *Id.*

The defense easily established during Agent Parkinson's cross-examination that these lyrics cannot pertain to the Mia Scott drive-by shooting for several reasons. First, the indictment does not charge Michael Williams or Samuel Rakestraw with the Mia Scott shooting or any other drive-by shooting. In fact, both Williams and Rakestraw were in jail at the time of that shooting. Second, the Mia Scott drive-by shooting occurred after the release of the "Bustin'" song. Finally, Mr. Rakestraw was falsely accused of another drive-by shooting of Dilyou. Thus, the government has not proven that these lyrics mirror or exhibit an unmistakable factual connection to the charged crimes.

The government claims that the references to K mean that Michael Williams carries out violent acts for his deceased mentor and gang leader, Marcus Darton, and thinks about his murder by a rival gang member every day. Doc. 2101 at 5-6. The government

maintains that this is the exact motive for the killing of Floyd Davis alleged in the indictment. *Id.* The government also argues that "green light" combined with "that means right away" means that "a kill order is to be carried out without delay," which is relevant to the hierarchy of the WHB gang where older gang leaders give a "green light" to younger members to commit an act. *Id.* at 6. The government maintains that the entire verse is specific to the murder of Floyd Davis in retaliation for the murder of Marcus Darton. *Id.*

As discussed earlier, there is a dispute as to whether the word "the" or "this" precedes "shit for my N, K." As the defense pointed out, if the word is "this," it could be referring to making this song in tribute to Marcus Darton. Agent Parkinson agreed that changing this one word would change the meaning of this lyric. Moreover, Floyd Davis was not killed in a drive-by shooting so the lyrics bear no relation to that crime. Finally, the government has ample evidence to support its theory that the motive for the Floyd Davis homicide was in retaliation to the Freestones murder of Marcus Darton. Therefore, the admission of this ambiguous lyric to help prove motive is unnecessary, especially in light of the prejudicial effect of the lyrics in the songs as a whole.

The government claims the following lyrics in the "Bustin'" song refer to a leader of the WHB giving the order to kill Floyd Davis and the plan for carrying out the murder:

> We out here when the block is hot
> Like we standin' next to that stove (That stove)
> If the big homie set that green light
> Then all my N-words gonna go (I'm gonna go)
>
> We'll have a bitch to come chill with you
> Just to cause diversion (Huh)
> Now we up in your house
> Standing behind the curtains (Huh)
> Ain't no talkin' when it comes to it
> I see your ass in-person (Huh)
> Leave your ass worthless (Huh)
> I feel like it's worth it

Doc. 2101 at 9.

The government asserts that the lyric, "If the big homie set that green light," means that "older members of the gang gave permission and instruction for the murder" of Floyd Davis.  *Id.*  Also, the government argues that the lyric, "we'll have a bitch come chill with you [j]ust to cause diversion," "aligns with the factual scenario of multiple violent acts the defendants committed, including the homicides of Marshall Davis and Floyd Davis, which "were in retaliation for the murder of Mar-K according to cooperating witness AMR."  *Id.*  The government notes that the Marshall Davis homicide occurred prior to the release of Bustin', and the Floyd Davis homicide was committed several months after the release of the song.  *Id.*   And like the Floyd Davis homicide, in the Marshall Davis homicide "it is alleged that a female participated in the homicide at the direction of WHB members."  *Id.*  The government also finds it "noteworthy that the lyric is not in the past tense."  *Id.*

The problem with government counsel's interpretation of these lyrics is that it conflicts with Agent Parkinson's testimony about how he interpreted this lyric.  Agent Parkinson testified that his interpretation of this lyric came from Ana Rodriguez.  9/27/22 Tr. at 118.  She told law enforcement that Floyd Davis told her that this is how his brother Marshall was set up and killed.  *Id*. at 118-119.  But the lyric is written in the future tense so it cannot refer to the Marshall Davis homicide as Rodriguez told Agent Parkinson.  And even if it somehow could relate to that homicide, Agent Parkinson testified that Marshall Davis was not killed in his house by someone standing behind curtains.  *Id*. at 122-123.  He was killed in a parking lot just like his brother.

When confronted with the problems about Agent Parkinson's interpretation of these lyrics, both Agent Parkinson and government counsel maintained that these lyrics also show the defendants' modus operandi of violent retaliatory acts.  *Id*. at 121.  However, defense counsel asked Agent Parkinson to identify a murder charged in the indictment, other than the Floyd Davis homicide, where a female was used to cause a diversion to commit a murder.  *Id*. at 122.  Agent Parkinson could not do so.  *Id.*  Thus, this lyric is not evidence of a modus operandi of the WHB.

Government counsel also argues that cooperating witnesses Ana Rodriguez and

Bernard Rayford provide similar statements about how the homicides of Floyd and Marshall Davis were committed.   As discussed above, the fact that Rodriguez and Rayford will testify at trial about how these homicides were committed shows that these lyrics are cumulative evidence.  To be sure, there is always cumulative evidence admitted at trial; for example, both Rodriguez and Rayford describing how the Floyd and Marshall Davis homicides were committed.  But that type of cumulative evidence does not create the danger of unfair prejudice like inflammatory and ambiguous rap lyrics which cannot be specifically tied to alleged crimes.

The government argues that the following lyrics in the "Bustin'" song refer to the "code of silence" and not talking about crimes on the phone.

> All my N's bustin' (Bang)
> We don't play around (Huh)
> It's murder season
> 'Cause our life lived in that Tuck town
> Get laid down and I'm gone (I'm gone)
> Clips about a mile long
> Smoke a N and don't talk about it
> So don't ax me over that phone.

*Id.* at 10.

The government claims that the lyric, "Smoke a N-word and don't talk about it. So don't ax me over that phone," is relevant to prove territoriality and relates to allegations in Count One of the indictment of WHB using witness intimidation and a code of silence (*i.e.*, not talking on the phone).  *Id.*  The government argues that this is consistent with recorded phone calls between defendant David Williams and a cooperating witness, Ana Rodriguez, in which he tells her not to discuss anything related to the Floyd Davis homicide on the phone or talk to the police.  *Id.*  The government submits that this evidence aligns with and puts in context the philosophy set forth in these lyrics.  *Id.*

The Court first notes that neither government counsel nor Agent Parkinson explained how these lyrics prove the territory of the WHB.   The Court assumes that it is the reference to "Tuck town," as perhaps "Tuck" is short for Tucson.  If that is the case,

that reference is not specific to the 36th Street area that the WHB allegedly controls.

More importantly, Agent Parkinson agreed that the reference to not talking on the phone could not relate to the Floyd Davis homicide or the code of silence with respect to this homicide because that murder occurred after this song was released.  9/27/22 Tr. at 139.  Faced with that reality, Agent Parkinson testified that the lyric refers to the philosophy of not talking about crime on the phone.  *Id*.  However, Agent Parkinson conceded that there are thousands of text messages where crimes are openly discussed.  *Id*. at 131.

As a result of Agent Parkinson's testimony on cross-examination, the Court concludes that the probative value of these lyrics is low.  The lyrics, written by some unknown person and allegedly sung by Michael Williams, have little probative value since no evidence was presented that Michael Williams knew about David Williams' attempts to silence Rodriguez.  Rather than introducing into evidence ambiguous and prejudicial lyrics, the government can (and no doubt will) introduce the recorded conversations between David Williams and Rodriguez into evidence at trial to prove the philosophy of not talking about crimes over the phone, as well as witness intimidation and the code of silence.  Thus, once again, probative value of the lyrics is reduced because they are cumulative evidence.

The following lyrics are in the song "Brother Like a MF," which was purportedly sung by Michael Williams, Samuel Rakestraw, and YM Da Kidd (although the specific singer was not identified):

> My N-words talkin' about family
> But it was day and night
> I catch some family talkin'
> They got circumcised.

*Id*. at 16.

In the government's pleading, it is represented that this lyric refers to the code of silence and "how the code is enforced by violence," and that "'[f]amily'" is how WHB members commonly refer to others in the gang."  Doc. 2101 at 16-17.  Agent Parkinson's interpretation was a bit more specific; he testified that he interpreted the lyric to mean

killing a snitch.  9/29/22 Tr. at 40-41.  However, he agreed with defense counsel that the lyric is in the past tense.  *Id.*  He also agreed that the indictment does not allege that a snitch was killed and there is no evidence of that; and Rakestraw (if he is the singer) is not confessing to anything he may have done.  *Id.* at 40-42.  Thus, this lyric does not mirror or exhibit an unmistakable factual connection to a charged offense.

This lyric is also in the "Brother Like a MF" song: "And if my N-word need him buried, he ain't go to ask."  Doc. 2101 at 20.  Agent Parkinson testified that this lyric refers to the fact that if gang members wanted someone killed, it would be done.  9/29/22 Tr. at 47-48.  In their pleading, the government states that the lyric "could be a reference to the violent acts the WHB members commit on behalf of other members," or it could refer to jail calls of co-defendants "that refer to fundraising operations WHB members would do for other WHB members funeral expenses."  Doc. 2101 at 20.  In light of the government's inability to commit to an interpretation of this lyric, the government cannot establish that the lyric relates to a charged offense or an allegation in the indictment.[11]

The following lyrics are also in "Brother Like a MF," which was uploaded on Michael Williams' Facebook page, and lists the rappers as Williams, Rakestraw, and YM Da Kidd (which is James Jones):

> Shoot a N up
> And then watch the news
> She was on my dick
> Until she heard that I killed her dude.

*Id.* at 12.

The government states that these lyrics reference several items in the disclosure. First, Christina Monge's grand jury testimony that the day after the Mia Scott shooting, co-defendant Reginald Johnson watched the news for a story about the shooting.  *Id.*  The

---

[11]  At oral argument, government counsel pointed out that many times a defendant's ambiguous post-arrest statement is subject to different interpretations.  The government will argue that the ambiguous statement is incriminatory and the defense will argue that it is not.  That is not an apt comparison because here it is the government offering different interpretations of the lyric.

government argues that Monge's testimony directly relates to these lyrics. *Id.* Also, Rochelle Valadez testified before the grand jury that she was in a relationship with Floyd Davis and then had later relationships with several co-defendants, some of whom made statements about the Floyd Davis homicide. *Id.*

The Court first notes that Agent Parkinson testified that YM Da Kidd sang these lyrics and, once again, the author of the lyrics is unknown. As a result, their probative value against these defendants is low. Additionally, the government did not explain (or sufficiently explain) how the Valadez testimony relates to these lyrics. In the Court's view, the lyric implies that a woman was first in a relationship with a WHB gang member. But Valadez's testimony is the opposite: she was first in a relationship with Floyd Davis and then with WHB members. The Court's interpretation of the lyric may not be correct; but the interpretation is not unreasonable and thus illustrates the problem of someone other than the author interpreting rap lyrics. Finally, Monge's testimony about Johnson watching the news after the Mia Scott shooting is not tied to a female being in a relationship with Floyd Davis. And no evidence was presented that showed that Michael Williams or Rakestraw knew about Reginald Johnson watching the news after the Mia Scott shooting (assuming this was in fact the shooting on the news) such that they could have written a lyric about that.

The government contends that the following lyrics in the "Brother Like a MF" song refer to cooking of powder cocaine into crack cocaine.

> We used to ride dirty
> On the interstate
> Just to see a muthafuckin'
> Dinner plate
> (Uh)
> Back then we was chuggin'
> Like a muthafucka
> Dope fiend kitchen
> We was cookin' like a muthafucka

*Id.* at 13-14.

The government states that the lyrics "dope fiend kitchen" and "cookin' like a muthafucka" is a direct reference to cooking crack cocaine as alleged in Counts One and Twenty-four of the indictment. *Id.* at 14.  Agent Parkinson similarly testified that these lyrics refer to the defendants converting powder cocaine into crack cocaine through a cooking process, often in the kitchen of their homes, rental houses, or the "shops." 9/27/22 Tr. at 58.  He added that Christina Monge testified before the grand jury about this cooking process in the houses and shops, and that TPD uncovered evidence of the cooking process when they executed search warrants at the houses and shops. *Id.*

Agent Parkinson agreed with defense counsel that "dinner plate" has different meanings. 9/29/22 Tr. at 162-163.  Agent Parkinson defined it as a girl you "want to have sexual intercourse with."  The other definition is "a way of making money" to feed oneself. *Id*.  No testimony was presented about how either definition of "dinner plate" fits into the context of this lyric.  As a result, this term is ambiguous.

The Court admits that the references to "dope fiend kitchen" and "cookin'" is one of the few lyrics that bear some relation to the charged offenses.  However, the lyric is cumulative since Monge will testify about the cooking process at houses, and law enforcement officers will testify about evidence of the cooking process recovered from the houses during the execution of search warrants.  And, once again, Professor Nielson testified that gangsta rap almost always encompasses lyrics involving criminal activity such as drug dealing.  For these reasons, the probative value of the lyric is low.

The following lyrics are also in the "Brother Like a MF" song:

> When it's time to catch a body
> We gonna fetch him out
> Hit him with a brand new 240
> Just to test it out

Doc. at 18-19.

In its pleading, the government claims that this lyric references a M240 rifle which uses .762 caliber ammunition, and .762 casings were found at the Floyd Davis murder scene. *Id.* at 19.  Also, Ana Rodriguez will testify that WHB members testified that WHB

members test fired a rifle prior to the Floyd Davis homicide, and .762 ammunition was later recovered from the scene of the test firing by law enforcement.   *Id.*

The proffered interpretation of these lyrics is undercut by Agent Parkinson's testimony on cross-examination.  Specifically, he agreed with defense counsel that a M240 is a fully automatic machine gun which fires 600 to 800 rounds a minute and is used by the United States military.  9/29/22 Tr. at 25-26.  A normal civilian cannot buy a M240, and it is a very expensive firearm. *Id.* at 26.  And no such weapon was used to commit the crimes charged in the indictment.  *Id*.  Thus, once again, the reference to this firearm and .762 ammunition is consistent with gangsta rap's fixation on firearms and ammunition; and the M240 reference is consistent with the fictional and exaggerated form of gangsta rap.   For what it's worth, the Court also notes that the lyric "hit him with a brand new 240, just to test it out" does not seem to relate to test firing a gun as the government contends.   Rather, it seems to refer to an actual shooting given the prior lyrics referring to "catch a body" and "fetch him out."   Thus, once again, the probative value of these lyrics is low.

In the song "Dome Body," which the government says was "likely sung by YM Da Kidd, James Jones, and/or Samuel Rakestraw," and also involved a famous rapper named Mozzy, the following terms and phrases are used: "Free Sly like a mothafucka," "Fuck a Stone," and "chopsticks."   Doc. 2101 at 21.   The government claims that these terms and phrases, in the context of the lyrics in which they are used, refer to the ongoing battle with the Freestones and a direct threat to use guns to retaliate against that rival gang.  *Id.*

No evidence was presented with regard to how "Free Sly," which is Shawmaine Moore's nickname, relates to the charged offenses.  The only testimony was that Moore was in jail at the time the song was released.  Additionally, the government clearly has a substantial amount of other evidence to show the ongoing feud with the Freestones.  And Professor Nielson explained that gangsta rappers often rap about a real or fictional rivalry with another group, almost always rap about guns, and often refer to guns as a "chop" or "chops."

The following lyrics are also in the "Dome Body" song:

You N's pussy on Facebook
Hella fakin' (Hella Fakin')
You N's can't get wet
When these levies breakin' (These levies breakin')

*Id.* at 23.

The government claims that this lyric "is relevant to the Megan Borges and Samuel Rakestraw conversations on Facebook to individuals they believed were speaking to police about WHB activities. This is very fact specific as to what gang members were doing to threaten or retaliate against others at the time." *Id.* Agent Parkinson testified that these lyrics are significant because it was a disparaging comment about rivals of the WHB being active on Facebook.

Agent Parkinson agreed with defense counsel that the lyrics do not say "you N's snitching on Facebook." 9/27/22 Tr. at 147. And "pussy" is also a reference to the female anatomy. *Id.* When asked if the Facebook posting could refer to "someone's girlfriend on Facebook," Agent Parkinson testified that "[b]ased on the content and context, that's not how I understand it." *Id.*

The Court finds that this lyric has limited probative value. Agent Parkinson did not explain how any word or phrase used in this lyric, other than the word Facebook, shows that it references conversations involving Borges or Rakestraw about snitching or retaliation. The Facebook posting is the best evidence to establish that Borges and Rakestraw were threatening individuals, and not Agent Parkinson's attempt to discern the meaning of this lyric.

These lyrics are also from the "Dome Body" song:
If you ain't tryin' to push
You ain't from the turf then
(You ain't from the turf)
'Cause all my N's clockin' in to put work in
Workin' doubles
Real hitters in the shop with us
(In the shop with us)
Got N's workin' the cameras
In case the cops hit us (In case the cops hit us)
Slidin' out with the chops

But we do it movin' (Gotta do it movin')
Unpackin' every bullet where we movin' to (Uh)

Doc. 2101 at 23.

The government represents that the reference to "shop" is where drugs were dealt, and "if you ain't from the turf then" refers to not being loyal to the gang and/or the territory of the gang. *Id.* The word "push" is a common street term for selling drugs, "put in work" means that gang members are expected to work at the shops selling drugs. *Id.* Also, the government says that it will present evidence that each shop had security cameras for the purpose of seeing rival gang members or police activity outside of a shop. *Id.* And furthermore, jail calls of co-defendants where they speak about not understanding how people in the shop still had drugs on them when the police arrived since the police should have been visible on the cameras. *Id.*

On cross-examination, Agent Parkinson testified that he does not know who wrote the "Dome Body" lyrics. 9/27/22 Tr. at 142. There was also no testimony or evidence presented about who sang the lyrics referencing the shops. Agent Parkinson agreed with defense counsel that neither Michael Williams nor Samuel Rakestraw were part of the phone conversations where the cameras in the shops were discussed. *Id.* at 149. Finally, Agent Parkinson agreed that the word "shops" is also referred to as a crack house, and both words are used nationwide and are not specific to the WHB. *Id.* at 150.

As is the case with the lyrics that refer to "dope fiend kitchen" and "cooking," the Court admits that the lyrics regarding the shops and cameras in the shops bear more relation to the evidence in this case than any other lyrics. However, the probative value is reduced based on the following: (1) the author of the lyrics is not known, and a famous rap artist named Mozzy was involved in making "Dome Body"; (2) relatedly, there was no evidence presented about who sang this lyric; and (3) "shops" and "chops" are terms commonly used by gangs and in rap songs; they are not specific to the WHB. Additionally, the lyrics are cumulative evidence because information extracted from Moore's phone revealed a conversation with Michael Williams about going to the "shop." Similarly, with respect to

the use of the word "chop" or "chops," the lyrics are also cumulative because the government extracted many text messages from Michael Williams' phone where he discussed selling "chops" and actually sent pictures of guns.

### 2. **Lyrics That Refer to the WHB Generally.**

There are lyrics in the songs that refer to the WHB generally.   The Court turns first to the "Bustin'" song (and video) allegedly sung by Michael Williams and published on social media on April 18, 2015.

> Yeah – LilMikeBoii
> Young Wreckin Krew
> We in this bitch
> Bustin (Rah)
>
> N's ain't even ready
> These bitch N's ain't
> These hoes ain't
> We'll give it to you anyway

Doc. 2101 at 4.

In its pleading, the government states that "Young Wreckin' Krew" is a subset of WHB gang members, including Michael Williams and Samuel Rakestraw, which "is known for killing, selling drugs, making rap music, and profiting off of the WHB."  *Id.* The government further states that the "lyric 'N's ain't even ready' portends to reference that the WHB members rivals are not ready for conflict that is underway, in conjunction with the rest of the song."  *Id.*

These lyrics clearly do not mirror or unmistakably exhibit a factual connection to the charges.   The indictment certainly mentions the "Young Wreckin' Krew" as a subset of the WHB.   But the defense established that the Young Wreckin' Krew is also the name of the defendants' rap group.  Agent Parkinson was aware that the defendants called their rap group the Young Wreckin' Krew.  9/29/22 Tr. at 7.   But he did not know that Michael Williams and Samuel Rakestraw filed paperwork with the Arizona Corporation Commission to incorporate the Young Wreckin' Krew.   9/27/22 Tr. at 86-87.  And that

paperwork only mentions these two men, and not the other alleged members of the Young Wreckin' Krew.  *Id.* at 88.  Thus, the lyric's reference to the Young Wreckin' Krew and that they will "give it to you anyway" can easily refer to many things other than that a rival gang is not ready.    Moreover, as is the case with many other lyrics, the government has other evidence that it can use to prove that Young Wreckin' Krew is a subset of the WHB gang.  In fact, Michael Williams and Samuel Rakestraw both have tattoos that reference the Young Wreckin' Krew.  9/29/22 Tr. at 6-7.  Thus, the government need not use a lyric whose meaning is ambiguous.

The following lyrics are also in the "Bustin'" song:

> My N's bustin', boy
> So don't get out of line
> I'm from Tre Six
> But I fuck with some N's from Deuce Nine
> Try me, I'm gonna shoot mine (Mine)
> At these bitch N's throats (Huh)
> Call me when it's go-time
> They told me double up
> I got two nines (I got two)

Doc. 2101 at 7.

Government counsel and Agent Parkinson maintain that this verse directly relates to the territoriality of the WHB, because "Tre six" is a reference to 36th Steet.   The phrase "I fuck with some N's from Deuce Nine" can be taken to mean that the WHB also collaborates with the 29th Street gang members at times. *Id.* at 7-8. The government asserts that the lyric is highly relevant to both territory boundaries of the criminal enterprise and to alliances and rivalries with other gangs in the area. *Id.* at 8.   And the lyric further explains and places into context other evidence at trial including phone downloads.  The phrase "I got two nines" is a reference to a nine-millimeter handgun.  *Id.*

Notwithstanding Agent Parkinson's explanation, the Court is still unclear the phrase "fuck with" shows a positive relationship with the 29th Street gang, especially given the next lyric: "Try me, I'm gonna shoot mine." Moreover, Agent Parkinson admitted that he

was aware that there is a 29th Street gang but did not know if they were affiliated with South Park.   9/27/22 Tr. at 132.   And as discussed several times above, Professor Nielson explained that references to firearms of all types is a prominent feature in gangsta rap music.  Finally, this Court has heard other evidence regarding the territory of the WHB in several evidentiary hearings which will be introduced at trial.  Thus, probative value of these rap lyrics is minimal.

### 3. Lyrics That Only Go to the Violent Tendencies of the Defendants and/or the WHB.

The government asserts throughout its pleading that many lyrics are probative because they demonstrate the gang lifestyle, which is focused on violence, and the defendants embracing of that lifestyle.  The Court notes that a prosecutor's intention to introduce rap lyrics that describe violence generally but are not specifically tied to the charged crimes or acts that led to those crimes, "skirt[s] dangerously close to advocating the use of the videos as evidence of [the defendants'] violent character."  *Coneal*, 41 Cal. App.5th at 971.

At oral argument, government counsel argued that the admission of propensity evidence only becomes a concern for Rule 404(b) other act evidence, and not evidence directly related to charged offenses.  However, the lyrics discussed below are clearly other act evidence because they are not tied to any allegation in the indictment, other than perhaps the overarching allegation that the WHB is a violent street gang.   The lyrics discussed below are but a few examples of the lyrics that tend to show a general propensity for violence, which is improper under Rule 404(b).  *See also* Doc. 2101 at 10, 13-14, 17 ("I say my life is trustin' this trigga"; "pistol cocked and I'm searchin'"; "leave you bitch N's worthless"; "Bitch I'm bangin'; "Then we all shoot"; "And we don't shoot just to shoot"; "Dr-dr-droppin' N's"; Poppin' N's"; "with hollow tips"; "Empty the whole damn clip").

The song "Bustin'" contains the following lyrics:

And I'm ridin' (What the fuck is up?)
I'm swirvin' (Swervin')
I'll spray you

Be like I ain't nervous (I ain't nervous)
All my N's
We really sinnin'
We like fuck it though
We ain't perfect (Perfect)

Doc. 2101 at 6.

Agent Parkinson testified that the word "spray" means to shoot guns rapidly. 9/27/22 Tr. at 111. Thus, this lyric which does not mention WHB, an alleged gang member, or any specific act alleged in the indictment is improper propensity of violence evidence.

The same is true for the following lyric:

Fuck feelings.
I ain't hurtin' (I ain't hurtin')
For my N's
I'm lurkin' (I'm lurkin')
Smoke mine
I'm gonna smoke yours
'Cause I got the feelin' it's worth it (Huh)

Bust ten and tell 'em hold dat
Said a N wasn't perfect (Huh)
When it comes to it
There's no right or wrong
When I feel the shit
It's all worth it

Man, my N's out here bustin'
(Out here bustin')

Doc. 2101 at 6-7.

In its pleading, the government states that "bustin" is a street term meaning shooting repeatedly, and that "lurkin'" is a term frequently used by WHB members to describe spying on or watching rival gangs. *Id.* at 7. Agent Parkinson testified similarly. He added that the phrases "smoke mine" and "I'm gonna smoke yours" refers to the rivalry between the WHB and the Freestones.

The references to "bustin" and "smoke" clearly relate to general violence. At the

- 98 -

evidentiary hearing, the term "lurkin" was tied to one text message or social media post made by defendant Shawmaine Moore.  In light of the massive amount of disclosure in this case, the Court is hard-pressed to conclude that the lyric in which this term is used relates to the instant charges based on that single reference.  And, as Professor Nielson testified, the references to a rivalry between gangs, including references to spying or watching them, is common in gangsta rap music.  Thus, the lyrics are improper propensity evidence.

The following lyrics, also in the "Bustin'" song, also relate to violence generally.

> Move around with that Sammy (Sammy)
> Ain't no bitchness in me (Not in me)
> All these guns on all my N's
> Yeah, bullets
> We got plenty (Plenty)
> We gotta do this shit for my bros, N
> Pistol cocked when I approach N's
> Quick and fast to reload, N
> Then give your ass a whole load, N (Load, N)

*Id.* at 8.

The government states that these lyrics relate to Count One of the indictment by mentioning "Sammy," which is Samuel Rakestraw, as well as motives of the WHB and the criminal enterprise.  *Id.*  These lyrics undoubtedly relate to general violence and firearms which, again, are common gangsta rap.   The reference to Sammy is not surprising since he is one of the rappers.   Thus, there is no probative value in these lyrics.

Based on the discussion above, the Court finds that the government has not skirted dangerously close to advocating the use of the videos and rap songs as evidence of the defendants' violent character, but rather, has crossed the line in seeking to admit the lyrics identified above.  The admission of this propensity evidence is improper.

### F. Any Probative Value in the Lyrics is Substantially Outweighed by the Danger of Unfair Prejudice.

Notwithstanding the discussion above, the Court acknowledges that certain lyrics, or at least words and phrases used in lyrics, could be interpreted to relate to the charged offenses or evidence in the case.  However, the problem is that the government is twisting

and stretching words and phrases (even if unintentionally) to come up with an interpretation that supports the charges, the evidence, and/or their theory of the case.   And in most instances, those attempted interpretations have failed.  For example, there are several times when the government's proffered interpretation of lyrics is inconsistent with the evidence in the case.   There are other times when Agent Parkinson's interpretation of a lyric is inconsistent with, or at least differs from, the interpretation set forth in the government's Supplemental Notice of Rap Lyrics/Songs/Videos.  As a result, the defense does not know what interpretation will be testified to at trial.   Additionally, there are lyrics that are ambiguous and some words or phrases used in lyrics are not even decipherable.  Finally, many of word and phrases used in lyrics are a prominent feature in all gangsta rap and relate to violence generally, and thus are not specific to the WHB or tied to the charged offenses.   As such, the probative value of the lyrics is minimal.

The Court notes that even if the probative value of the lyrics is greater than recognized by the Court, it would still recommend precluding the rap video and songs because the prejudice that will result from the admission of this evidence is devastating for the reasons already discussed at length.  To summarize, even though the author of the lyrics is not known, the government essentially wants to use the lyrics as the defendants' confessions to the charged crimes.   Second, the lyrics are so highly inflammatory that there is a great risk that a jury will convict the defendants for impermissible reasons.  Third, the admission of the rap video and songs, and the resultant testimony from Agent Parkinson and Professor Nielson, has the potential to become a feature of the trial and overshadow the acts giving rise to the charges.  The result is a risk of confusing and/or misleading the jury.  There is simply no reason to jeopardize the defendants' right to a fair trial when the government has acknowledged that it has a ton of other evidence to prove what is depicted in the video and sung about by the defendants.

## CONCLUSION

For the reasons discussed above, the Court concludes that the probative value of the rap video and rap songs is substantially outweighed by the danger of unfair prejudice and

1   the risk of misleading and confusing the jury that will result to the defendants if this

2   evidence is admitted at trial.  Accordingly, the Court recommends that the District Court

3   grant the Joint Motion to Preclude Rap Music, Videos, and Associated Content.

4           Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and

5   file written objections within 14 days of being served with a copy of this Report and

6   Recommendation. A party may respond to the other party's objections within fourteen

7   days. No reply brief shall be filed on objections unless leave is granted by the district court.

8   If any objections are filed, this action should be designated case number: **CR 18-01695-**

9   **TUC-JAS**.  Failure to timely file objections to any factual or legal determination of the

10  Magistrate Judge may be considered a waiver of a party's right to de novo consideration

11  of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en

12  banc).

13          Dated this 9th day of December, 2022.

14

15

16  Eric J. Markovich
    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28