**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-01695-TUC-JAS (EJM) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Michael Anthony Williams - 005,<br>Samuel Lee Berrelle Rakestraw, III – 004, | |
| Defendants. | |

Pending before the Court is a Motion to Preclude/Limit Testimony from Proposed Gang Expert Frieberg filed by counsel for defendants Michael Anthony Williams and Samuel Rakestraw. (Doc. 1595.)[1]   The defense first objects to Tucson Police Department ("TPD") Detective Frieberg's qualifications to testify as an expert on street gangs. *Id.* at 2-3.   The defense also argues that the proposed expert testimony is improper because: (1) it amounts to criminal profile testimony; (2) the opinions are unreliable, invade the province of the jury, improperly go to the ultimate issue to be decided by the jury, transmit inadmissible evidence to the jury, and violate the defendants' confrontation rights; and (3) the expert is also a case agent and these dual roles create a danger of unfair prejudice and jury confusion. *Id.* at 3-12. The defense requested a *Daubert* hearing to challenge Detective Frieberg's qualifications and the reliability of her opinions.

---

[1]  The motion also originally sought to preclude gang expert testimony by Michael Johnson. However, the government has since decided not to call Johnson as an expert witness.

The government first argues that Detective Frieberg will be providing lay opinion testimony.   Alternatively, the government argues that if the Court finds that her opinions are expert testimony, she is highly qualified to testify as an expert about street gangs.  (Doc. 1708 at 7-8.) The government also argues that the proposed testimony is not criminal profile testimony and that the Ninth Circuit has permitted gang expert testimony "to put the aspects of criminal gang structure and activity in perspective for the jury[.]" *Id.* at 11. The government also argues that Detective Frieberg's role as the case agent does not prevent her from providing expert testimony because a "dual witness" jury instruction can be given to alleviate the danger of "blurring the distinction" between Detective Frieberg's roles.  *Id.* at 11-13.  As a result, there is no danger of unfair prejudice or jury confusion. *Id.* at 14-15.

For the reasons discussed below, the Court concludes that there is not proper foundation for the proposed lay opinion testimony.  Specifically, the lay opinions are not solely based on Detective Frieberg's perceptions, as is required for lay opinion testimony. The Court also concludes that there is not proper foundation for expert opinion testimony because Detective Frieberg could not sufficiently articulate the principles and methods that she used to form her opinions.  As a result, the opinions are not reliable.  Accordingly, it is recommended that the District Court preclude Detective Frieberg from providing lay or expert opinion testimony on the proffered subject areas.

# FACTUAL BACKGROUND

### A.   The Charges.

On April 6, 2022, a federal grand jury sitting in Tucson, Arizona returned a Third Superseding Indictment against Michael Williams, Samuel Rakestraw, and seventeen other individuals.  (Doc. 1425.)  The charged offenses pertain to an alleged criminal enterprise operated by a gang known as the Western Hills Bloods ("WHB").   Williams and Rakestraw are charged with the following four felony offenses.  Count One charges Williams and Rakestraw (and other co-defendants) with participating in a RICO conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 1963(a), the objects of which are: (a) acts involving murder

(18 U.S.C. §§ 1959(b)(1) and 1961(1)); (b) offenses involving drug trafficking (21 U.S.C. §§ 846 and 841); and (c) acts involving the obstruction of justice (18 U.S.C. § 1512). Count Two charges Williams and Rakestraw (and other co-defendants) with Violent Crime in Aid of Racketeering – Conspiracy to Commit Murder, in violation of 18 U.S.C. § 1959(a)(5). Count Three charges Williams and Rakestraw (and other co-defendants) with Violent Crime in Aid of Racketeering – Murder, in violation of 18 U.S.C. §§ 1959(a)(1) and 2. Count Four charges Williams and Rakestraw (and other co-defendants) with Use of a Firearm During and in Relation to a Crime of Violence Resulting in Death, in violation of 18 U.S.C. §§ 924(j), 924(c)(1)(A)(i), (ii), (iii), and 2.

Michael Williams is also charged with the following additional offenses which are not alleged against Rakestraw: (1) Counts 12, 13, and 16: Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) Counts 14 and 17: Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; (3) Count 24: Conspiracy to Possess with the Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 846 and 841; (4) Count 25: Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841; (5) Count 33: Conspiracy to Possess with the Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 846 and 841; (6) Counts 34 and 37: Possession with the Intent to Distribute Marijuana, in violation of 21 U.S.C. § 841; and (7) Count 38: Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. § 841.

### B.    The Motion to Preclude.

On May 5, 2022, the defense filed a motion to preclude Detective Frieberg's proffered expert testimony on street gangs based on the grounds discussed above and requested a *Daubert* hearing. (Doc. 1595.) The government filed its response on May 26, 2022. (Doc. 1708.) Pursuant to the District Court's Order, the government filed a supplemental pleading in which they identified the following opinions that Detective Frieberg will provide at trial, as well as the bases for the opinions. (Doc. 2084.)

(1)    That the WHB is a Tucson-based criminal street gang that is also known as

- 3 -

1    the "Western Hills Posse Bloods," the "Western Hills Gangster Bloods," the "36th Street
2    Bloods," "The Hills," and the "Young Wreckin' Krew." *Id.* at 25.  This opinion is based
3    on Detective Frieberg's investigation of the WHB; specifically, speaking with witnesses
4    and members of the gang, seeing gang tattoos, and reviewing Facebook messages, jail calls,
5    and phone downloads.  *Id.*

6            (2)     That in December 2018, there were 144 documented WHB gang members
7    and associates.  *Id.* This opinion is based on information obtained from a TPD database
8    called "eGMIC" which is used to document individuals that meet gang criteria.  *Id.*

9            (3)     That the WHB had an ongoing rivalry with the Freestone Bloods and the 4th
10   Avenue Crips.  The opinion is based on Detective Frieberg's responding to crimes where
11   the perpetrators and victims were members of opposite gangs, speaking to witnesses and
12   defendants, seeing tattoos and indicia of gang membership (like wearing clothing of a
13   certain color), and reviewing downloads of defendants' phones and Facebook posts.  *Id*. at
14   25-26.

15           (4)     That WHB members use the following code phrases and gang slang:
16   "Blood," "Damu," "relatives," "whoop," "Yabba," "lurking," "hills or the hills," "Young
17   Wreckin' Krew," "hills in peace," "greenlight," "snitch or rat," "OG (Original Gangsters),"
18   "Big Homie," and "Little Homie."  *Id.* at 26.  Detective Frieberg will opine on what these
19   terms mean based on her lengthy investigation in this case, which included reviewing hours
20   of jail calls, phone downloads, and Facebook posts; interviewing defendants and witnesses;
21   and viewing pictures of gang tattoos.  *Id.* at 26-27.

22           (5)     That the WHB gang operates in a geographic boundary in the Western Hills
23   neighborhood.  *Id.* at 27.  This opinion is based once again on the lengthy investigation,
24   including reviewing rap videos made by the defendants, interviewing defendants and
25   witnesses, and responding to crimes within the WHB territory.  *Id.*

26           (6)     That WHB members predominantly wear red, use unique hand signs, and
27   have tattoos which demonstrate their affiliation to the WHB.   *Id.* Detective Frieberg's
28   opinions are based on reviewing eGMIC information on WHB members, reviewing rap

videos made by WHB members, reviewing pictures from phone downloads and social media posts, and speaking with defendants and witnesses. *Id.*

(7)     That WHB uses social media and rap videos to warn and threaten members of rival gangs and people who provide information to the police. *Id.*  Relatedly, Detective Frieberg will interpret social media postings made by defendants Borges and Michael Williams where they call K.D. a "rat" and posted pictures of grand jury transcripts and police reports to prove that K.D. is a "rat." *Id.* at 27-28.  These opinions are based on her review of social media posts, her review of phone downloads, and information from witnesses. *Id.* at 28.

(8)     That there was retaliatory violence between the WHB and the Freestones. *Id.* In doing so, Detective Frieberg will interpret the ambiguous term "winning," which refers to the power struggle between these two gangs.  *Id.* She will also interpret ambiguous phrases in rap videos produced by the defendants, such as "greenlight" and "I do it for Mar-K." *Id.* These opinions are based on her review of rap videos, investigation of dozens of crimes involving the WHB, the investigation of the Marcus Darton homicide, hours of listening to jail calls of defendants, and her review of social media posts and downloads of defendants' phones. *Id.*

As noted above, the government first argues that these opinions "fall[] under lay witness testimony" because the opinions all come from Detective Frieberg's "involvement in the investigation from which this indictment stems."   *Id.* The government goes on to state that "if the Court should decide any of the above information is expert testimony, the government will revisit its decision to present Det. Frieberg as an expert and request a dual witness jury instruction." *Id.*[2]

C.     **The *Daubert* Hearing.**

Detective Frieberg testified at a *Daubert* hearing over the course of two days – October 26, 2022, and December 2, 2022.   Her testimony is set forth below.

---

[2] It is not clear to the Court what the government means by "revisit its decision" to present expert testimony and request a dual witness jury instruction since such an instruction would only be needed if Detective Frieberg provides expert opinion testimony.

1          **1.      <u>Direct Examination by Government Counsel:</u>**

2          Detective Frieberg has been with TPD since 2008.  10/26/22 Tr. at 15.   When she

3    started at TPD, she attended a basic training which consisted of 680 hours of course

4    material.  *Id.* at 16.   There was a three-hour gang component that involved general gang

5    information, such as how to identify a gang member in terms of clothing and colors worn.

6    *Id.*  Detective Frieberg then attended a 170-hour post academy training.  *Id.* at 16-17.

7          Detective Frieberg started as a patrol officer and was in that position for about five

8    years.  *Id.* at 17. She testified that as a patrol officer it was important to be able to identify

9    a gang member for two related reasons: intelligence in the police community and to place

10   gang-related information into a TPD database.  *Id.*   As a patrol officer, Detective Frieberg

11   worked on cases where there was gang involvement "a handful of times."  *Id.* at 18.

12         She was promoted to the rank of detective in 2013.  *Id.* She completed field training

13   which consisted of "shadowing" four different detectives for "two-week stints in various

14   units."  *Id.* She was ultimately assigned to the gang unit where she remained until 2021.

15   *Id.* at 19.   She participated in specialized gang trainings and attended gang-related

16   conferences while in the unit.  *Id.* at 20-23.   There was instruction on social media, case

17   reviews, courtroom testimony, interview techniques, identification of gangs along

18   racial/ethnic lines, and gang trends.  *Id.* at 23.

19         Detective Frieberg also had training on gang member identification, including the

20   eGMIC database.  *Id.* at 26.   She explained that eGMIC is a database where an officer or

21   detective documents the biographical information of an individual that they have identified

22   as a gang member.  *Id.*  Detective Frieberg both entered information into eGMIC and used

23   the information from eGMIC in her gang investigations.  *Id.* at 27.   If there is inaccurate

24   information in eGMIC, officers and detectives have a responsibility to make corrections.

25   *Id.*

26         Detective Frieberg attended gang intelligence meetings once a week.  *Id.* at 28.  The

27   meetings primarily consisted of TPD officers and detectives, but other law enforcement

28   agencies would sometimes attend.  *Id.* Recent cases or investigations are discussed in the

1   meetings, fliers about people who need to be identified are shared, and recent eGMIC cards

2   of gang members are also shared.  *Id.*

3        Detective Frieberg worked on hundreds of cases involving gangs and was the lead

4   detective in dozens of those cases. *Id.* at 19.  The lead detective (or case agent) "take[s] the

5   primary role in the investigation," and is familiar with the entire case.  *Id.*  Detective

6   Frieberg has conducted hundreds of interviews with gang members or associates, reviewed

7   dozens of phone downloads of gang members, and listened to "dozens and dozens" of jail

8   calls involving gang members.  *Id.*

9        Detective Frieberg is currently in the homicide unit, but she still shares information

10  about gangs with other agencies.  She also regularly conducts interviews of gang members,

11  reviews phone downloads relating to gang activity, and monitors social media posts of gang

12  members or their associates discussing gang activity.  *Id.* at 30.

13       Detective Frieberg testified that there are patterns and similarities among street

14  gangs, such as have "loose hierarchies." *Id.* at 24.  In a street gang, typically the OGs (or

15  original gangsters) or Big Homies assert themselves as a leader because of their history of

16  violence. *Id.* at 24-25.

17       In 2018, there were 140 WHB gang members that were documented in eGMIC. *Id.*

18  at 32.   Detective Frieberg became involved in the investigation of the WHB in 2015.  *Id.*

19  at 31-32.   When she started working on this investigation, she had already had cases

20  dealing with WHB members and she used what she had learned in those cases in her

21  investigation.   *Id.* at 32.  During the investigation, Detective Frieberg reviewed about a

22  dozen phone downloads, spent many hours reviewing transcripts of jail calls, and spent

23  "dozens and dozens" of hours reviewing social media of gang members.   *Id.* at 33.  She

24  also conducted dozens of interviews of people that were either in or associated with the

25  WHB. *Id.*

26       During the course of her investigation, Detective Frieberg became "familiar with

27  words and phrases that were commonly used by Western Hills members," and became

28  "somewhat fluent in Western Hills slang."  *Id.* at 34.  For example, WHB members also

- 7 -

called themselves other names – *e.g.*, Young Wreckin Krew, Family Thing, Western Hills Posse Blood, Western Hills Gangster Bloods. *Id.* She saw these names "during the course of this investigation[.]" *Id.* Specifically, the names were seen on tattoos. *Id.*

She also became familiar with the term "Yabba" during her investigation. *Id.* at 34-35. She testified that "Yabba" is "a derogatory term they would use when they would refer to their rival gang, the Freestones." *Id.* at 35. The word "damu," which is Swahili for blood, was regularly used by gang members and some members had tattoos with this word. *Id.* It was common for gang members to use the words "relatives" or "family" in talking to other gang members. *Id.* She explained that the gang members see themselves as a family so they refer to each other as "family" or "brother." *Id.*

The term "whoop" is used by WHB members to mock a police siren. *Id.* at 36. "The w-h significant for Western Hills" and "[a] lot of times they'll replace the o-o for a 3, 6" to represent 36th Street "which is one of their territories[.]" *Id.* The word "lurking" is used "like spying on, so that the person you're watching doesn't know that you're there." *Id.*

"Tre Six is 36 which, again, is 36th Street" which is a border of the WHB. *Id.* Detective Frieberg testified that the phrase "Tre Six" came up hundreds of times during her investigation; for instance, members have tattoos of that phrase. *Id.* at 37. The term "HIP" means "Homie in Paradise or Hills in Peace" and is similar to "RIP"; HIP was seen on memorial shirts for deceased gang members. *Id.* Detective Frieberg saw these shirts in dozens of pictures from phone downloads and social media postings. *Id.*

The term "OG" refers to original gangster which is what WHB members typically called "older gang members that the younger ones looked up to." *Id.* at 38. Detective Frieberg saw or heard the term OG dozens of times during her investigation. *Id.* As a result, she feels that she has a good understanding of what that term means. *Id.* Relatedly, Detective Frieberg heard the term "big relative" used during her investigation. *Id.* at 42. She testified that "big relative" is "similar to the OG or the big homie." *Id.*

The phrase "little homie" came up on a regular basis during the investigation. *Id.* at 38. Detective Frieberg heard that phrase in jail calls and saw it on social media postings.

*Id.* As a result, she feels that she has a good understanding of what the phrase means. *Id.* at 39. She testified that the phrase is "basically the opposite of the OG" in that the little homies are "the up-and-comers of the gang." *Id.* at 38-39.

The terms "burner" and "soldier" came up several times during the investigation. *Id.* at 39-40. As a result, Detective Frieberg is comfortable with what those terms mean. *Id.* at 40. The term "burner" references "a firearm that's used and gotten rid of to evade law enforcement." *Id.* A "soldier" is typically "the more violent of the gang" who "are willing to put in the work to represent their gang but they're also willing to do what they need to do if someone disrespects their gang." *Id.* Defense counsel objected to Detective Frieberg testifying about what "burner" means because it is not listed as an opinion in the government's notice. *Id.* at 41.

Detective Frieberg regularly heard gang members use the term "slide." *Id.* at 41. As a result, she is comfortable in her understanding of the term. *Id.* She testified that "slide" or "sliding" typically means "to come in" or "to show up," depending on the context in which the word is used. *Id.* at 42.

Detective Frieberg testified that based on her training and experience "street gangs typically have some sort of territory associated with them[.]" *Id.* She testified that a territory is "not as predominant as it used to be," but "typically street gangs have a territory [be]cause that is where they tend to conduct their business within those lines so they're not interfering with other gang territories." *Id.* at 43. There can be "repercussions between gangs if the territory boundaries aren't kept[.]" *Id.* For example, there can be retaliatory violence like shootings; she explained that "it boils down to money" and "money is getting taken away" if a group encroaches upon another group's territory. *Id.* Defense counsel objected to the testimony about retaliatory violence because that opinion is not in the government's notice. *Id.*

As a result of her investigation, Detective Frieberg became "aware of certain boundaries that encompassed the territory of the Western Hills Bloods gang[.]" *Id.* at 43-44. The "northern boundary is 36th Street, the southern boundary is Ajo Way, the western

boundary is Campbell, and the eastern boundary is Country Club." *Id.* at 45.  She again testified that the number 36 and the phrase "Tre Six" came up often in her investigation. *Id.* She testified that "Tre Six was another way that [she] often saw Western Hills members saying 36[.]" *Id.*  She saw 36 come up in social media, tattoos, and replacing the o-o in whoop with 36.  *Id.* She testified that 36th Street was the most important street to the WHB. *Id.* at 45-46.  Detective Frieberg became aware of a WHB holiday which was referred to as "Tre Six Day." *Id.* at 46.  This holiday occurred on March 6th, based on March being the third month of the year.  *Id.*

During her investigation, Detective Frieberg became aware of ongoing rivalries between the WHB and the Freestones as a result of "[t]he constant violence back and forth between Western Hills and the Freestones."  *Id.*  She explained that she was responding two to three times a month to violent incidents involving the WHB and the Freestones.  *Id.* at 46-47.   She testified that she was correctly identifying the people involved in these incidents as gang members.  *Id.* at 47.  The memorial T-shirts that said "Yabba killer" also reflected the rivalry between these gangs.  *Id.*

Detective Frieberg became aware of alliances between gangs "[t]hrough numerous tattoos that several of them have called 'Family Thing'[.]" *Id.* at 48.  She testified that she "learned that this is the clique of the alliance between the Western Hills and the South Park." *Id.*  She saw that "same tattoo on people that were documented" WHB and South Park gang members.  *Id.*  As a result, she became "aware of the friendliness between those two groups[.]" *Id.*

As a result of her training and experience, Detective Frieberg knows that street gangs typically use hand signs.  *Id.* The purpose of hand signs is to show "what gang they represent" and the signs typically have meanings.  *Id.* The signs could have a threatening purpose.  *Id.*  Detective Frieberg became familiar with hand signs used by WHB members by viewing them on social media, photographs, and rap videos.  *Id.* at 49.  She testified that the WHB members use "a sign where they put their thumb and their ring finger together touching," which represents a W and "the three and the six for 36th Street, and then also

- 10 -

the B" for Bloods.  *Id.* Detective Frieberg testified that this hand sign is specific to WHB because she has never seen any other gang in Tucson making that hand sign.  *Id.* at 49-50. Detective Frieberg identified gang signs in various photographs and identified the people making the signs, including these defendants.  *Id.* at 50-51.

Based on her investigation, Detective Frieberg became aware that the color red is associated with the WHB.  *Id.* at 51.  With respect to the term "flag," Detective Frieberg testified that "[h]istorically, Blood members and Crip members would fly a flag, which would be typically a bandana of the color red for Blood, blue for Crips."  *Id.* at 52.

Gang members also commonly "use tattoos as an identifier of them being part of a particular gang[.]" *Id.*  The use of tattoos is typically "a consistent pattern across street gangs[.]" *Id.* The WHB use tattoos to reflect their membership in the gang.  *Id.* at 53.  For instance, WHB gang members have tattoos that say "Hills," "B," "Family Thing," and "Blood."  *Id.* at 54-56.   "Blood gang members in general use dog tattoos or dog print tattoos" and often refer to each other as "dog." *Id.* at 58.   Defendant Jermaine Maxwell has such a tattoo as well as one that says "Kaps," which is his moniker or street name.  *Id.* at 56.  He also has a tattoo that says "SPFG," which stands for South Park Family Gangster. *Id.* at 57.

Michael Williams' Facebook page has a picture of the tattoo on his back that says "WHGB" which stands for Western Hills Gangster Blood.  *Id.* at 60.   Some people post the comment "WHoop" on that picture.  *Id.*  Michael Williams has a tattoo on his neck that says "YWK," which stands for Young Wreckin Krew, which is "a clique within Western Hills."  *Id.* at 61.  Below the YWK tattoo is a tattoo in red ink that says "MOB," which "stands for member of Blood."  *Id.*  He has another tattoo that says "Family Thing."  *Id.* at 62.  Another tattoo which is in the shape of a book has the phrase "God bless all my Hills N-word" within the book.  *Id.* at 63.

Mr. Rakestraw has a tattoo on his neck that says "Young Wreckin Krew."  *Id.* Detective Frieberg has not seen such a tattoo "anywhere outside of Western Hills Bloods[.]" *Id.* at 64.

Defendant David Williams has a tattoo on one hand that says "Young" and a tattoo on his other hand that says "Flaw." *Id.* Detective Frieberg testified that this is his street name. *Id.* David Williams and others referred to that street name in texts, etc. *Id.* David Williams has tattoos that say "frontline" and "soldier." *Id.* at 69. Detective Frieberg again testified that soldiers are typically the most violent members of a gang. *Id.*

Defendant Shawmaine Moore has the word "Blood" tattooed on his stomach and a tattoo on his inner forearm that has a B with a red bandana wrapped around it. *Id.* at 65. Above that tattoo, he has a tattoo that says "TucTown," which is "typical of gangs in Tucson." *Id.* at 66. He has a tattoo on his back that says, "Western Hills," but the "I" in "hills" is a tattoo of a bullet cartridge. *Id.* at 65. Moore has tattoos on his arm that say "3B6," "Tre Six," "Family Thing," as well as dog paw prints in several places. *Id.* at 66. He has a tattoo that says "damu" along his collarbone. *Id.* at 67. Further down on his neck he has a tattoo that says, "M star B, which is symbolic for MOB, member of Blood." *Id.* Detective Frieberg testified that "typically, Blood members represent a five-point crown and a five point star." *Id.* Moore has a tattoo of a paw print on his chest as well as tattoos of dogs on both sides of his chest. *Id.* "Blood money" is also tattooed on his stomach with blood dripping down from that phrase. *Id.* at 67-68.

Defendant Marcell Gray has tattoos of a "B" on his collarbone, a five-point crown, and "SS" which stands for south side. *Id.* at 68. He has a paw print tattoo in red ink and a tattoo of a dog that is wearing a baseball cap with a "red emblem on the front." *Id.* He also has a tattoo of a book "with the verbiage about hills" which is similar to Michael Williams' tattoo. *Id.*

There is a picture of Samuel Rakestraw and another picture of Shawmaine Moore who are both knelt down "at the neighborhood sign of Western Hills." *Id.* at 69-70. Detective Frieberg saw many pictures of WHB members posing with that sign. *Id.* at 70. She also testified that this sign marks the territory of the WHB. *Id.* This posing with a sign that represents gang territory is common among gang members. *Id.* There is also a rap video with the WHB members standing on top of this sign. *Id.*

During her investigation, Detective Frieberg saw disseminated threats to the Freestones using social media. *Id.* Specifically, gang members are "communicating amongst each other," talking about how problems that are between them, not getting along, and snitching. *Id.* at 71. Also, the T-shirts with the phrase "Yabba killer" were posted on social media. *Id.*

Detective Frieberg is familiar with the phrase "green light" because it came up multiple times during the investigation. *Id.* Detective Frieberg testified that given the context in which this word has been used, it means "a command has been given . . . from someone above and told to go do something, it means to go do it." *Id.* at 72. She also testified that "typically, the older members of the gang, the OGs, the big homies," would be the only people to give a "green light." *Id.* The "green light" is given to the younger gang members – the little homies or soldiers. *Id.* The rap video provides an example of older members of the gang giving the green light. *Id.*

### 2.      Cross-Examination by Mr. Flores:

Detective Frieberg has "always been involved in some way, shape, or form with the Western Hills Bloods" since 2015. *Id.* at 74. She probably had some involvement with the WHB as far back as 2013 as well. *Id.* at 74-75.

Her last gang-related training was in March 2019 when she attended "the eGMIC, the gang member identification training that [she] attended and assisted in teaching other members as well." *Id.* at 75. She again testified that in 2018 there were about 140 WHB gang members identified in eGMIC. *Id.* She believes that number has gone down to about 110. *Id.* The number has gone down because TPD no longer has a gang tactical unit whose sole purpose was to respond to neighborhoods with high gang activity. *Id.* at 75-76. As a result, she is not saying that there are less gang members, but rather less people are being identified because there are "less boots on the ground." *Id.* at 76. An officer can search eGMIC "by the gang and it will tell you how many members are in the database and how many associates are in the database." *Id.* at 76-77. Detective Frieberg cannot recall if the 140 or 110 people were only gang members or members and associates. *Id.* at 77.

Detective Frieberg agreed that her opinions are based "somewhat on [her] training and experience apart from [her] investigation of Western Hills Bloods[.]" *Id.* For example, that most gangs have a "loose hierarchy" that includes "OGs, big homies, [and] little homies." *Id.* at 77-78.   In response to counsel's question of whether Detective Frieberg is going to provide an opinion at trial of the loose hierarchy of the WHB, she testified that "I guess if it's asked of me." *Id.* at 78.  Detective Frieberg agreed that she received training on what an OG means, and also had experience with that term.  *Id.* She agreed that an OG is not always a leader of the gang; an OG can be a former or older gang member.  *Id.* at 80. As a result, when someone is referring to an OG, "it's not always someone who's giving orders or has a leadership role[.]" *Id.*

Counsel asked Detective Frieberg for the basis for her opinion that an OG of the WHB "is somehow giving orders." *Id.* at 80-81. Her response was: "Through interviews, through social media, through rap lyrics, experience in dealing with the gang." *Id.* at 81. Counsel asked Detective Frieberg to identify "a specific interview where someone told you there is an OG of the Western Hills Bloods." *Id.* Her response was: "Not in those exact words but the way [WHB members] refer to each other." *Id.* When asked for the name of one person who said that, Detective Frieberg testified: "I've done hundreds of interviews, I can't give you one." *Id.* She testified that several people mentioned the word OG during interviews.  *Id.* at 85.   But she could not identify those people.

When asked to identify "one example of social media where someone is referring to someone else as an OG of the Western Hills Bloods," Detective Frieberg testified: "I've reviewed hundreds and hundreds of documents.  It's hard to pinpoint one example." *Id.* at 82.  She also cannot say how many times she saw the word OG on a social media post.  *Id.* at 84.  She added: "My opinion derives from an accumulation of interviews, social media, and . . . I can't reference every statement I make." *Id.* at 82.

Given that OG can mean an older gang member and not a leader, Detective Frieberg agreed with counsel that if OG "pop[s] up on a social media post, that doesn't tell us anything about what that person's role is" in the gang.  *Id.* at 83.   She conceded that the

1    reference to an OG "could mean that person is just an older person, maybe a former gang
2    member, that has absolutely no leadership role[.]" *Id.*

3          Over the course of her career, Detective Frieberg has investigated hundreds of gang
4    members that belonged to dozens of gangs in Tucson. *Id.* at 85-86. The terms "big homie"
5    and "OG" are common terms used by gangs and are not specific to the WHB. *Id.* at 86-87.
6    Detective Frieberg believes that the use of the word "big homie" in the rap lyrics in this
7    case refers to the WHB. *Id.* at 87. That belief is based on the rap video which shows the
8    defendants with other gang members wearing red clothing and holding up a shirt that says
9    "Hills in Paradise" while saying either "'big homie' or 'OG' gives the green light, then we're
10   all going to go." *Id.* at 87.

11         The term "green light" came up a handful for times during the investigation; for
12   example, in the rap video and social media posts. *Id.* at 87-88. She does not know if she
13   ever talked to a gang member about what "green light" means. *Id.* at 88. Counsel asked
14   what the basis is for her opinion that "green light" means "go take care of something" or
15   "giving permission." *Id.* at 88-89. She testified that "the rap lyrics help us out with what
16   it means, the context of what is being rapped and what is being said while holding up" a T-
17   shirt that has a picture of "a deceased homie that was killed by a rival gang member." *Id.*
18   at 89. Also, social media posts say "green light" when WHB members "are posing wearing
19   their shirts of a deceased gang member." *Id.* She equates "green light" to the "red
20   light/green light game that we all played when we were younger; red light means stop,
21   green light means go." *Id.* When asked if her conclusion was based on just "common
22   sense" rather than her experience, Detective Frieberg testified that it is based on the context
23   of her investigation. *Id.*

24         Detective Frieberg again testified that she formed her opinion that there is a rivalry
25   between the WHB and the Freestones based on responding to crimes where the victim and
26   perpetrator were members of opposite gangs. *Id.* at 89-90. Counsel asked her to provide
27   an example of such a crime. *Id.* at 90. Detective Frieberg pointed to the homicides of
28   Marshall and Floyd Davis. *Id.* However, she conceded that no one has ever been arrested

and charged for the homicide of Marshall Davis. *Id.* at 91. But there are "persons of interest" that have been identified as WHB members. *Id.* In response to counsel's question if she based her opinion on "persons of interest," Detective Frieberg testified that "[i]t's not only just responding to the crimes but it corroborates other things and other information we've obtained that there's a rivalry." *Id.* at 92. Specifically, she looked at the eGMIC information "when people are interviewed on both sides, they acknowledge that there is a rivalry." *Id.* However, she could not provide an example of a gang member who was interviewed regarding a rivalry. *Id.* She stated she's "seen it from both sides" – WHB and Freestones. *Id.* at 93. But she does not know if she was the person who conducted the interview(s). *Id.*

Counsel asked Detective Frieberg if there was any other basis for her opinion about this rivalry. *Id.* at 94. She pointed to the interview of Ana Rodriguez. *Id.* Detective Frieberg agreed with counsel that Rodriguez is going to be a witness in this case and that "we don't need you to repeat what she's going to say[.]" *Id.* She also agreed that if Rodriguez testifies that there is a rivalry, "she's going to have her own foundation for that opinion[.]" *Id.* Detective Frieberg cannot recall "off the top of [her] head" any other interview that would form the basis for her opinion about the rivalry. *Id.* at 95.

Counsel turned to the Floyd Davis homicide as being a basis for the opinion about the rivalry. *Id.* Counsel asked if "the fact that Western Hills Bloods allegedly committed the homicide of Floyd Davis, that that is the foundation for your opinion that there's a rivalry between Western Hills Bloods and Freestones[.]" *Id.* Detective Frieberg testified that "[i]t adds to it but that's not the sole reason." *Id.* When asked to provide other examples of crimes that form the basis for her opinion, Detective Frieberg stated she's "interviewed several people" in this case which has gone on for several years and "it's hard for [her] to do that because . . . so many people have been interviewed[.]" *Id.* at 95-96. So her opinion is based on everything that she learned during the investigation. *Id.* at 96.

The murder of Marcus Darton was part of the basis for her opinion about the rivalry. *Id.* at 97. However, she acknowledged that no one was ever arrested for that murder. *Id.*

at 98. She bases her opinion about the rivalry on "[e]vidence and interviews" and speaking with the case agent on that homicide about who he believes was responsible. *Id.* at 98-99.

Detective Frieberg does not know if she will be testifying about the rivalry between the WHB and the Fourth Avenue Crips, even though that subject is referenced in the government's Notice. *Id.* at 99.  The basis of her opinion on that rivalry would be from witness interviews, specifically Kenyatta Dilyou. *Id.* at 100. Detective Frieberg cannot recall what Dilyou told her because "that interview was years ago[.]" *Id.*  Social media posts between Dilyou and defendant Megan Borges also factor into her opinion about the rivalry. *Id.* at 101.   Detective Frieberg agreed with counsel that her testimony on this rivalry is not based on anything that she witnessed; rather, she would be "basically rereading or regurgitating what these social media posts stated." *Id.*

Detective Frieberg again testified that the word "woop" is used to mock a police siren. *Id.* at 101-102.    But she agreed that the government's Notice says that gang members use this word "as a term of excitement or greeting." *Id.* at 102.  She testified that the word "evolved into a greeting." *Id.*  The foundation for her definition of "woop" comes from her general training on gangs, and not specifically the WHB. *Id.* However, she again testified that the WHB spell it as "whoop" with the "w-h" referring to Western Hills; but that does not change the meaning of the word. *Id.* at 103.

In response to counsel's question of Detective Frieberg's interpretation of the word "Yabba," Detective Frieberg believes "it came from an interview during this investigation." *Id.* at 104.  It may have been during an interview with Christina Monge. *Id.* Detective Frieberg agreed that Monge is going to be a witness in this case. *Id.* She added that the word "Yabba" was seen throughout the investigation, including the phrase "Yabba killers." *Id.* at 104-105.

Detective Frieberg again testified that the Young Wreckin Krew is a "clique of the Western Hills Bloods[.]" *Id.* at 105.  She explained that "Bloods are composed of different cliques and sets." *Id.* at 106.  When asked if she would testify about anything else regarding the Young Wreckin Krew, Detective Frieberg testified that "[t]hrough interviews, through

GMICs we've learned about Young Wreckin Krew." *Id.* She identified the Sherman Shields interview. *Id.* Shields is a WHB member, but not a defendant in this case. *Id.* Detective Frieberg did not conduct the Shields interview; his statement about the "clique" was obtained through an eGMIC entry. *Id.* She is aware that Young Wreckin Krew is a rap group. *Id.* at 107. Thus, her testimony will be that they are both a clique and a rap group. *Id.*

The term "little homies" means the younger members of the gang or the "up-and-comers." *Id.* at 108. The latter term "could mean someone who was trying to prove themselves to get into the gang or someone that was still doing work for the gang." *Id.* The bases for her opinion are interviews and jail calls. *Id.* Detective Frieberg cannot "pinpoint" an interview because she's "done so many interviews[.]" *Id.* In terms of specific jail calls, she testified that "I want to say it was Labarr Martinez was involved in the phone calls where they're talking about the shops and how if they're not making money, that the little homies won't eat." *Id.* at 109. Neither Michael Williams nor Mr. Rakestraw was part of those jail calls. *Id.* She cannot recall any other jail calls even though she has reviewed hours of jail calls. *Id.* at 110. Detective Frieberg agreed that the terms "OG," "big homie," and "little homie" are not specific to the WHB. *Id.* at 111. As a result, her understanding of "little homie" is also from her training and experience. *Id.*

Detective Frieberg agreed that she previously testified that "burner" is a reference to "guns that were gotten rid of[.]" *Id.* The foundation for that opinion is "interviews," but she cannot point to an interview of a specific person. *Id.* at 111-112. She also agreed that "burner" is a common term that is not specific to the WHB. *Id.* at 112. As such, she probably heard this word in trainings and intelligence briefings; she also heard this word mentioned in other gang-related investigations. *Id.* She agreed that she is also using information from her training and experience outside of this investigation as the foundation for her opinions. *Id.* at 113. She cannot recall if Williams or Rakestraw ever talked to her about a "burner." *Id.*

Detective Frieberg agreed that she testified that a "soldier" means "more violent

individuals that put in work[.]" *Id.*   The basis for that opinion is her training, and not anything she learned during this investigation.  *Id.* at 114.  However, she added that she has "seen a tattoo that says, 'soldier'."  *Id.* Counsel asked if that tattoo automatically means that a person is more violent and puts in work.  *Id.* Detective Frieberg testified that she learned the definition of this word from her training and experience as well as this investigation. *Id.* at 114-115.

The meaning of "slide" depends on the context in which it is used.  *Id.* at 115.  "[O]ne example is . . . to come in, like if I'm going to slide up, I'm going to come in[.]" *Id.*  She agreed that "slide" can mean many things, such as "[s]omebody slides into someone else's . . . direct messages."  *Id.*  It can also mean "I'm going to go" to a place; and "slide out" can mean to leave a place.  *Id.* at 115-116.   Counsel asked if Detective Frieberg was going to testify about the word "slide" at trial because the government's Notice does not indicate that she will testify about the word.  *Id.* at 116.   She testified: "I can't answer that.  I don't know."  *Id.*

With respect to the territory of the WHB, Detective Frieberg agreed that there is at least one other gang in this territory.  *Id.* at 116-117.   Detective Frieberg again explained that "historically the territories were hard boundaries in which that gang would [conduct] their business" and other gangs couldn't cross into that area."   *Id.* at 117.  There could be repercussions if another gang did so.  *Id.*  Detective Frieberg does not know if there have been such repercussions based on the violation of a territory in the case at hand.  *Id.*

Detective Frieberg agreed that the Vistas gang also celebrates Tre Six day.  *Id.* at 118-119.    Detective Frieberg does not recall what WHB members were wearing the T-shirt with "Yabba killer" printed on it.  *Id.* at 119.   She believes she saw such a shirt at Michael Williams' residence during the execution of a search warrant.   *Id.* at 120.  Detective Frieberg agreed that she testified that "there was a friendliness" or "alliance" between the South Park gang and the WHB.  *Id.*

Detective Frieberg agreed with counsel that on direct examination she incorrectly identified a tattoo on Michael Williams when in fact it was a tattoo on Marcell Gray.  *Id.*

at 127-128.    She also agreed that "this is just an example of how sometimes people can make mistakes in an investigation[.]" *Id.* at 129.    Similarly, witnesses could provide inaccurate information.  *Id.* As a result, when testimony is based on what witnesses said, that information could be incorrect and/or based on lies or misinterpretations.   *Id.*

Detective Frieberg agreed that defense counsel's role is to try "to figure out whether or not this information has some reliability to it[.]" *Id.* at 129-130.   Counsel pointed out that it is difficult for him to do that when he is not being provided with the basis for her opinions, such as the names of people she interviewed.  *Id.* at 130.    Detective Frieberg testified that: "I've interviewed so many people, I can't direct you to a source."  *Id.*  Counsel asked Detective Frieberg if she would agree that when she cannot direct counsel to a source, there is no way to verify the reliability of her opinion. *Id.* Detective Frieberg testified: "No, not necessarily," because counsel has been provided with the interviews done on this case. *Id.*

Counsel pointed out that without referencing specific disclosure he "has to guess or somehow figure out" the foundation for her opinions.  *Id.*  Counsel asked: "So how am I supposed to verify the reliability, simply by believing what you say?" *Id.* at 131.   Detective Frieberg responded: "No.   Such as for an example, reviewing the same social media, the same statements that are involved in this case." *Id.* Counsel asked whose opinion counts if he "read[s] the same social media, read[s] the same interviews, and come[s] to a different conclusion." *Id.*   Detective Frieberg testified that she has "a lot of gang investigation training in regards to that as well."  *Id.*  She agreed with counsel that her opinions could be "skewed by [her] training and experience[.]" *Id.*

Counsel turned to the government's Notice regarding the opinions that Detective Frieberg will provide at trial.  *Id.* at 131-132; Ex. 9.   In response to counsel's question of whether Detective Frieberg "had any input or any hand in preparing this document," she testified that she has "read some of it."  10/26/22 Tr. at 132.

Counsel pointed Detective Frieberg to the following statement in the Notice: "That the WHB uses social media and rap videos to warn and threaten rival gangs and those who

give information to police," and "will interpret social media postings by defendants Monteen and M. Williams . . .where they call KD a rat and posted pictures of grand jury transcripts and police reports to prove KD is a rat." *Id.* at 132-133.   Detective Frieberg does not believe that she read that statement prior to "[j]ust now[.]" *Id.* at 133.   She agreed with counsel that if she had previously read that statement she "would have probably realized that that's a mistake[.]" *Id.*   She also agreed that the reference to Monteen should be Megan Borges and that Michael Williams was not involved in those postings. *Id.*

Counsel pointed Detective Frieberg to the statement in the Notice that she will testify about "the retaliatory nature of violent crimes between the Western Hills Bloods and rival gangs, specifically the Freestones." *Id.* at 134.   When asked the basis for that opinion, Detective Frieberg responded: "As we've previously discussed, through following evidence, through witness statements, through the back and forth violent crimes amongst these two groups." *Id.* Counsel asked Detective Frieberg multiple times to identify the retaliatory violent crimes that formed the basis for her opinion. *Id.* She eventually testified that "[s]o from my time in working in this unit, my first knowledge of this was because of Marcus Darton getting killed." *Id.* at 136.   She agreed with counsel that she believes the Freestones were responsible for that murder, but that no Freestone member was ever arrested in connection with that crime. *Id.* at 137.   When asked to provide the name of a witness who said that Darton was killed by a member or members of the Freestones, Detective Frieberg testified that "I'm not the case detective on that one, I'm not privy to every interview that was done but I have a general knowledge of the case and a general knowledge of who was suspected to be involved." *Id.*   Another violent crime was the murder of Marshall Davis. *Id.* at 138.   However, she agreed with counsel that no one has been arrested and convicted of that murder. *Id.*   She added that the Floyd Davis murder shows the retaliatory violence. *Id.* at 139.   But she agreed that this murder is part of this case, and no one has yet been convicted of that crime. *Id.*

The government's Notice also states that Detective Frieberg "will interpret ambiguous communications from gang members referencing winning, which refers to the

power struggle between the Freestones and Western Hills Bloods[.]" *Id.*   Detective Frieberg does not know how often she saw the word "winning" come up in this investigation.  *Id.* at 140.   The basis for her opinion was a statement made by Bernard Rayford during an interview; however, she is not sure if he used the word "winning."  *Id.* at 140-141.   Defense counsel showed Detective Frieberg a transcript of her grand jury testimony which reflects that she testified that "there was an exchange between Mr. Moore and someone by the name of either Spook or Spock and that statement that he made was, 'Tell Smash we winning[.]'" *Id.* at 142.   As a result, Detective Frieberg agreed that the basis for her interpretation of the word "winning" could come from what was found in Moore's cell phone.  *Id.* at 143.

In response to the question of how the word "winning" demonstrates a rivalry between the WHB and the Freestones, Detective Frieberg testified that "you have to look at the totality of it." *Id.*   She added that "within hours or minutes" of the Floyd Davis homicide a message was sent "from Shawmaine Moore to someone in a jail or prison system that had a phone asking to relay a message."  *Id.* Detective Frieberg agreed that the word "winning" is not ambiguous; and it is not a slang term or a gang code word.  *Id.* at 144.   She agreed that the jury would not need help deciphering the word "winning," but she added that the jury would need to know "the context of what's going on in - -with the gang and the investigation and what just occurred."  *Id.* She also agreed that government counsel will most likely "provide all the facts necessary for the jury to determine what 'winning' means and in the context it belongs in[.]" *Id.* at 145. However, Detective Frieberg does not know if the jury needs her interpretation to assist them if "all the facts are brought forward by the government[.]" *Id.*

Testimony turned to Detective Frieberg's proffered opinion of the meaning of the phrase "I do it for Mar-K." *Id.* at 145.   She agreed that her opinion is based on her interpretation of the rap lyrics in which that phrase is used.  *Id.* at 146.   She has no training or experience in interpreting rap lyrics; she has never been qualified as an expert to interpret rap lyrics; and she has never interpreted rap lyrics in a trial.  *Id.*  Detective Frieberg agreed

that the government's Notice says that she will testify that "I do it for Mar-K" relates to "the retaliation for the death of big homie Marcus Darton[.]" *Id.*   When asked the foundation or basis for that opinion, Detective Frieberg testified as follows:  "Well, it's apparent that's what he's saying at that time, there's a memorial shirt for Marcus Darton being held up in the video." *Id.* at 146-147.   In response to counsel's question of why it was "apparent" that this phrase means "'I am going to retaliate for his death,'" she testified: "Not those exact words but they're acting for him the way – they're acting because of what happened to him." *Id.* at 147.  She testified the "they" she is referring to are members of the WHB. *Id.*   With respect to her use of the word "acting," she testified that "[a]cting in a capacity to carry out" or "uphold their status in the gang and for furtherance of the gang." *Id.*  Detective Frieberg disagreed that she comes to this conclusion based on "the two letter word 'it'[.]" *Id.*  She explained that "[s]o if you were just to give me that line with no other knowledge of the rap video, of the rap lyrics, I wouldn't know what just that line meant but the totality of the circumstances in the rap video and what is being said and the actions they're doing helps me to interpret that." *Id.* at 148.   Detective Frieberg does not know who wrote these rap lyrics and she has never spoken with Michael Williams or Mr. Rakestraw "about the meaning of these lyrics[.]" *Id.*  She does not believe she has spoken with anyone about the meaning of these lyrics. *Id.*  Detective Frieberg disagreed with counsel that "the entire song is a memorial of Mar-K." *Id.* at 149. She also disagreed that the reference to doing "it" for Mar-K and his picture on the shirt is so that "he can always be remembered in this video." *Id.*  She does not even think that interpretation is possible given the totality of the video. *Id.*

Counsel pointed out that the government's Notice states that the basis for her opinion of what "I do it for Mar-K" means is based on the video, as well as the "investigation of dozens of crimes involving WHB during the indictment time frame, involvement [in] the investigation of [the] Marcus Darton homicide, hours of listening to jail calls, and recordings of defendants, review of social media posts, downloads of WHB members' and associates' phones." *Id.* at 150.   Counsel asked Detective Frieberg to

1    identify "in any one of these groups of evidence" her basis for her interpretation of "I do it

2    for Mar-K." *Id.* She testified that "there's not one thing that points to it, you have to look

3    at the totality of everything." *Id.* at 151.

### 3.   Cross-Examination by Mr. Payson:

5    Detective Frieberg testified that a "hybrid gang" is typically not the same as criminal

6    street gangs that have territories. *Id.* at 153. However, hybrid gangs are "ever evolving,"

7    more so on social media. *Id.* Members will jump from gang to gang in order to get fast

8    and easy money. *Id.* The distinction of being a Blood or Crip "kind of goes away unless

9    there's a conflict, then they'll jump into a different ship[.]" *Id.* at 154. Detective Frieberg

10   clarified that it is not the gang itself that is hybrid, but rather members. *Id.* She would not

11   characterize any of the defendants in this case as hybrid gang members. *Id.* She does not

12   know if Bernard Rayford is a hybrid gang member. *Id.* Gangs use hand signs and

13   sometimes have gang dances; but she is not aware of a WHB gang dance. *Id.* at 155.

14   Detective Frieberg agreed that she is not an expert in rap music and dislikes some

15   rap music. *Id.* at 155. Counsel turned to the government's Notice of Detective Frieberg's

16   proposed expert testimony. *Id.* at 156; Gov. Ex. 9. Detective Frieberg has seen the Notice,

17   but she does not think she reviewed it with government counsel and cannot recall if she

18   received it before it was filed. *Id.* at 156. Counsel asked Detective Frieberg to point out

19   any inaccuracies. *Id.* at 157. She testified that "when it talks about green light, I would

20   say to commit a violent act or an act of violence instead of specifically a murder." *Id.* She

21   agreed that she previously testified that this term can also mean "to do something[.]" *Id.* at

22   158. She added that "something" can be "[a]n order given by someone else to someone"

23   to commit an act of violence, "but could be giving a green light on anything." *Id.*

24   The following criteria are used to label a person as a gang member: self-

25   proclamation, written or electronic correspondence, a witness statement or official

26   testimony, clothing colors, gang paraphernalia, photographs, tattoos, or any other indicia

27   of gang membership. *Id.* at 160. If one of the criteria is met, then the person could be a

28   suspected gang member. *Id.* If two or more are met, then under Arizona law the person is

1    deemed a gang member.  *Id.*

2        Counsel turned to Detective Frieberg's experience in testifying in gang cases, which

3    was confusing.  *Id.*  She first testified that "there's never been a gang case in the state."  *Id.*

4    She explained that she has gone to trial many times in cases involving gang members, but

5    never testified in those cases.  *Id.*  As such, she had "never identified someone as a gang

6    member during a criminal trial[.]"  *Id.* at 161.  However, she then stated that in cases

7    "[w]here a gang member was involved, whether it be victim or suspect," she has testified

8    six to twelve times.  *Id.*  In terms of the names of those six to twelve cases, she recalls a

9    case against Count Mitchell, a WHB gang member, and a defendant named Aggie.  *Id.*  She

10   cannot recall other case names.  *Id.* at 162.  She also cannot recall if she testified in cases

11   involving Freestone gang members.  *Id.*

12       The following testimony was again confusing (at least for the Court).  Detective

13   Frieberg first testified that "in the state we haven't been able to talk about the gang

14   allegation."  *Id.* at 162.  She does not know the reason for that prohibition.  *Id.* at 163.

15   However, she then testified that "[t]hey haven't been gang allegation cases so we weren't

16   able to talk about the fact that they're a gang member."  *Id.*

17       Detective Frieberg has never testified as a gang expert.  *Id.* at 164.  She agreed with

18   counsel that the opinions she will provide at trial are based both on her training and her

19   work on the WHB investigation.  *Id.* at 165-166.

20       Counsel turned to the first proffered opinion: that the WHB is a Tucson-based

21   criminal street gang.  *Id.* at 166.   Detective Frieberg agreed that her opinion is based on

22   hearsay, for example, reviewing jail calls, witness interviews, and self-proclamation.  *Id.*

23   at 174-175.  When asked if all street gangs are criminal, Detective Frieberg testified: "I

24   can't answer that.  ARS defines criminal street gangs, it doesn't just define a street gang."

25   *Id.* at 167.  She agreed with counsel that it is not against the law to belong to a gang.  *Id.*

26   Her opinion is that a person is not a criminal simply because they are in the WHB.  *Id.* at

27   167-168.

28       Detective Frieberg's opinion is that the Western Hills Bloods is also referred to as

1    the Western Hills Posse Bloods, the Western Hills Gangster Bloods, and The Hills.  *Id.* at

2    168.  Her understanding is that a lot of the 36th Street Bloods represent Western Hills; but

3    she does not know if it is a separate gang. *Id.*

4         YWK is a clique within Western Hills which still claims Western Hills; it is not a

5    separate gang.  *Id.* at 168-169.  Her understanding is that members of the YWK include

6    Michael Williams, Samuel Rakestraw, and Sherman Shields.  *Id.* at 169.   She does not

7    know if there are other members because "they're not open about it."  *Id.* at 170.  As a

8    result, members cannot be identified unless "there's a tattoo we see or something like

9    that[.]" *Id.* Detective Frieberg agreed that Michael Williams and Samuel Rakestraw both

10   have a YWK tattoo.  *Id.* at 171.  She does not know anyone else who has such a tattoo.  *Id.*

11        Detective Frieberg agreed that YWK is also a rap group and that Michael Williams

12   and Rakestraw are rappers.  *Id.* at 171.  She does not know if any of the other defendants

13   are rappers.  *Id.*  When asked if anyone has ever said that YWK is anything other than a

14   rap group, she testified that "[i]t's come up in GMICs where other people have been

15   interviewed [and say] that it's a clique."  *Id.* at 171-172.   Specifically, Sherman Shields

16   talked about it "when he was GMIC'd," and perhaps William Ward as well.  *Id.* at 172.

17        In response to counsel's question if South Park is the same as WHB, Detective

18   Frieberg testified that "they have an alliance with Western Hills Bloods."  *Id.* at 173.  She

19   agreed with counsel that South Park is a different gang, but people within both gangs

20   associate with each other.  *Id.* at 174.

21        Counsel turned to the proffered opinion that in December of 2018 there were 144

22   documented WHB gang members and associates.  *Id.* at 175.  Detective Frieberg testified

23   that this is a fact, not her opinion.  *Id.*  She explained that "[t]he information obtained from

24   the [eGMIC] database was that number."  *Id.* at 176.   Counsel asked how he could verify

25   that this information was true and if Detective Frieberg "look[ed] through and personally

26   [saw] all the names[.]" *Id.* She testified that she did not obtain that number; the analysts in

27   the gang unit did. *Id.*

28        At this point, the Court interjected and stated: "I thought GMIC was off the table"

and that Detective Frieberg was not going to rely on eGMIC as a basis for her opinions. *Id.* The government stated that the Court was correct and that Detective Frieberg will not testify at trial that there were 144 Western Hills Blood gang members in December of 2018. *Id.* at 176-177.  Nevertheless, counsel continued to ask questions about eGMIC.  *Id.* at 177.

Detective Frieberg agreed that there are currently 110 WHB gang members identified in eGMIC.  *Id.*  When asked if that means that 30 people had left the gang, Detective Frieberg testified that "the information is only stored for five years so if they're flagged a gang member in 2015 and they have no other contact with any law enforcement. . .that can reflag them, they go out of the system, they are purged from the system." *Id.* Thus, the reduction of WHB members could be the result of attrition, or it could be because the TPD gang tactical unit that was making contacts in the neighborhoods with a lot of gangs was eliminated.  *Id.* at 177-178.    Detective Frieberg does not know if Michael Williams, Mr. Rakestraw, or any other defendant is currently listed as WHB members in eGMIC. *Id.* at 178.    Detective Frieberg may have entered information relating to Mr. Rakestraw and/or Michael Williams into eGMIC.  *Id.* at 179.

Counsel turned to proffered opinion three: the rivalry between the WHB and the Freestones and the WHB and the Fourth Avenue Crips.  *Id.* Detective Frieberg agreed with counsel that the information about the rivalry with the Fourth Avenue Crips came from Kenyatta Dilyou; however, she added that there were other sources that she cannot recall. *Id.* She cannot recall the time frame when she had that conversation with Dilyou.  *Id.* at 180.

Detective Frieberg's opinion is that there are Facebook posts or chats "of members of the gangs threatening each other." *Id.*   The Dilyou/Borges exchange is "the one that comes to mind" that forms the basis for her opinion.  *Id.*  She later added that "Mr. Rayford has also made some comments about Western Hills seeking out the Freestones."  *Id.*  When asked to provide examples of the Freestones making threats to the WHB, she testified as follows: "Again, the back and forth.  One example is a Freestone gang member shooting and killing of a rival Western Hills gang member," Raymond Symonette.  *Id.* at 181.

Detective Frieberg does not know if that shooting was planned or was "a spontaneous shooting that occurred as a bar was closing[.]" *Id.*   She cannot think of "[a]ny other examples of the Freestones planning to go after Western Hills Bloods, on Facebook or otherwise[.]" *Id.*

Counsel turned to the proffered opinions regarding code phrases and gang slangs. *Id.* at 183.  Detective Frieberg agreed that the word "Blood" is not unique to the WHB; it refers to the Blood gang generally and is used throughout the country.  *Id.* She does not know if Michael Williams or Mr. Rakestraw ever used the word "damu."  *Id.*  With respect to the word "relative," Detective Frieberg agreed that some "co-defendants may be relatives literally[.]" *Id.*  In fact, Michael Williams and David Williams are related.  *Id.* at 183-184.   Christina Monge told law enforcement that the word "Yabba" is a reference to the Freestones.  *Id.* at 184.  The word "lurking" can mean going through social media posts as well as physically following or spying on someone.  *Id.*   The terms "rat" or "snitch" means "someone who gives information to the authorities[.]" *Id.* at 186.     Detective Frieberg agreed that these are common terms; however, she added that "some people of the general population," like older people, may not know what those terms refer to.  *Id.* Detective Frieberg agreed that the terms "OG" and "big homie" are not unique to the WHB and are used everywhere, such as on TV and in movies.  *Id.* at 186-187.   She does not know if Mr. Rakestraw ever used those terms.  *Id.* at 187.   The basis for her opinion that "little homie" means an "up-and comer" member of the gang came from jail calls.  *Id.* at 187-188.   The one call that she recalls is with Labarr Martinez and perhaps Reginald Johnson.  *Id.* at 188.  She believes that Mr. Rayford "made mention to big homies," but she cannot recall if the word "little homie" was used.  *Id.*  The term "burners" can mean guns and phones.  *Id.* The term "soldiers" means someone who will commit violent acts or tend to be more violent in backing their gang.  *Id.* at 189.  That term is not specific to the WHB. *Id.* at 188-189.  The source of her opinion is David Williams' tattoo that said "frontline soldier," as well as her general gang training.  *Id.* at 189.  She agreed that the fact that a person who has a tattoo of the word "soldier" does not mean that the person will commit

1   violent acts.  *Id.* at 190.

2        Detective Frieberg testified that the OGs in the WHB are Jermaine Maxwell,

3   Reginald Johnson, and Labarr Martinez.  *Id.* at 187. Marcus Darton was also an OG. *Id.*

4   The OGs of the Freestones are Rodney Senior and Gil Nichols, and Floyd and Marshall

5   Davis were as well.  *Id.*

6        Detective Frieberg testified that the persons of interest in the Marshall Davis

7   homicide were Tenell Mure, David Gorsave, Troy Howell, and someone else who she

8   cannot recall.  *Id.* at 185.   But the other person is not Mr. Rakestraw or Michael Williams.

9   *Id.*  To her knowledge, they had nothing to do with that homicide.  *Id.*

10        Counsel turned to the proffered opinion about the boundaries of the WHB.  *Id.* at

11   190.  The basis for her opinion about the boundaries of the WHB comes from "intelligence,

12   through talking to the gang tactical unit when they were around," and information

13   developed during this investigation.  *Id.* at 191.   The territory of the South Park gang

14   encompasses from 36th Street up around 22nd Street or 29th Street, but there is no overlap

15   in territory with the WHB.  *Id.* The Vista gang's territory is between Western Hills I and

16   II; but she is not sure if there is an overlap in territories.  *Id.* at 191-192.  She also does not

17   know the Freestones territory.  *Id.* at 192.  Some of the WHB members live in the gang's

18   territory, but many do not.  *Id.*  The WHB does not exclusively stay within their territory,

19   but they typically (although not exclusively) have their shops in their territory.  *Id.*  In

20   response to counsel's question of "what does the territory matter then," Detective Frieberg

21   testified: "I can't tell you that.  I don't know."  *Id.* at 193.    Neither the Floyd Davis

22   homicide nor the Eddie Murphy homicide occurred within the WHB territory.  *Id.*

23   Detective Frieberg does not know if the WHB territory has changed or expanded over the

24   past decade or two.  *Id.* at 193-194.  Detective Frieberg testified that the WHB territory has

25   been the same "[s]ince I've been around[.]" *Id.* at 194.  She has no information that the

26   WHB is trying to expand their territory.  *Id.*

27        Counsel turned to the proffered opinion about indicia of gang membership.  *Id.* She

28   agreed with counsel that red is the predominant color for Blood gang members.  *Id.*  If

someone is not wearing red clothing, it does not mean that they are not a gang member. *Id.* Similarly, if someone "flashes a hand sign" that does not necessarily mean that they are involved in a gang. *Id.* As far as Detective Frieberg can recall, the only "alleged gang-associated tattoo that [Mr. Rakestraw] has is the Young Wreckin Krew on his neck[.]" *Id.* at 195. The acronym "MOB" stands for either "member of Blood" or "money over bitches." *Id.* The latter means money is more important than women. *Id.*

The next opinion relates to alleged threats made over social media. *Id.* Detective Frieberg again testified that the communication at issue involves Megan Borges and not Ms. Monteen. *Id.* Detective Frieberg does not know if Borges is a WHB member because she does not "have the database in front of [her]." *Id.* She added Borges "was associated to various different Western Hills gang members during the time of this investigation." *Id.* at 196. In response to counsel's question of whether she would be relying on the database to form her opinion, Detective Frieberg testified that the database is so old that it is not "a reliable source at this point." *Id.* Borges has been involved in criminal activity – *e.g.*, drug sales and hiding evidence – with WHB members. *Id.*

In a social media conversation on August 3, 2017, Dilyou says to Borges: "What's up with you, N? You don't F with me." *Id.* at 197. Borges says words to the effect of "leave me alone," and continues to engage in the conversation. *Id.* at 198. In response to counsel's question of whether the term "stacking figures" used by Dilyou could mean "lining up dead bodies," Detective Frieberg testified that she has "no idea" of what that term means. *Id.* She believes that Dilyou has an extensive criminal history, but she does not recall if "his priors" are violent. *Id.* She thinks that Dilyou was a victim of a violent crime and "he was involved in prohibited possessor cases." *Id.* at 199. The conversation ends with Dilyou saying: "Okay, I respect how you feel." *Id.*

In a social media conversation in April 2018, Dilyou calls Borges a bitch and that "he knocked out Count and six N's jumped him." *Id.* Borges responds: "It was one N and females." *Id.* That comment relates to a video depicting Dilyou getting into an altercation at the fairgrounds with a group of females and Count. *Id.* at 200. Borges tells Dilyou that

1    he got what he deserves because he was disparaging one of the women's dead sons.  *Id.*

2    Dilyou responds: "When I see you, I'm show you why N's scared of me."  *Id.* A document

3    is then posted which says "that Dilyou and Watkins identified M. Williams and Samuel

4    Rakestraw as the shooters in a September 11th, 2015 incident[.]" *Id.* at 200-201.  Detective

5    Frieberg agreed with counsel that the September 11th incident resulted in Rakestraw's false

6    arrest which led to him spending six weeks in jail for a crime he did not commit.  *Id.* at

7    201.   She agreed that "that's what Mr. Rakestraw's upset about" the day of this

8    conversation.  *Id.* In fact, Rakestraw enters the conversation and says: "Kenyatta's, that's

9    a snitch N for you."  *Id.* at 202.  Detective Frieberg agreed that the word "snitch" is the

10   same as a "rat."  *Id.*  Dilyou responds: "You're really mad because I f-u-c-c your baby

11   mama.  Just say it pussy."  *Id.*   Rakestraw then says: "Who care what it look like?  You a

12   snitch.  Are we got problems.  We on you as, period, and N-I-D-G-A-F."  *Id.* at 203.

13   Detective Frieberg testified that this last comment could be a threat or a warning.  *Id.*

14   However, she clarified that she meant the layman's definition of a threat and not a criminal

15   offense.  *Id.* Detective Frieberg is not aware of Dilyou getting beat up after this April 2018

16   conversation.  *Id.* at 204.  Dilyou also did not tell her that he felt scared by Rakestraw's

17   comments.  *Id.*   And no one ever told Detective Frieberg that they felt threatened by the

18   rap songs or by YWK.  *Id.* at 204-205.

19           Testimony turned to Detective Frieberg's deletion of her work emails and text

20   messages.  *Id.* at 205.  Detective Frieberg deletes most of her work emails.  *Id.* at 206.   In

21   response to counsel's question of which emails she keeps, Detective Frieberg testified: "I

22   can't tell you exactly which ones I keep but after a certain period, the ones I keep drop off

23   because of our retention system with the city."  *Id.* After 90 or 120 days, the emails are no

24   longer retained by the email system.  *Id.* at 207.   She does not believe that TPD has an

25   email retention policy.  *Id.* at 208.   She will occasionally print out emails and put them in

26   a file, but "it's not a consistent thing."  *Id.* at 209.   She used email extensively in this case

27   but did not keep those emails. *Id.* at 207-208.   Detective Frieberg agreed that the contents

28   of those emails could have included "a memorialization of what's gone on in this case[.]"

1    *Id.*  On this case, she communicated by email with Agent Berlin, Agent Parkinson, Alex

2    Tisch, Detective Padilla, John Paul Bogdonovich, and possibly Detective Barber early on

3    in the investigation.  *Id.* at 208-209.  She does not believe she communicated with witnesses

4    in this case by email.  *Id.* at 210.

5            Counsel turned to text messages that he believes are pertinent to this case.  *Id.* at

6    211.  Detective Frieberg wrote a text message that said that law enforcement was called

7    out on a drive-by and two Fourth Avenue Crips were detained.  *Id.*  The text goes on to

8    say: "It wasn't until the last interview of the night we found out the suspects were Mike

9    and Sammy.  They were in Mike's car.  We couldn't find the car last night.  We have an

10   ATL out for the car.  I will let Paul know if the car or they are located this weekend."  *Id.*

11   at 211-212.   Detective Frieberg agreed this text message pertains to the investigation of

12   Michael Williams and Samuel Rakestraw.  *Id.* at 212.  When asked if the message "has

13   details that are pertinent for everyone to know," Detective Frieberg testified: "Not

14   necessarily.  It would be documented in a report."  *Id.*

15           Detective Frieberg deletes case-related text messages.  *Id.* at 215.  At the time of the

16   text message discussed above, she did not have a work cell phone.  *Id.*  She set up her

17   phone in a manner where text messages would be automatically deleted after a period of

18   time.  *Id.*  But she cannot recall how her phone was set up because "[t]his was seven years

19   ago."  *Id.*

20           **4.**      **Redirect Examination by Government Counsel:**

21           If a witness contacted Detective Frieberg by email with important information, she

22   would print the email and scan that document into a TPD evidence database.  *Id.* at 219-

23   220.   Consistent with TPD practice, any email that had important information about a case

24   would either be documented in a report or saved before the email was automatically

25   deleted.  *Id.* at 220.   As a result, the text message discussed on cross-examination would

26   have been memorialized in a report.  *Id.* at 221.

27           Testimony turned to the slang terms used by WHB members.  *Id.*  Detective Frieberg

28   was immersed in the WHB investigation for several years.  *Id.* at 222.     She feels

comfortable interpreting slang terms used by WHB members because she spent so much time talking to WHB members, listening to audio, and reading text messages. *Id.* She has heard the slang terms that she previously testified about numerous times during her investigation. *Id.* at 223.   For example, an extraction of defendant Moore's phone revealed that he sent a picture of a shirt that says "Yabba killer" on the sleeves. *Id.* at 224.  A search of Michael Williams' phone showed a message where the sender referred to Williams as "damu." *Id.* Moore also calls someone "damu" in a text message. *Id.* at 225.  Someone refers to Moore as soldier, which is spelled phonetically as "s-o-u-l-j-a-h." *Id.* The term "relatives" is used many times during phone calls between Labarr Martinez and Jermaine Maxwell. *Id.* at 226.   The word "lurking" is used by Moore in a recorded conversation with Rochelle Valadez. *Id.* at 227.  The word "OG" is used many times by many WHB members. *Id.* at 229.  A contact is saved in Moore's phone named "OG Trig." *Id.*   There are references to "OG" in interviews. *Id.* at 230.   In a jail call, Labarr Martinez uses the terms "big homie" and "little homies." *Id.* at 231-232.  Maxwell also refers to "little homies." *Id.* at 233.   Sherman Shields and Shawmaine Moore are referred to as "little homies" by other WHB members. *Id.* at 234.   The word "burner" is used in communications involving Michael Williams. *Id.* at 235.  People ask Williams on Facebook if he had any burners; in response, Williams sends pictures of firearms. *Id.* Williams asks someone if anybody is trying to sell a burner. *Id.* The word "soldier" is tattooed on David Williams. *Id.* at 236.   Facebook records show a comment on the death of Mar-K: "another real soldier taken too soon[.]" *Id.* at 237.

Testimony turned to rivalry between the WHB and the Freestones. *Id.* Detective Frieberg again testified that she responded to several cases where these two gangs were involved:   the Floyd Davis homicide, the Marshall Davis homicide, and the Mar-K homicide. *Id.* There were multiple ways that she knew both gangs were involved in those homicides; for example, "clothing indicia" and statements and social media posts "with regard to the defendants in this case as to who they believe killed Mar-K[.]" *Id.* at 237-238. The homicides of K.G. and Raymond Symonette also involved these two gangs. *Id.* at 238.

Detective Frieberg testified that the animosity between these gangs is still ongoing.  *Id.* at 238-239.   There were statements made in 2021 by "the defendants or the co-conspirators in this case . . . about going to get or going to hurt Freestones[.]" *Id.* at 239.

Bernard Rayford has also described "why this beef [] started" and provided background on the Marcus Darton shooting.  *Id.* at 240.   David Williams told Rayford that "they killed my big homie," which is Marcus Darton.  *Id.* Rayford stated that the WHB's intention was to get payback for the murder of Darton.  *Id.* at 241.   Rayford also said that David Williams told him that the WHB will kill Freestones when they see them.  *Id.* at 241-242.  Rakestraw told Rayford that he's "Hills forever."  *Id.* at 242.  Rayford said that WHB is still after the Freestones.  *Id.* at 244.

Detective Frieberg recalls defense counsel asking her about Dilyou's Facebook posts regarding a fight at the Pima County Fair and suggesting that the fight may have been about saying something about someone's dead son.  12/2/22 Tr. at 5.  This post is not the only thing that supports Detective Frieberg's opinion that there was a rivalry between the WHB and the Freestones.   *Id.* She also bases her opinion on interviews, the constant retaliatory shootings back and forth, and the T-shirts that say "Yabba killer." *Id.* at 6.

The Facebook posts between Borges and Dilyou encompassed more than just the fight and talking about someone's dead son.  *Id.* at 8.  There is also a mention that the fight occurred because Dilyou is a "snitch."  *Id.* at 9.   Specifically, Borges calls Dilyou a "snitch." *Id.* The posts also mention "gangsta beefs." *Id.* at 10.  These posts are evidence that Detective Frieberg relied on for concluding that there is a rivalry between gangs.  *Id.*

Detective Frieberg was aware that there was a group of men known as the Young Wreckin Krew that existed before "the current one the involves the defendants in this case" are in.  *Id.* The previous Young Wreckin Krew was associated to the WHB.  *Id.* There is a YouTube video that shows this previous group rapping, dressed in red, and near the Western Hills sign.  *Id.* Detective Frieberg is familiar with some of the members of the previous group, but "[i]t was a generation before [her] time in gangs."  *Id.* at 11.  She believes that either a half-brother or step-brother of David and Michael Williams was in

the previous group, as well as an individual "who goes by J. Smash." *Id.* Shortly after Floyd Davis was killed, Shawmaine sent a text message (apparently while in prison) to someone that said "Tell J. Smash we winning." *Id.* at 12-13. Detective Frieberg interpreted the message as "another retaliatory statement." *Id.* at 13.

Testimony turned back to the certain words and phrases used by WHB members. *Id.* Detective Frieberg's opinions of what those words and phrases mean is based on her "being involved in gang investigations, in particular this Western Hills case, which has been going on for years and years[.]" *Id.* Specifically, she has "reviewed so much social media, done so many interviews, [and] listened to phone calls[.]" *Id.* She learned what the words and phrases mean "based on the content and context of those conversations[.]" *Id.*

For example, Detective Frieberg's opinion is that the phrase "green light" is specific to the WHB and means "someone of a higher authority than them has given someone below them an order to go do something, typically . . . a violent act." *Id.* at 13-14. And in this case the violent act is retaliatory in nature. *Id.* at 14. The higher ranking gang members "have put their work in" and "gained the respect of the gang," so they are "the ones that organize the gang." *Id.* The younger gang members "are willing to commit violent acts against those who disrespect their gang so they can someday be someone" of higher authority. *Id.* The orders given to "soldiers," who are the lower ranking gang members, is consistent among street gangs generally and the WHB. *Id.* at 21-22. With respect to the hierarchy of a gang, Detective Frieberg testified that street gangs are "loosely structured." *Id.* at 22. She explained that unlike a motorcycle gang that has "more of a formal hierarchy where they have a president" and a treasurer, street gangs do not "necessarily have that formal structure but they do have an OG, a big homie" that the soldiers report to. *Id.* at 22-23. There can be consequences if an order is not followed; however, there is no evidence in this case that an order was not followed. *Id.* at 23-25.

Again, Detective Frieberg bases her opinions on the totality of the information that she has been privy to during this investigation; for example, interviews and her review of social media posts, text messages, and phone calls. *Id.* at 15. Also, the rap video supports

her interpretation of "green light" because the Marcus Darton shirt is shown and they rap "about big homie giving a green light and they're all going to go[.]" *Id.* at 20.   The same is true with the Facebook photo of WHB members wearing "the Raymond Symonette memorial shirts" which was posted shortly after a Freestone member killed Symonette.  *Id.* Detective Frieberg testified that there was retaliation but she cannot say "if it was specific to the Raymond Symonette" murder.  *Id.*  But, based on her experience, she would expect there to be retaliation for that murder.  *Id.* at 21.

## DISCUSSION

As mentioned earlier, the government argues that Detective Frieberg's testimony will include lay opinions which are proper based on her experience in this lengthy investigation.   Alternatively, the government argues that if the Court determines that her testimony involves expert opinions, then she is qualified to provide those opinions and the opinions are relevant and reliable.  The defense argues that the proffered opinions amount to expert testimony that Detective Frieberg is not qualified to provide, and even if she were, the opinions are not reliable.  As such, the defense argues that Detective Frieberg only be permitted to provide lay opinions, which are limited under Federal Rule of Evidence 701 to her perceptions, during her testimony at trial.

The primary difficulty in resolving the instant motion is determining which of the proffered opinions are expert testimony and which are lay testimony.  And the parties have not helped in that regard.   At oral argument, the Court asked counsel to provide an example of Detective Frieberg's lay opinion as opposed to her expert opinion.  Neither counsel did so.

The Court notes that Detective Frieberg's testimony at the evidentiary hearing about how gangs operate generally – *e.g*., indicia of gang membership, hierarchy, slang, code words, etc. – is clearly expert testimony because that testimony is based on her training and experience with gangs and is not specific to the WHB.   But the government's proffered opinions do not relate to gangs generally, but rather, are specific to the WHB and hinge on Detective Frieberg's involvement in this investigation.   As a result, the line between

1   Detective Frieberg's lay and expert opinions is blurred.   The Court will do its best to bring

2   clarity to that issue after setting forth the relevant rules of evidence and pertinent case law

3   regarding lay and expert testimony.

4           **A.**    **The Law.**

5         Federal Rule of Evidence 701 provides that "[i]f a witness is not testifying as an

6   expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on

7   the witness's perception; (b) helpful to clearly understanding the witness's testimony or to

8   determining a fact in issue; and (c) not based on scientific, technical, or other specialized

9   knowledge within the scope of Rule 702.   "[L]ay opinion testimony is admissible only if

10  the government lays a foundation indicating that the opinion [is] 'rationally based on the

11  witness's perception.'"   *United States v. Holguin*, 51 F.4th at 865 (quoting *United States v.*

12  *Rodriguez*, 971 F.3d 1005, 1019 (9th Cir. 2020)).

13        Federal Rule of Evidence 702 allows "a witness qualified as an expert by

14  knowledge, skill, experience, training, or education" to provide opinion testimony

15  regarding scientific, technical, or other specialized subject matters if: "the testimony is

16  based on sufficient facts or data; the testimony is the product of reliable principles and

17  methods; and the expert has reliably applied the principles and methods to the facts of the

18  case."   The Ninth Circuit has held that the "admissibility of expert opinion testimony

19  generally turns on the following preliminary question of law determinations" by the trial

20  judge: (1) whether the expert has appropriate qualifications – *i.e.,* some special knowledge,

21  skill, experience, training, or education on that subject matter; (2) whether the opinion is

22  based on scientific, technical, or other specialized knowledge; (3) whether the testimony is

23  relevant and reliable; (4) whether the expert's opinion would assist the trier of fact in

24  understanding the evidence or determining a fact in issue; and (5) whether the probative

25  value of the expert testimony is substantially outweighed by the risk of unfair prejudice,

26  confusion of issues, or undue consumption of time.   *United States v. Hankey*, 203 F.3d

27  1160, 1168 (9th Cir. 2000).

28        The Ninth Circuit has "described several dangers with a witness testifying in both

lay and expert ('dual-role') capacities." *Holguin*, 51 F.4th at 862.  Specifically, an "agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and relay on hearsay." *Id.* (quoting *Vera*, 770 F.3d at 1242).  As a result, a district court should "clearly separate [a] case agent's testimony between lay observations and expert testimony." *Rodriguez*, 971 F.3d at 1019.   The "demarcation of when officers are testifying in their lay or expert roles makes it easier to determine whether and how that testimony is supported by the proper foundation." *Id.* "The dangers of dual-role testimony can also be mitigated by separating testimony into lay and expert phases, requiring specific foundation testimony, and preventing witnesses from engaging in speculation, conveying hearsay, or interpreting clear statements." *Holguin*, 51 F.4th at 862.

The Ninth Circuit's recent opinions in *Rodriguez* and *Holguin*, which address dual-role testimony about gangs, are relevant to the case at hand.  In *Rodriguez*, the Ninth Circuit found that "[t]he district court appeared to misapprehend the parameters of expert testimony in the gang expert context, assuming that the officers' general qualifications sufficed to support the full range of opinion testimony they might give." 971 F.3d at 1018. Specifically, the court explained that "to provide interpretive testimony concerning terms or phrases without fixed meanings, 'an officer's qualifications, including his experience with [gang] investigations and intercepted communications, are relevant but not alone sufficient to satisfy Federal Rule of Evidence 702.'" *Id.* (quoting *Vera*, 770 F.3d at 1241. Rule 702 requires a district court "to assure that an expert's methods for interpreting the new terminology are both reliable and adequately explained." *Id.* The court concluded that some of the expert opinions about the structure and operation of the gang and "the meanings of terms with fixed meanings like 'taxes,' 'green lights' or 'hard candy lists'" passed muster under Rule 702.

> But when the officers began to opine about uncommon terms or phrases that they encountered for the first time in this investigation, the basis for their expert testimony in numerous instances grew thin.  And when this occurred,

the officers generally did not offer an explanation for how they arrived at their interpretations, nor did the court require them to provide one. At times when the officers did provide an explanation, some of those explanations failed to evince indicia of reliability or methodological rigor.

*Id.* at 1018-1019.

The court noted that some of the proffered expert testimony was appropriate for admission as lay opinion testimony based on the officers' firsthand experience with the investigation. "But because the district court did not view any of the officers' interpretive testimony as lay opinion testimony, it did not require the officers to establish the requisite foundation." *Id.* at 1019. As a result, the court held that the district court erred in treating "all the officers' interpretive testimony as expert opinion, irrespective of the specific foundation for any individual interpretive statement." *Id.* at 1019.

In *Holguin*, the court concluded that the dual-role testimony was proper because of the safeguards employed by the district court. First, the district court instructed the jury on dual-role testimony both before the officer testified and at the end of the case. Second, the district court bifurcated the officer's testimony "into percipient and expert phases." This separation was reinforced by the government signaling of when each phase began. Third, "the district court required the government to specify whether each question was directed at [the officer's] training and experience or his participation in the investigation." Specifically, the government began its questions with "'based on your training and experience'" or "'based on your participation in the investigation.'" *Id.*

The court then turned to whether there was adequate foundation for the expert and lay opinion testimony. With respect to the expert testimony of the officer, the court first noted that "[e]xperience alone is a reliable basis for the expert testimony regarding gang structure and activities as well as the meaning of familiar expressions." 51 F.4th at 856. The court found that the officer's testimony about the gang "was amply supported by and within the scope of his extensive investigative experience." *Id.* Specifically, the officer had "investigated hundreds of gang crimes, many involving [this gang], and he received information about the gang from contacts with members and associates, confidential

1   informants, crime victims, and other investigators." *Id.* As a result, the court concluded

2   that the officer could reliably use his own extensive experience investigating gang crimes

3   to form conclusions about how the gang operated and "to testify reliably about gang

4   terminology familiar from investigations."

5          The court also rejected the defendant's argument that the expert testimony violated

6   the Confrontation Clause because it relied on hearsay. *Id.* The court noted that under Rule

7   703 an expert may rely on hearsay if experts in the particular field would reasonably rely

8   on that kind of information in forming an opinion. The court held that when a "gang expert

9   'applied his training and experience to the sources before him and reached an independent

10  judgment,' without 'directly repeating what someone else told him,' his testimony about

11  gang operations does not offend the Confrontation Clause." *Id.* at 856.[3]

12         The court also rejected the defense argument that the expert "gave disguised

13  percipient testimony based on personal observations rather than objective principles." *Id.*

14  at 857. The court noted that Rule 703 allows an expert to base his opinions on facts or data

15  that he personally observed. The court reasoned that the gang expert testimony distilled

16  and synthesized what he personally observed, "making it 'an original product.'" *Id.*

17  (quoting *Vera*, 770 F.3d at 1239.) Finally, the court noted that "[e]ven if some of [the]

18  testimony could have been formulated as lay opinion, 'the line between lay and expert

19  opinion depends on the basis of the opinion, not its subject matter,'" and the expert testified

20  based on specialized knowledge. *Id.* (quoting *United States v. Barragan*, 871 F.3d 689,

21  704 (9th Cir. 2017)).

22         The court then addressed the defense argument that the officer's lay opinion

23  testimony was admitted without proper foundation. *Id.* at 864. The Ninth Circuit noted

24  that, in many instances, the offered lay opinions were based on the officer's "'participation

25  in the investigation' as a whole, not on any particular perceptions during that investigation."

26

27  [3] In the case at hand, there is a Confrontation Clause concern because, as discussed in text *infra*, in many instances Detective Frieberg's expert testimony consists of her merely

28  repeating what witnesses told her without adequately explaining how she used those statements along with her experience and/or other evidence to reach an independent judgment.

1    *Id.* at 865.  The lay opinion testimony at issue described roles played by individuals in the

2    gang, gang monikers used by the defendants and others, and the meaning of words and

3    phrases encountered in the investigation.  The court noted that "[a]ll of this can be the

4    proper subject of lay opinion testimony."   *Id.*   "However, lay opinion testimony is

5    admissible only if the government lays a foundation indicating that the opinion was

6    'rationally based on the witness's perception.'"  *Id.* (quoting Rule 701).  Thus, there must

7    be "some testimony about the investigative activities that could have supported a witness's

8    lay opinion."   *Id.*

9         The officer in *Holguin* testified that he "participated in searches, surveillance

10   operations, and arrests as part of the investigation resulting in the charges tried before the

11   jury.   In some cases, he mentioned that he learned certain information by reviewing

12   Facebook and prison correspondence by participants in the drug conspiracy, but he never

13   explained the scope of that review."   The court noted that for much of the lay opinion

14   testimony, "there was no discernable connection between [the officer's] investigative

15   activities and his conclusions."  *Id.*   As a result, the court concluded that "[w]ithout a

16   specific foundation, there was a serious risk that the jury filled in the gap by looking to the

17   basis that supported [the officer's] expert testimony – his extensive experience and training

18   as an officer – and presumed that basis would also support his lay opinion testimony.  That

19   risk is exactly why district courts should ensure that a dual-role witness lays an adequately

20   specific foundation."  *Id.* at 865-866.

21        **B.    Analysis.**

22        As discussed above, unlike in *Holguin* and *Rodriguez,* none of Detective Frieberg's

23   proffered opinions go to gang structure, organization, or operation generally.  Rather, each

24   opinion is specific to the WHB and are based on Detective Frieberg's lengthy involvement

25   in the investigation that led to the instant charges.   The Court will again set forth the

26   proffered opinions and then discuss whether there is proper foundation for lay opinion

27   testimony and/or expert opinion testimony. (Doc. 2084.)

28        (1)    The WHB is a Tucson-based criminal street gang that is also known as the

1   "Western Hills Posse Bloods," the "Western Hills Gangster Bloods," the "36th Street

2   Bloods," "The Hills," and the "Young Wreckin' Krew." *Id.* at 25.

3   (2)   In December 2018, there were 144 documented WHB gang members and

4   associates. *Id.*

5   (3)   The WHB had an ongoing rivalry with the Freestone Bloods and the 4th

6   Avenue Crips.

7   (4)   The meanings of the following code phrases and gang slang used by WHB

8   members: "Blood," "Damu," "relatives," "whoop," "Yabba," "lurking," "hills or the hills,"

9   "Young Wreckin' Krew," "hills in peace," "greenlight," "snitch or rat," "OG (Original

10  Gangsters)," "Big Homie," and "Little Homie." *Id.* at 26.

11  (5)   The WHB gang operates in a geographic boundary in the Western Hills

12  neighborhood. *Id.* at 27.

13  (6)   WHB members predominantly wear red, use unique hand signs, and have

14  tattoos which demonstrate their affiliation to the WHB. *Id.*

15  (7)   The WHB gang uses social media and rap videos to warn and threaten

16  members of rival gangs and people who provide information to the police. *Id.*   For

17  example, Detective Frieberg will interpret social media postings made by defendants

18  Borges and Michael Williams where they call K.D. a "rat" and posted pictures of grand

19  jury transcripts and police reports to prove that K.D. is a "rat." *Id.* at 27-28.

20  (8)   There was retaliatory violence between the WHB and the Freestones. *Id.*

21  For example, Detective Frieberg will interpret the ambiguous term "winning," which refers

22  to the power struggle between these two gangs. *Id.*   She will also interpret ambiguous

23  phrases in rap videos produced by the defendants, such as "green light" and "I do it for

24  Mar-K." *Id.*

25          **1.      Lay Opinions.**

26  The foundation for lay opinion testimony must be based on Detective Frieberg's

27  "particular perceptions" during the investigation, rather than her "participation in the

28  investigation" as a whole. *Holguin*, 51 F.4th at 865.   She "may not testify based on

- 42 -

speculation, rely on hearsay, or interpret unambiguous, clear statements." *Id.*   Here, the foundation for the lay opinions suffers from all of these defects.

The first opinion – that the WHB is a Tucson-based criminal street gang that goes by other names as well – is easily dealt with.  The Court finds that this opinion, whether lay or expert, is inadmissible because it invades the province of the jury.  The RICO charges require the government to prove that the WHB is a criminal enterprise.  Detective Frieberg's testimony that the WHB is a criminal street gang, which is essentially a synonym for enterprise, goes directly to that element.  Moreover, as discussed below for other proffered opinions, the foundation for this lay opinion is based on hearsay and other inadmissible evidence, which is not permitted for lay opinion testimony.  For these reasons, this lay opinion is improper and should be precluded at trial.

The second proffered opinion based solely on the eGMIC database – *i.e.*, in December 2018, there were 144 documented WHB gang members and associates – is no longer an issue.  *Id.*   During the *Daubert* hearing, the government represented that Detective Frieberg will not testify about the number of WHB members or rely on eGMIC for any of her opinions (whether lay or expert).  The Court notes that it would have found that there is not proper foundation for this lay opinion given how the eGMIC database operates, including the inclusion of hearsay statements.

The foundation for the remaining proffered lay opinions is deficient for the following reasons.  First, Detective Frieberg again relies on hearsay, such as witness interviews or statements, to form her opinions.  She specifically referred to interviews of Rodriguez, Rayford, Dilyou, and Monge, as part of the basis for her opinions.  And there were interviews of other people that she could not recall.  Relatedly, for some opinions she relies on eGMIC, which is also based on hearsay and is unreliable for that reason (and many others), even though government counsel has said that eGMIC will not be used as the foundation for any opinion.

Second, as in *Holguin*, for some opinions Detective Frieberg "learned certain information by reviewing Facebook" and jail calls, "but [s]he never explained the scope of

1   that review." *Holguin*, 51 F.4th at 865.  She only testified generally that she reviewed

2   hours of jail calls, phone downloads, and social media posts. She only pinpointed one or

3   two examples of jail calls, posts, and evidence obtained from phone downloads.  In fact, as

4   discussed more fully below, when asked by defense counsel the basis for her opinions,

5   Detective Frieberg repeatedly testified that it was based on "her lengthy investigation" or

6   "the totality of the investigation" and could not thoroughly detail all the evidence that she

7   relied upon to form an opinion.  To be sure, government counsel spoon-fed Detective

8   Frieberg examples of foundational facts on redirect examination.   However, those

9   examples were always followed by testimony that these were only a few of the facts that

10  Detective Frieberg relied upon to form her opinion.  Thus, defense counsel is still unsure

11  of all the foundational facts that form the basis for Detective Frieberg's opinions.

12      Third, some opinions are based on the rap video and songs which (at this point) are

13  inadmissible at trial, and therefore, cannot be used to support a lay opinion.  And even if

14  the rap music is admitted at trial, Detective Frieberg has no training or experience in

15  interpreting rap lyrics.   As such, her interpretation of rap lyrics is not a reliable basis for

16  any opinion.

17      Fourth, some opinions pertain to unambiguous or clear words or phrases that need

18  no further explanation.  For example, everyone knows what the words "winning" and "rat"

19  mean.   In fact, Detective Frieberg agreed that the jury does not need her to define those

20  common terms.

21      Fifth, some opinions are based on speculation.  For example, Detective Frieberg's

22  interpretation of the word "green light" and the phrase "I do this for Mar-K."  And, once

23  again, the interpretation of this term and phrase are based primarily on the rap lyrics which

24  are not admissible.   Detective Frieberg uses this one rap lyric about Mar-K (a nickname

25  for Marcus Darton) and a memorial shirt to conclude that these defendants and the WHB

26  generally were planning to retaliate against the Freestones for the murder of Darton. There

27  is no doubt that Detective Frieberg believes that to be true, but that conclusion is a big leap

28  based solely on this lyric and a T-shirt.   Similarly, it is a big leap to conclude that "green

light" means a big homie in the WHB authorized the commission of a violent act against rivals. In fact, Detective Frieberg agreed that the common definition of "green light" means to authorize or give the go-ahead to do something, and that "something" does not always mean a violent act. Additionally, it is speculative to conclude that one Facebook conversation between Borges, Dilyou, and Rakestraw where Dilyou is called a "rat" means that the WHB threatens rivals with violence. That is especially true when this one conversation is juxtaposed with the massive amount of disclosure in this case.

For the reasons discussed above, the Court concludes that Detective Frieberg's lay opinions are not supported by proper foundation. As such, it is recommended that she be precluded from testifying about the proffered opinions as a lay witness.[4]

## 2.   Expert Opinions.

The Court turns to the government's alternative argument that the proffered opinions are the proper subject of expert witness testimony. As discussed below, Agent Frieberg is qualified to testify as a gang expert. However, Detective Frieberg's opinions are not reliable because she could not sufficiently articulate the principles and methods that she used to form her opinions.

"Law enforcement professionals are routinely qualified to offer expert testimony based on their training and experience." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022). As a result, if a law enforcement officer has extensive experience with gang and drug investigations, then his/her expert testimony about gang members and drug dealers involves "specialized knowledge" beyond the common knowledge of jurors.

---

[4] The Court notes that Detective Frieberg is certainly going to be permitted to testify about the many facts that she learned during her investigation; for example, identifying the hand signs (*e.g.*, the 3-6 and B) and tattoos depicted in photographs. She will also be able to testify that she saw these hand signs and tattoos many times during her investigation. But, again, she did not connect the dots on how these facts support her proffered opinions. The Court also notes that based on Detective Frieberg's factual testimony at trial, there may be lay opinions that have sufficient foundation, but which were not set forth in the government's Notice. The Court leaves it to the District Court to determine whether those lay opinions should have been included in the government's Notice, or if the Notice only needed to detail the proffered expert opinions.

*Holguin*, 51 F.4th at 854.

The defense argues that Detective Frieberg is not qualified to testify as a gang expert because she has never testified as a gang expert at trial or even at a *Daubert* hearing regarding her gang expertise.  Those facts alone do not control the analysis of whether Detective Frieberg has the requisite qualifications to testify as a gang expert.  Indeed, that is a circular argument because, if true, it would mean that there would never be expert testimony.   Stated another way, there's a first time for everything.

The Court finds that Detective Frieberg is qualified to testify as a gang expert based on her training and experience.  She has attended many trainings on street gangs over the course of ten years and has been working on gang investigations and cases for basically her whole career.  She has worked on hundreds of cases involving gangs and was the lead detective on dozens of those cases.  She has conducted hundreds of interviews of gang members and associates, reviewed dozens of downloads of gang members' phones and social media postings, and listened to dozens of jail calls involving gang members.  Thus, there is no doubt that Detective Frieberg has the requisite qualifications to testify as a gang expert and that her testimony would assist the trier of fact because the operation of a street gang is beyond the common knowledge of jurors.

However, "reliability is an entirely separate question.   A district court must distinguish an expert's *qualifications* from the *reliability* of the expert's principles and methods." *Id.* (emphasis in original).  While there is inevitably some overlap, "they remain distinct concepts and the courts must take care not to conflate them."   *Id.* The reliability of an expert's testimony is an inquiry that focuses not on what the expert says or his/her qualifications, but rather "what basis they have for saying it."   *Id.* (internal citations omitted).

> For some experts, the relevant reliability concerns may focus on personal knowledge or experience.   In such cases, the inquiry may cover whether the expert's experience supports the expert's conclusions; whether the expert's reasoning is circular, speculative, or otherwise flawed; or whether the expert's reasoning is adequately explained.

*Id.* at 855.

The Court has concerns about the reliability of Detective Frieberg's principles and methods used to form the basis for her expert opinions for several reasons. As discussed earlier, some opinions are based on speculation – *e.g.*, her interpretations of "green light," "I do it for Mar-K," and the Facebook comment that Dilyou is a "rat." And other opinions amount to Detective Frieberg merely repeating what a witness told law enforcement, rather than her reaching an independent judgment based on all the information available to her, which presents a Confrontation Clause problem. *See Holguin*, 51 F.4th at 856; *United States v. Vera*, 770 F.2d 1232, 1239 (9th Cir. 2014) (Confrontation Clause was not violated when expert was not directly repeating what others had told him, but rather distilled and synthesized what he had learned through his experience).

Additionally, as in *Rodriguez*, when Detective Frieberg opined on uncommon terms or phrases that she encountered for the first time in this investigation, the basis for her expert testimony was thin. She did not provide an adequate explanation for how she arrived at many of her interpretations. When she did provide an explanation, it failed to evince indicia of reliability or methodological rigor. For example, Detective Frieberg defined the following uncommon words and phrases: "Young Wreckin Krew," "yabba," "damu," "whoop," "Tre Six," "Homie in Paradise," and "HIP." Detective Frieberg repeatedly testified that these words and phrases came up numerous times in her investigation and often pointed to specific examples. But, in each instance, the explanation for her interpretation was the substantial amount of time that she spent on talking to WHB members, listening to audio, and reading text messages. 10/26/22 Tr. at 22. That general and vague explanation is not sufficient to establish that her interpretations of these words and phrases are reliable.

Relatedly, Detective Frieberg repeatedly testified that the totality of her lengthy investigation was the basis for her other opinions. But, again, she was light on specifics. For example, she testified that her opinion that an OG of the WHB gives the orders to lower-ranking gang members is based on interviews, social media, rap lyrics, and

experience in dealing with gangs.  10/26/22 Tr. at 81.  When asked to point to a specific interview where someone told her there is an OG of the WHB, she testified: "Not in those exact words but the way [WHB members] refer to each other as OG."  *Id.*  She added that her "opinion derives from an accumulation of interviews" and review of social media postings.  *Id.* at 82.  Similarly, she testified that her opinion that "green light" means go to carry out a violent act is based on the context of her investigation.  *Id.* at 89.  She testified that "jail calls" were the basis for her opinion about the meaning of "little homies."  *Id.* at 108.  When asked to identify a specific jail call, she testified: "I want to say it was Labarr Martinez was involved in the phone calls[.]" *Id.* at 109.  She could not recall any other jail calls among the hours of calls that she reviewed.  *Id.* at 110.  When asked the basis for her opinion about the retaliatory violent crimes involving the WHB and the Freestones, Detective Frieberg testified: "through following evidence, through witness statements, through the back and forth violent crimes amongst these two groups."  *Id.* at 134.   As to the basis for the opinion that the phrase in the rap song, "I do it for Mar-K," means retaliating for his death, Detective Frieberg testified that "there's not one thing that points to it, you have to look at the totality of everything" – *e.g.*, investigations of dozens of crimes involving the WHB, the Marcus Darton homicide investigation, hours of listening to jail calls and recordings of defendants, and review of social media posts and downloads of defendants' phones.  *Id.* at 151.

As mentioned earlier, government counsel pointed Detective Frieberg to some examples of evidence that led her to her opinions.  However, once again, she always testified that these were only a few examples of the evidence developed during the investigation that she used to form her opinions.   But she did not pinpoint the other examples.

Defense counsel tried mightily (and the Court to a lesser extent) to get Detective Frieberg to detail all the evidence that she relied on to form an opinion.  But her response was always that she could not be expected to remember every piece of evidence in this years-long investigation.  For example, when asked to identify one individual who said that

the WHB has an OG, she testified that: "I've done hundreds of interviews, I can't give you one." *Id.* at 81.   Relatedly, when asked to identify a social media post where someone refers to an OG of the WHB, she testified: "I've reviewed hundreds and hundreds of documents.  It's hard to pinpoint one example." *Id.* at 82.   She added that: "I can't reference every statement I make." *Id.*  When asked to provide examples of crimes that form the basis for her opinion that there was an ongoing rivalry between the WHB and the Freestones, she testified that she has "interviewed several people" in this case which has gone on for several years and "it's hard for [her] to do that because . . . so many people have been interviewed[.]" *Id.* at 95-96.

Defense counsel made a last-ditch attempt to get Detective Frieberg to thoroughly detail the evidence that she relied on to form her opinions.  Counsel explained to Detective Frieberg that it is difficult for him to figure out the reliability of her opinions if she cannot point to specific evidence, such as interviews, that support her opinions.  *Id.* at 130. Detective Frieberg testified: "I've interviewed so many people, I can't direct you to a source." *Id.*  Detective Frieberg added that counsel has been provided with the interviews done on this case and other evidence, so counsel can "review[] the same social media, the same statements that are involved in this case." *Id.* at 130-131. In essence, Detective Frieberg improperly shifted the burden to defense counsel to figure out the basis for her opinions by combing through the massive amount of disclosure involved in this case.

The problem with Detective Frieberg's inability to detail the evidence (or at least all the evidence) that she relied on to form her opinions is that the *Daubert* hearing, not the trial, was the time when she needed to articulate every piece of evidence that she used to form the basis of each opinion.  That detail was required so the defense could assess and/or challenge the basis for the opinion, and so the Court could determine whether the opinion had the requisite foundation and was therefore reliable.  The fact that this was a big investigation with lots of interviews, jail calls, social media posts, and phone downloads, is not an excuse for the lack of specificity.  To the contrary, the large amount of disclosure in this case makes it even more important for Detective Frieberg to be precise about what

1    evidence led to her opinions.

2         The government relies heavily on *United States v. Hankey*, 203 F.3d 1160 (9th Cir.

3    2000) to support its argument that Detective Frieberg's extensive experience with street

4    gangs generally and the WHB specifically is proper foundation for her expert opinions.

5    However, *Hankey* is distinguishable from the case at hand because the expert "was

6    repeatedly asked the basis for his opinions and fully articulated the basis, demonstrating

7    that the information upon which he relied [was] the type normally obtained in his day-to-

8    day police activity."  203 F.3d at 1170.  In the case at hand, defense counsel not only

9    repeatedly asked Detective Frieberg for the basis for her opinions, they begged and pleaded

10   with her to provide that information.  However, unlike the expert in *Hankey*, she was unable

11   to articulate the basis for her opinions, other than in the most general and vague way – *e.g.*,

12   "the totality of everything," an "accumulation" of the evidence, "following the evidence,"

13   and/or her lengthy investigation.   In fact, the importance of specifically articulating the

14   basis for an expert opinion is demonstrated in *Hankey*.  There, the district court allowed

15   the expert to testify that two defendants were gang members but refused to allow the expert

16   to testify about another defendant's gang membership because the expert had not seen that

17   defendant in several years. *Id*. at 1169.  The Ninth Circuit concluded that "it was difficult

18   to imagine that the [district] court could have been more diligent in assessing relevance

19   and reliability" of the expert testimony.  *Id*.

20        Here, it would be patently unfair for the Court to allow Detective Frieberg to provide

21   expert opinions on matters highly specific to the WHB given her failure to specifically

22   articulate the basis for her opinions.  Detective Frieberg would be filling in the gaps of the

23   government's case by rendering expert opinions that are not based on proper principles and

24   methods.  In fact, Detective Frieberg's expert testimony would essentially amount to her

25   saying to the jury: "You can trust me, I investigated the WHB and these defendants for a

26   long time."   And cross-examination at trial regarding the foundation for Detective

27   Frieberg's opinions is not going to blunt the impact of her expert testimony.  For example,

28   if Detective Frieberg testifies (as she did at the evidentiary hearing) that the basis of an

opinion is the totality of the investigation, the jury is not going to understand that the reliability of her opinion may be suspect because she does not detail the specific evidence that supported her opinion.  To the contrary, the jury would more likely view defense counsel as being nitpicky in asking for specifics from this expert witness who has spent the past seven-plus years of her career on this case.

For the reasons discussed above, the Court finds that the government has not established that the principles and methods used by Detective Frieberg to form her expert opinions are reliable.   For that reason, it is recommended that the District Court preclude Detective Frieberg's expert witness testimony on the proffered opinions.

### 3.        Dual-Role Testimony.

The Court notes that it would have been prudent and far safer for the government to notice a "blind" or "cold" gang expert witness, like it did for the drug trafficking expert, to educate the jury about street gangs.  Assuming the expert had the requisite qualifications and the principles and methods used to form opinions were reliable, that expert clearly would have been permitted to testify because the operation of street gangs is beyond the knowledge of a common juror.   A "blind" or "cold" expert would have testified about street gangs generally, in terms of their operation, hierarchy, hand signs, tattoos, clothing colors, slang and coded language, and the code of silence.  The government could have easily tied these general subject areas to the specific evidence admitted at trial – *e.g.*, percipient witness testimony, text messages, Facebook posts, evidence recovered from phone downloads, and pictures of the defendants' tattoos, wearing red clothing, and making hand signs – to support its argument that the WHB has all the hallmarks of a criminal street gang.

At oral argument, the Court asked government counsel why a "blind" expert was not noticed.  12/2/22 Tr. at 90.  Government counsel responded that she originally noticed both Detective Frieberg and Detective Johnson (who is a retired), but "we were up against a deadline." *Id.*  Counsel explained that she "continually asked [Johnson] for a contract so that we could nail him down with the office and I simply never got one." *Id.* at 91.  Given

1   the deadlines, counsel did not think that the district court "would be particularly receptive"
2   to the government noticing a new expert; as a result, the government "decided to go with
3   just an expert that was part of the case." *Id*.

4       The Court appreciates government counsel's candor.   However, the Court is
5   surprised that the government's decision was not strategic, but rather the result of
6   scrambling to meet deadlines in a case that has been pending for four and a half years, and
7   to a large extent, hinges on the government proving that the defendants were in a violent
8   street gang.   That said, we are where we are.

9       As discussed in detail above, there is certainly a significant risk that the jury will fill
10   in the gaps by looking to the basis that supports Detective Frieberg's expert testimony –
11   her training and experience – and presume that basis will also support her lay witness
12   testimony.  Relatedly, as discussed earlier, Detective Frieberg's status as an expert could
13   lend her unmerited credibility when testifying as a percipient witness.  Additionally, cross-
14   examination may be inhibited, jurors could be confused, and she may be more likely to
15   stray from reliable methodology and rely on hearsay.

16       All that said, if the district court disagrees with this Court and allows Detective
17   Frieberg to provide dual-role testimony, *Holguin* and *Rodriguez* make clear that the court
18   "must 'engage[] in vigilant gatekeeping' to ensure that 'jurors are aware of the witness's
19   dual roles.'"  *Holguin*, 51 F.4th at 862.   For what it's worth, this Court is concerned about
20   whether there are sufficient safeguards that the district court can employ to ensure that the
21   jury understands dual-role testimony.  From a practical perspective, and with all due respect
22   to the Ninth Circuit, dual-role witness jury instructions before Detective Frieberg's
23   testimony and at the end of the case, bifurcation of her testimony into percipient and expert
24   phases, and having the government specify if her testimony is "based on her experience"
25   or "based on her participation in the investigation," are not likely going to alleviate the
26   risks created by her dual-role witness testimony.  In this Court's view, it is not reasonable
27   to expect the jury to be able to compartmentalize Detective Frieberg's sweeping expert
28   opinions regarding the WHB and her lay witness testimony.  Again, the district court may

1   well disagree or have ideas for additional safeguards.

2   **CONCLUSION**

3       For the reasons discussed above, the Court concludes that the government has not

4 established the proper foundation for Detective Frieberg to provide lay or expert opinion

5 testimony on the proffered subject areas.    Accordingly, the Court recommends that the

6 District Court grant the instant motion and preclude testimony on the proffered opinions.

7       Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and

8 file written objections within 14 days of being served with a copy of this Report and

9 Recommendation. A party may respond to the other party's objections within fourteen

10 days. No reply brief shall be filed on objections unless leave is granted by the district court.

11 If any objections are filed, this action should be designated case number: **CR 18-01695-**

12 **TUC-JAS**.  Failure to timely file objections to any factual or legal determination of the

13 Magistrate Judge may be considered a waiver of a party's right to de novo consideration

14 of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en

15 banc).

16       Dated this 20th day of January, 2023.

17

18

19                   Eric J. Markovich
                  United States Magistrate Judge

20

21

22

23

24

25

26

27

28